Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2        FOR THE DISTRICT OF ALASKA AT ANCHORAGE
 3  _____
                                              )
 4  GREGORY JOHNSON and KIMBERLY              )
    JOHNSON, individually and                 )
 5  on behalf of their minor                  )
    children MADISON JOHNSON                  )
 6  and ALEXANDER JOHNSON,                    )
                                              )
 7                  Plaintiffs,               )
                                              )
 8       vs.                                  )
                                              )
 9  UNITED STATES OF AMERICA,                 )
                                              )
10                  Defendant.                )
                                              )
11  Case No. 3:06-CV-00120-RRB
12
13  _____
14        VIDEOTAPED DEPOSITION OF KERILEE KATONGAN
    _____
15
              Pages 1 - 111, inclusive
16
              Friday, April 20, 2007
17                  3:05 P.M.
18
19
20
              Taken by Counsel for Plaintiffs
21                        at
                    DILLON & FINDLEY
22          1049 West 5th Avenue, Suite 100
                    Anchorage, Alaska
23
24
25
```

EXHIBIT C
PAGE 1 of 4

Page 40

1  A. No.
2  Q. All right. Does it show the time they're
3  coming in?
4  A. Yes.
5  Q. And the date?
6  A. Yes.
7  Q. All right. And so -- and are those -- are
8  those printout -- are the printouts given to you the
9  day before the visit so you will know what your next
10  day is going to be like?
11  A. No. It's a day-to-day thing. Whoever
12  calls in needs an appointment. It's written. And
13  if there's none for that day, and they want to be
14  seen that day, then the call gets transferred to the
15  on-call health aide --
16  Q. All right.
17  A. -- because they don't see any patients.
18  They just work with the PA.
19  Q. Okay. So if I wanted to see, for the
20  months of May and June of 2004, which patients --
21  how many patients you saw in clinic, I would look in
22  that logbook, and it would tell me how many patients
23  you saw and the time that you saw them, correct?
24  A. I think so.
25  Q. All right. Is there any other

Page 41

1  documentation I could look at to see how many
2  patients that you saw over a period of time?
3  A. I think they do -- the clinical supervisor,
4  I'm guessing it's her. They have the -- they get
5  all the PEFs for that month, and they count the
6  number of patients, patient encounter forms you
7  have, and they write them -- write them down. And
8  then I think there's a separate category for
9  emergency or medevac, so that's how they keep track
10  of their medevacs and their emergencies.
11  Q. Don't they also do that for the Indian
12  Health Service funding so they can show patient
13  contacts, how many patient contacts came into the
14  clinic, or do you know?
15  A. I'm not too sure how that works.
16  Q. All right. But in terms of the supervisor
17  taking the patient contacts then, there is a
18  document or there is a -- there's a record kept of
19  how many patient contacts either you see or
20  Mr. Davalos sees or some other health care worker,
21  correct?
22  A. Yes.
23  Q. And that would include inpatient and
24  outpatient, right?
25  A. I'm not sure if it was only inpatient or if

Page 42

1  it included on call, too.
2  Q. Okay. All right. Well, sometimes
3  patients, though, even when it was 8:00 to 5:00
4  Monday through Friday, would need to be seen at
5  their home, right?
6  A. Yes.
7  Q. Was that regular or was that unusual?
8  A. First it was regular, but if they could
9  make it to the clinic and they just didn't want to
10  go there, because they didn't want to walk, then I
11  don't know.
12  Q. Okay. For patients that were injured
13  serious enough that they couldn't come to the clinic
14  physically, was that unusual or common?
15  A. It -- it depended. I don't know. You
16  didn't see much of that.
17  Q. Okay. Can you recall -- can you recall it
18  ever happening?
19  A. Elderly falling and can't get up.
20  Q. Apart from the elderly falling and not
21  getting up, did you -- do you recall that ever
22  happening?
23  A. Between the hours of 8:00 to 5:00?
24  Q. Yeah.
25  A. Yes. Sometimes we would have to go over to

Page 43

1  other people's homes. They absolutely refused to go
2  to the clinic, and they'd call up and be real ugly,
3  saying that they're going to call the cops or --
4  obviously, they'd be drinking.
5  And you never went to their home alone. You
6  took a police officer with you. And once it checked
7  out, that they were being fine, then you documented
8  it.
9  Q. Okay. Let me rephrase the question then
10  and add that to the -- to the question. Other than
11  people that were -- had been drinking and you had to
12  take a police officer along that were being --
13  refusing to come to the clinic, and the elderly that
14  fell and were injured, do you recall ever going to
15  someone's house, apart from those two categories of
16  patients, during regular clinic hours?
17  A. No.
18  Q. All right. Tell me what you recall about
19  the first time that you talked to Kimberly Johnson
20  on May 22nd, 2004 about Greg.
21  A. She said that he had back pain, and he was
22  supposed to travel. His back pain was worse, and
23  she was wondering if someone could go and take a
24  look, or examine him.
25  Q. Anything else you recall about that call?

13 (Pages 40 to 43)

Page 44

1  A. No, I don't think so.
2  Q. All right. Did you go?
3  A. Yes.
4  Q. And do you recall what time you went?
5  A. It was early, 7:00, 7:30.
6  Q. Did it get you out of bed, the call?
7  A. Yes.
8  Q. All right. And had you been out late the
9  night before?
10 A. I'm not too sure. I don't think so.
11 Q. All right. Did it -- did the call actually
12 wake you up?
13 A. Yes.
14 Q. And so you had to wake up and get dressed
15 and go to the house?
16 A. Yes.
17 Q. And tell me what you recall when you got
18 there.
19 A. Greg was in his bedroom. I'm not sure if
20 he was sitting up or if he was lying on his side.
21 Their daughter was in the living room playing, and
22 Kim was home. I think that was it.
23 Q. Okay. Did you actually physically -- do
24 you recall where the bedroom was in the house?
25 A. You went into the door, and once you went

Page 45

1  in, you were facing a -- a wall kind of at the end,
2  I guess. And it was to the left.
3  Q. Okay.
4  A. And like another left.
5  Q. A left and a left?
6  A. A left and then another left. I don't know
7  if there was a door before his bedroom or not. That
8  was the first time I have ever been in that house.
9  Q. Okay. When you went to see Mr. Johnson,
10 did you physically examine him?
11 A. Yes.
12 Q. What did you -- what -- how did you examine
13 him? What did you check on?
14 A. I checked his lower back. I pushed on it
15 for tenderness, and I checked his pulses and his
16 feet. And I checked for strength. I checked his
17 blood pressure and his temperature. I asked him a
18 few questions.
19 Q. Where did you -- how did you test his
20 strength?
21 A. His feet were probably propped like this,
22 his legs, then. I had him -- or I would put my
23 hands on one side, and I would have him pull, and I
24 would be pulling, to check to -- to see if both
25 sides were of equal strength. And --

Page 46

1  Q. Probably -- go ahead.
2  A. And then I would push on the bottom of his
3  feet. And I would have him push back to see if that
4  was equal.
5  Q. Why were you doing that?
6  A. Just to see if he had equal strength in
7  both his legs.
8  Q. What did that tell you, if he did or not?
9  A. If there wasn't equal strength, then there
10 probably was a problem.
11 Q. Did you write down what your findings were?
12 A. I think I did on a little scrap paper.
13 Q. All right. And did you chart that?
14 A. No. After I did the examination, I called
15 Dave, and I asked -- or I reported to him, because I
16 wasn't sure what -- what the diagnosis would be
17 other than acute back strain. And he -- I think he
18 went over, and I -- that might have been when I
19 turned the patient over to Dave.
20 Q. When -- when you say that you were -- his
21 feet were propped up, propped up against what?
22 A. He was just lying flat on his back.
23 Q. So what were -- what was his -- what were
24 his feet propped up against?
25 A. They weren't propped up against anything.

Page 47

1  They were just there like -- like he was holding
2  them up himself. He wasn't letting them fall to
3  relax or -- just to do the --
4  Q. And he -- and it's your testimony he was
5  lying flat on his back?
6  A. He might have been. I don't -- I'm not too
7  sure.
8  Q. Okay. Did -- did it come to pass that you
9  gave him an injection of any medication?
10 A. I gave him two shots that day.
11 Q. When did you give him the first shot?
12 A. I think -- well, it probably was around
13 8:00 or after 8:00.
14 Q. Let me stop you. So after you did your
15 examination and you recall writing something on a
16 piece of paper, did you immediately call Dave?
17 A. I called him to consult, because I didn't
18 know what the diagnosis would be other than acute
19 back sprain -- strain.
20 Q. Was it obvious to you that he was in severe
21 pain?
22 A. It was obvious he was in pain.
23 Q. Did you conclude that he was having severe
24 pain?
25 A. I knew he was in pain. I didn't know it

EXHIBIT C
PAGE 3 of 4

Page 64

1  Q. Did she have your cell phone number?
2  A. She had -- I think so, yes.
3  Q. Did she have Dave's cell phone number?
4  A. Dave didn't have a cell phone. We had home
5  phones. I had the satellite phone.
6  Q. All right. So you had the phone. If
7  someone was calling the clinic, they would have had
8  to call you?
9  A. Yes.
10 Q. So between Friday and Monday, they would
11 have had -- how would you have gotten ahold of Dave?
12 A. Calling him at home.
13 Q. So the only way that -- that Kim or -- or
14 Greg could have gotten ahold of Dave would be to
15 call him at home?
16 A. Yes.
17 Q. All right. Is his number in the phone
18 book?
19 A. I'm not too sure.
20 Q. Was your number in the phone book?
21 A. I don't think so. I was staying with my
22 boyfriend. I don't know.
23 Q. Okay. And the reason that you carry the
24 phone around with you is the on -- so that people --
25 other people that aren't on call won't be getting

Page 65

1  the calls, only the on-call person?
2  A. I carried the phone with me, because I
3  didn't like staying in a lot, and I would go out for
4  bike rides or for runs. And it was a way that I
5  could be out enjoying what I liked to do without
6  having to stay near the phone all the time --
7  Q. Okay.
8  A. -- or having the cops going to look for me
9  when --
10 Q. But if somebody was trying to get ahold of
11 you, I mean, to the clinic, and the on-call person,
12 they would call 911, and then dispatch would put the
13 call through to you. Is that how it worked?
14 A. No.
15 Q. How did they get ahold of you?
16 A. If they called 911 or the police station,
17 they would probably say they had an emergency. And
18 if they needed an health aide, then they would give
19 them the health aide's number, because they also had
20 an on-call schedule down there.
21 Q. So they would give the health aide's home
22 phone number or the satellite phone?
23 A. Probably the home phone. If you had the
24 satellite phone, you would call them up and tell
25 them that you would have it. But sometimes the

Page 66

1  battery would die. And if that wasn't working, then
2  they would give him the home phone.
3  Q. All right. Why would -- but -- but do you
4  recall specifically Ms. Johnson calling you
5  personally after the visit on the 22nd?
6  A. I don't remember.
7  Q. Okay. To the best of your recollection, do
8  you have any recollection of her calling you on
9  the -- after the 22nd?
10 A. I don't think so. I don't remember. I'm
11 not too sure.
12 Q. All right. And there -- and that's another
13 reason that you chart things in chart notes, because
14 here we are in 2007; it's hard to remember all
15 things specifically, correct?
16 A. Yes.
17 Q. But some of the things you do recall
18 specifically, right?
19 A. Yes.
20 Q. I mean you specifically recall that he was
21 in the bed, right?
22 A. Either sitting or laying down when I first
23 got there.
24 Q. And you specifically recall that he never
25 got up and went to the bathroom while you were there

Page 67

1  and Mr. Davalos was there?
2  A. I didn't see him get up and use the
3  bathroom.
4  Q. Well, you were in the room with Mr. Davalos
5  while he was doing the examination. You would have
6  seen him -- he's a big man -- had he gotten up and
7  gone to the bathroom, right?
8  A. Yes.
9  Q. All right. And gain, these are the kind of
10 things that you chart in terms of the patient's
11 mobility, that kind of thing, your observations.
12 Those are the kind of things that you actually put
13 in the objective part of the visit, correct?
14 A. Yes.
15 Q. And are you -- are you trained on the --
16 the method of putting objective, assessment,
17 symptoms, that kind of thing? Do they give you an
18 acronym to use?
19 A. SOAP.
20 Q. SOAP. They give you the SOAP acronym.
21 Symptoms, objective findings, assessment, and plan?
22 A. Yes.
23 Q. All right. And that's what you -- under
24 the SOAP method, you put -- symptoms, you put what
25 the -- the patient's complaining of, right?

EXHIBIT __C__
PAGE __4__ of __4__