Page 1

1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF ALASKA AT ANCHORAGE

3    ———————————————————————————

GREGORY JOHNSON and KIMBERLY        )
4    JOHNSON, individually and on        )
     behalf of their minor              )
5    children, MADISON JOHNSON and      )
     ALEXANDER JOHNSON,                 )
6                                       )
                Plaintiffs,             )
7                                       )
          vs.                           )
8                                       )
     UNITED STATES OF AMERICA,          )
9                                       )
                Defendant.              )
10   ———————————————————————————)
     Case No. 3:06-CV-00120-RRB

11

12

13   ———————————————————————————

     VIDEOTAPED DEPOSITION OF DAVID DAVALOS, PA-C
14   ———————————————————————————

15

                      Pages 1 - 183
16                Thursday, March 8, 2007
                      8:23 A.M.
17
             Taken by Counsel for Plaintiffs
18                        at
           Norton Sound Regional Hospital
19                   Nome, Alaska

20

21

22

23

24

25

EXHIBIT _E_
PAGE _1_ of _8_

Page 116
1  L4-L5, at least at that level. It could be lower, but
2  the seriousness of it, when you have the strength
3  going down, you probably have an extruded disc. And
4  that's the assumption, you know, that it just doesn't
5  happen with -- unless you get spinal shock from
6  trauma. But you probably have an extruded disc that's
7  putting pressure on that nerve.
8      Q   And by "that nerve," what nerve are you
9  referring to?
10     A   The nerve that affects the -- it's the
11 sciatic nerve. Remember, a sciatic nerve is like a
12 bundle, it's like a bundle of wires. And depending on
13 where you have -- you put pressure on it, is the
14 symptoms that you exhibit. If you have it at a
15 certain area or complete or a little bit or whatever,
16 you'll have some or all symptoms. So this was one
17 symptom that I picked up that was positive.
18     Q   Do I understand your testimony to be that the
19 decreased strength of dorsiflexion bilaterally was
20 indicative to you of an injury at the level of the
21 sciatic nerve?
22     A   Affecting the sciatic nerve.
23     Q   Both sides?
24     A   Yes, ma'am.
25     Q   Is it also accurate to say that you concluded

Page 117
1  from that, and your other examinations, that there was
2  likely a disc injury at L4-5?
3      A   Yes.
4      Q   Did you evaluate whether there was -- did any
5  of the evaluation you've just described indicate to
6  you - or evaluate, I should say - an injury above
7  L4-5?
8      A   You know, no. I would say no. At the time,
9  I'm not -- I don't remember what I -- what I do is, if
10 I find an injury that's -- once I see the injury, then
11 I realize you have to determine: can you take care of
12 the injury, yes or no. If you can't, what do you have
13 to do.
14     Well, the injury has to -- if you can't take
15 care of it, you have to send them somewhere where the
16 injury can be taken care of. We don't diagnose it out
17 there very often, we just identify the injury, and
18 it's up to whoever you send them to to definitively
19 treat it.
20     So all I had to do was identify that there's
21 an injury and that it's serious enough that they need
22 to go out. Or a lot of people with bad backs will
23 come in, and they can't walk, they can't stand up.
24 They're really miserable. And what you do is you put
25 them at bedrest for three days, and then you

Page 118
1  reevaluate them over the three days.
2      His injury was serious enough that we were
3  worried about it on the first days, because we'd
4  normally say, well, in three days, let's recheck you.
5  But his showed some changes and he was in a lot of
6  pain, so we checked him more than we do a normal
7  person that, you know, flared up a back.
8      So there's even policies, recommendations for
9  disc injuries. A lot of physicians, back physicians,
10 that know that there's a disc injury, will have
11 people -- they don't rush in and do surgeries on an
12 extruded disc, they want it to calm down so they can
13 let the injury establish itself, then they decide what
14 they're going to do.
15     So when you first see an injury that you're
16 concerned, and you think it's enough that you need to
17 let their doc know, then you're concerned about it.
18     Q   You used the term "extruded" disc. Are there
19 other terms that mean the same thing that are used to
20 describe that?
21     A   Ruptured disc, some people will use a term
22 like bulging disc. It depends on who you're talking
23 to. You talk to a spine specialist, an extruded disc
24 means where the contents of the disc actually leave
25 the body itself and extrude out, outward or inward,

Page 119
1  but it leaves the capsule that it's in.
2      Q   And it was your assumption on 5/22 that
3  that's what you were dealing with; is that accurate?
4      A   Yes.
5      MS. LINDQUIST:  Can we go off record?
6      VIDEOGRAPHER:  Off record, 11:50.
7      (Proceedings recessed for lunch.)
8      VIDEOGRAPHER:  We're on record at 12:42.
9  BY MS. LONG:
10     Q   Mr. Davalos, I want to go back to the
11 physical evaluation that you described earlier. And
12 you noted in your description of what you normally do
13 in a neurological evaluation in a situation with low
14 back pain such as Mr. Johnson's, that you do sensory
15 testing, including sharp -- and I forget the other
16 one.
17     A   Sharp and soft.
18     Q   Soft, okay. Let me ask you if there's
19 anywhere in this record that identifies the results of
20 a sensory evaluation such as that on 5/22/04.
21     A   The results of it?
22     Q   Yes.
23     A   Well, your sensitivity to soft and sharp
24 touch, it's decreased. The arrow down means decreased
25 sensitivity. That's the result of that test.

32 (Pages 116 to 119)

EXHIBIT _E_
PAGE _2_ of _8_

Page 128

1  you actually did reach, and who that person was and
2  where they were located.
3     A  It's just as is written there. You call that
4  number there, and whoever is covering answers the
5  phone, the answering service, and they tell you where
6  that doctor is at and who's covering for them and they
7  give you -- they connect you to whoever is covering.
8     Q  All right. So if I understand you, you
9  called Dr. Voke's office, his answering service told
10  you that Dr. Eule was covering for him; is that
11  correct?
12     A  Well, they said that Dr. Voke wasn't in for
13  some reason, that this group was covering, and for
14  that group was this physician.
15     Q  Was covering for that group?
16     A  Yes, ma'am.
17     Q  And you're not sure whether you talked to
18  Dr. Eule. Do you know who you talked to?
19     A  No.
20     Q  And was that person qualified to evaluate
21  Mr. Johnson's needs?
22     A  I explained what I had, and then they said
23  send him in, you know. And who was it? It was a
24  physician. Are they qualified to tell the needs? I
25  can't tell you. I don't know. I don't know their

Page 129

1  credentials.
2     Q  All right. You believe you spoke with a
3  physician?
4     A  Yes.
5     Q  And what makes you think that?
6     A  Usually you can't send in a patient. They
7  won't accept patients without you talking to the
8  physician that's going to pick them up when they come
9  in. You can't send a patient out for no reason at
10  all, without having responsibility, somebody's going
11  to take them on the other side. That's just a federal
12  law.
13     Q  What was your intention in terms of -- on
14  5/22, in terms of sending Mr. Johnson out?
15     A  What was my intention?
16     Q  Uh-huh.
17     A  In terms of what?
18     Q  Well, you indicated that you called, that you
19  can't send somebody out without having somebody at the
20  other end to receive them. And I want to know if you
21  had developed a plan as of 5/22/04 on sending
22  Mr. Johnson out.
23     A  On that day it was to send him out
24  commercial, if possible. And he didn't -- he asked
25  me, he said -- I just barely remember some of this

Page 130

1  stuff. So he asked if he had to go in that day,
2  and --
3     Q  I want you to stick, if you will, to 5/22. I
4  don't mean to interrupt, but I want you to stick to
5  5/22 because we have a record that we have to protect.
6     A  Yeah. It's the same.
7     Q  It's the same?
8     A  It's the same.
9     Q  All right. Thank you.
10        So on 5/22 you had a conversation with
11  Mr. Johnson --
12     A  That he should go in.
13        I'm sorry.
14     Q  You had a conversation with Mr. Johnson about
15  going into Anchorage?
16     A  Uh-huh.
17     Q  Is that yes?
18     A  Yes.
19     Q  Tell me everything that you remember about
20  that conversation.
21     A  I just remember bits and pieces. Part of it
22  was did he have to go in.
23        I said, Yes, you need to go in. We can't do
24  anything for you out here except give you pain
25  medication.

Page 131

1        Do I have to go in today?
2        And I go, Well -- and I gave him the options.
3  That they probably won't see you today. You can go in
4  through the ER, but he's going to see you tomorrow.
5  He asked that you come in through the ER tomorrow,
6  which will be day two.
7        And so essentially that's -- that was my
8  conversation. There probably was a lot more spoken,
9  but I don't remember.
10     Q  When you say day two, what are you referring
11  to?
12     A  Sunday.
13     Q  Day two of what? You used the term.
14     A  Day one is the 22nd, day two is the 23rd.
15     Q  And what do the day one and day two relate
16  to?
17     A  Day one is the first day I saw him.
18     Q  Not related to his injury, but just related
19  to the care that you provided; is that what I
20  understand?
21     A  Yes. It's only the days that I saw him.
22     Q  Now, do I also understand your testimony that
23  Ms. Katongan was with you at the 9:30 appointment?
24     A  Yes.
25     Q  I'm not sure it's an appointment when you go

EXHIBIT  E
PAGE  3  of  8

Page 132
1  to their house, but that event?
2     A   Yes.
3     Q   All right.  And did you see Mr. Johnson again
4  on 5/22?
5     A   I saw -- I'm taking credit for the visit that
6  she made in the morning, because these medications
7  have to be answered for.  And I saw him at the 9:20
8  too -- 9:20.  And so those would have been the two
9  visits.
10       Now, when the medication came in that night,
11  I can't recall if I delivered them, somebody else
12  delivered them.  I don't recall.
13     Q   Okay.  We'll talk about that in a minute.
14       Explain to me your medical analysis on what
15  you believed was going on with Greg Johnson on
16  5/22 after your examination and evaluation.
17     A   I believed that he had a significant disc
18  injury and that it was more than the regular bad
19  backs.  Though I've seen people who can't even sit up,
20  that it just ends up being one of those kind of bad
21  backs that had no disc involved, and have been fooled.
22  But I felt that it was a significant bad back, you
23  know, a disc injury probably.  And hence, once I reach
24  that decision, then he needs to go.  And that was my
25  assessment.

Page 133
1       Now, was it going into detail of equina?  No.
2  No.  He had a significant enough injury that I have to
3  send him to the specialist; they'll sort that out.  At
4  that point, mine is just to keep him comfortable and
5  facilitate him getting into town.
6     Q   And what did you do -- well, let me ask you
7  another question.
8       You ordered Vicodin from Nome as a
9  prescription for Mr. Johnson, correct?
10     A   Yes.  So that he wouldn't have to keep on
11  getting shots.  They become pretty painful after a
12  while, so you're just adding pain to pain.
13     Q   And where are the shots given?
14     A   On the buttocks.
15     Q   And does it matter which side?
16     A   No.
17     Q   Do you recall doing any of your examination
18  on Mr. Johnson on the 22nd while he was lying down?
19     A   No.
20     Q   Did you do a straight leg raise test on him?
21     A   I don't recall.
22     Q   You didn't note it, though, correct?
23     A   No, I didn't note it.  It's not in here.
24     Q   Do you recall speaking with Dr. O'Neill on
25  5/22/04?

Page 134
1     A   Yes.
2     Q   What do you recall about that?
3     A   I called and asked her for -- I needed some
4  Vicodin, some stronger pain relief.  And I explained
5  to her why, what I needed it for, that I have a
6  patient that I'm sending to Anchorage that needs
7  stronger pain relief than Tylenol 3's that I've been
8  using morphine on, and that it -- you know, at that
9  time it was going to be the next day that he was going
10  to fly.
11       And she agreed.  She said that she would have
12  to get it from the nurse's station, because they
13  don't -- or the ER, because you don't -- the
14  pharmacies are closed on the weekends, so you have to
15  go to other places to get it, and that they'd get it
16  out as soon as possible.
17     Q   And do you believe that you received it that
18  day?
19     A   I can't -- I don't recall.  I've thought
20  about that and thought about that, and I just don't
21  recall.  I don't recall if we got it, we picked it up
22  and delivered it.  I just don't remember.  It's one of
23  those things: it's a lesser thing, you know, in an
24  event that you do.
25     Q   Do you recall whether you ran this -- the

Page 135
1  facts of Mr. Johnson's case by Dr. O'Neill?
2     A   Not all of it, no.  No.  It was
3  straightforward, a nonbeneficiary that was going to go
4  to their doctor.  And so the part that I ran past her
5  was the part why he needed a controlled drug like
6  that.
7     Q   And that was the pain that you described?
8     A   The pain.
9     Q   Do you recall any other interaction with
10  either Kim or Greg Johnson on May 22nd, '04?
11     A   I remember Mrs. Johnson was very concerned
12  about him, and rightfully so.  Very concerned about
13  him.  And I think I ran into her at the store, at the
14  AC Store.  That's all I can remember.  I mean, after
15  all of these years, that's what I remember.
16     Q   And do you remember, you know, speaking with
17  her or any of the content of that interaction?
18     A   I remember I spoke to her, but I don't
19  remember what the contents were.
20     Q   And you don't recall whether you delivered
21  any further medication to Mr. Johnson on that date?
22     A   I don't remember.  I don't remember.
23     Q   Do you know how you came to the Johnson
24  residence on the 23rd?  Do you know whether you were
25  called to the residence or you had a preexisting plan

36 (Pages 132 to 135)

EXHIBIT  E
PAGE  4 of 8

JOHNSON v. USA

DAVID DAVALOS, PA-C
3/8/2007

Page 136

1  to arrive at the Johnson's on the 23rd?
2      A   Well, there was an agreement that -- that I
3  would help him get on the plane. I could make things
4  happen, get a stair chair, get people from the local
5  airport. We do this all the time. We do this for, if
6  we have a medevac where somebody -- we have to lift
7  them up in a stretcher or there's somebody who's a
8  paraplegic, which we have a couple in -- we used to
9  have a couple in town, or an elderly person that
10  you're worried about that you don't want them falling.
11  These are things that are called upon, you know,
12  intermittently to help.
13      So I told them we can use that. We can put
14  him in a stair chair, get him up on the plane, have
15  him sit in the chair, strap him in, then he could go.
16  That he wouldn't have to try to climb on that plane.
17      Q   And you had that conversation when?
18      A   The first day, the 22nd. Because the
19  agreement was, if he's not going that day, then he'll
20  go the next day and I'll help him get on the plane.
21      Q   Did you discuss with him on the 22nd any
22  potential consequences of a delay in going to
23  Anchorage or to see a specialist?
24      A   I don't remember. Usually my conversations
25  are: We can't take care of you here, you have to go.

Page 137

1  It's not a matter of, you know, that this'll calm
2  down, you'll get better. You say: You've got to go.
3  We can't take care of you here. It's not going to get
4  better.
5      And that's pretty much straightforward. You
6  don't sugarcoat it, you don't put your own opinion in
7  it.
8      The opinion that I had was that if you don't
9  go, you know, you'll probably be staying in a hotel
10  and going tomorrow morning anyway, but that was just
11  because he didn't feel like going in that day, the
12  first day.
13      Q   And do you recall the reason that he gave
14  that he didn't feel like going in that day?
15      A   No. The second day he wanted to -- he didn't
16  feel good. He didn't -- it was very painful. We
17  tried to sit him up to see how it was going to go, and
18  he just was really uncomfortable, didn't want to. He
19  just says, no, let's wait another day.
20      But on the first day, I don't recall why he
21  didn't want to go in.
22      Q   Do you recall discussing medevac with him on
23  the 22nd, or with Ms. Johnson?
24      A   No.
25      Q   Do you recall talking to either one of them

Page 138

1  on the 23rd about medevac?
2      A   No.
3      Q   Tell me what you recall about the interaction
4  on the 23rd with the Johnsons.
5      A   It was pretty much -- what I recall is pretty
6  much what's in here. I don't recall things outside
7  this.
8      Q   When you say that patient was called early
9  this morning, are you saying that a telephone call was
10  made to --
11      A   Yes. I called to see if his --
12      Q   Wait until I finish my sentence, sorry. --
13  that a telephone call was made to his house?
14      A   Yes.
15      Q   Go ahead and explain what you were about to
16  say.
17      A   The call was just to let him know I'm getting
18  ready to come over, and that's essentially what that
19  conversation was, I'm getting ready to come over and
20  get him ready to go on the airplane. And then I went
21  over.
22      Q   And did you talk to him this morning?
23      A   Yes.
24      Q   On the phone?
25      A   No.

Page 139

1      Q   Who did you speak with?
2      A   To the wife.
3      Q   And do you recall the substance of that
4  conversation?
5      A   I'm coming over to get him ready.
6      Q   Do you know what time that call was made?
7      A   No. I -- the exact time, I don't know.
8      Q   Did you take anyone with you to the Johnson's
9  house when you went over on the 23rd?
10      A   No, no. It was a preparatory. You go over
11  and see what they need, because you're going to have
12  to medicate them, and so you go by yourself.
13      And then later on, once they're feeling
14  better and you've assessed them and how they're going
15  to go, then you call in the people that you need.
16  They all are working all day, so they can't stand by
17  and wait. When you need them, then you call them and
18  they come over and do what you need, and then -- then,
19  you know, you can release them.
20      Q   Was it your medical opinion on 5/23/04, as a
21  result of your interactions on the 22nd and at that
22  visit on the 23rd, that Mr. Johnson needed care
23  outside of the village?
24      A   He needed care outside the village on the
25  22nd. And then on the 23rd it reinforced it. So yes.

37 (Pages 136 to 139)

EXHIBIT  _E_
PAGE  _5_ of _8_

Page 144

1  injuries were.
2      A   Well, I have an extruded L4-L5 disc, and it's
3  extrudes to the right and it -- so for a short while,
4  I had lost the use of my lower part of the right leg.
5  It felt like hot coffee pouring down it all the time.
6  But it started out slowly, and became worse and worse
7  and worse over months.
8          And so that some people, it happens real
9  quick; some people, it doesn't. It takes a long time.
10 Mine was a long time. It took a long time to develop.
11         And that that's so they understood that the
12 process -- you know what the process is. You know,
13 why it starts at the top, the back hurts, and it goes
14 down the legs.
15     Q   And was that your purpose in describing your
16 own injury?
17     A   Usually I just tell them that for reference
18 so they know, people know what it is. A lot of people
19 will come to you with back injuries, and they think
20 they have cancer or something. And you say, well, let
21 me explain to you what's going on.
22         And then once you tell them from a firsthand
23 position or firsthand setting, they seem to understand
24 better what you're talking about. There are a few
25 people that are in denial about back injuries. Well,

Page 145

1  more than a few. But you have to explain to them why
2  the back hurts and then the leg's burning.
3      Q   And did you believe that Mr. and/or
4  Mrs. Johnson was in that category of people who did
5  not understand what was going on with the back?
6      A   I don't remember.
7      Q   Did you write all of this note at one time
8  from 5/23?
9      A   Yes.
10     Q   The examination that you did notes:  Deep
11 tendon reflections, 2 plus bilaterally at the knee?
12     A   Yes.
13     Q   And how did you do that evaluation?
14     A   You reach behind the leg, the popliteal
15 fascia, that's behind the kneecap on the back part of
16 your knee. And you can use anything, like a
17 stethoscope to a reflex hammer, and you activate the
18 subpatellar tendon. And you'll either get a response
19 in the upper leg, the quads, or you get the jerk of
20 the foot.
21     Q   And on that day what response did you get?
22     A   They were going down. They were no longer 3
23 plus, they were 2 plus. They were a measurable
24 decrease.
25     Q   And what did that mean to you?

Page 146

1      A   It was getting worse.
2      Q   And did you do DTRs of the ankle?
3      A   Yes, I did. Whenever I do them, I usually do
4  them at the knees and behind the ankle.
5      Q   You didn't note any results from an ankle
6  DTR, correct?
7      A   No. I put the pertinent positives in there.
8      Q   I need you to describe what you mean when you
9  say that you put the pertinent positives in there.
10     A   The item that you can measure is a pertinent
11 positive. A pertinent negative is something you
12 expect but it's not there, so that's a pertinent
13 negative.
14     Q   So what does that mean the DTR was for the
15 ankle if you did it on 5/23?
16     A   It would have been normal. I couldn't have
17 measured a change in it.
18     Q   Was a 3 plus of the ankle on 5/22 a normal
19 measurement?
20     A   The reference on 5/22 was primarily for the
21 knee. And I didn't -- wouldn't have made reference to
22 the ankle. Although I would have done the ankle, the
23 one that was pertinent was the one at the knee.
24     Q   And you indicate that it was decreasing or
25 diminishing between the 22nd and the 23rd?

Page 147

1      A   Yes.
2      Q   Did you have a reflex at the ankle when you
3  did your knee evaluation? Did you have the knee jerk
4  reaction, or did you have any reaction in the
5  hamstring or the quadriceps?
6      A   I can't remember which one. To be honest
7  with you, I don't remember.
8      Q   Is there a significance as to whether it's
9  one or the other?
10     A   No.
11     Q   For your neurological?
12     A   You should get -- what you're doing is you're
13 activating the quadriceps muscle. And whether you do
14 it with the foot flaring out, you're still using the
15 same muscle. So when you look at it above or you
16 watch for the leg to move, it's the same muscle.
17     Q   Is it the same nerve?
18     A   Yes.
19     Q   Your next note is: Decreased strength with
20 dorsiflexion in both feet.
21         Is it accurate to say that you were referring
22 to a decrease in strength from the day before?
23     A   Yes.
24     Q   "Weak plantar flexion," that is a
25 deterioration of the neurological function from the

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

EXHIBIT _E_
PAGE _6_ of _8_

Page 152

1  and could not stop urination. Do you recall the facts
2  of that?
3     A   Well, that one, I wrote that one down kind of
4  badly. He couldn't get up, because of the pain, to go
5  to the bathroom. So when he started to go, he
6  couldn't stop. And so the question was, you know, "Is
7  it just flowing freely?" And he says, "I can't get to
8  the bathroom." So that's how I understood it.
9     Q   When you say has dribbling, are you sitting
10 here today, under oath, testifying that he was not
11 dribbling after emptying his bladder, or do you have
12 no recollection at this time?
13    A   I don't have a recollection on that one.
14 That one, see, is in the subjective category. That's
15 what they tell me. Objective is what I find.
16    Q   Did you look to see what he was talking
17 about?
18    A   Yes. Yes. His -- he had a urine stain on
19 his underwear. But, I mean, did I see him dribbling?
20 No.
21    Q   Did you determine whether the urine stain on
22 his underwear was fresh or wet?
23    A   No.
24    Q   Did you ask him about when that was caused?
25    A   No.

Page 153

1     Q   Or occurred?
2     A   No. No, in the sense that I don't remember,
3  you know.
4     Q   As a result of your interaction with
5  Mr. Johnson on the 23rd, did you take any action to
6  have him transferred to Anchorage?
7     A   To call in a medevac?
8     Q   Any action whatsoever.
9     A   No.
10    Q   Why not?
11    A   Because he said he wanted to wait another
12 day. And despite what I told him, he wanted to wait
13 another day and see if he feels better.
14    Q   Well, what did you tell him?
15    A   I told him that he's not going to get any
16 better there, we can't do anything for him, he needs
17 to go.
18    Q   Did you tell him that he could get worse?
19    A   I don't recall if I told him he could get
20 worse. I told him he's not going to get better and
21 he's going to -- it's not going to change, you know,
22 in the sense of getting better.
23    Q   Did you tell him that he could, if his
24 symptoms continued to progress, lose bowel and bladder
25 control?

Page 154

1     A   No, I don't recall telling him that. That's
2  something we look for.
3     Q   Do you recall telling him or did you tell him
4  that he could lose his ability to walk forever if he
5  waited?
6     A   No, I did not.
7     Q   Did you discuss medevac with Mr. Johnson or
8  Mrs. Johnson on 5/23/04?
9     A   No, I did not.
10    Q   After the appointment or visit that's marked
11 as 11 a.m., whether it happened shortly before or
12 shortly after that, did you see or talk to either of
13 the Johnsons on the 23rd?
14    A   After that?
15    Q   After that.
16    A   I don't recall, no. Then the instructions
17 were that I'll come over and get you ready that day?
18 Well, when that ended, then: I'll be back over
19 tomorrow and see how things are.
20       And essentially that was the agreement that I
21 remember. And then when I came over the next day,
22 which was a Monday, he had significant neural
23 findings.
24    Q   Tell me what those significant neurological
25 findings were by your estimation?

Page 155

1     A   His soft and sharp touch were dramatically
2  decreased. He could not dorsiflex, and a great
3  decrease in plantar flexion, that means pushing foot
4  down bilaterally. He had less than 1 plus deep tendon
5  reflex at the knees bilaterally. He had a little bit
6  of clonus. That's where you pop the foot and you get
7  kind of like a spasm response bilaterally.
8     Q   Okay. What do you mean by pop the foot?
9     A   You grab the foot and you push it up real
10 suddenly. And in normal cases, you'll get a couple of
11 responses and that's it. In abnormal cases, where
12 it's looping up and back, you'll get a shaky jerky
13 kind of response.
14    Q   Did you do that test the day before?
15    A   I always do that test.
16    Q   So does that test have a name?
17    A   Yes, it does. It's a test for clonus, is
18 what it is.
19    Q   If you think of the name of it, you can fill
20 it in.
21    A   I'm sorry.
22    Q   That's all right.
23       There isn't any indication on the records
24 from the 22nd or the 23rd that you did that test,
25 correct?

PACIFIC RIM REPORTING, LLC
www.courtreportersalaska.com

EXHIBIT ___E___
PAGE ___7___ of ___8___

Page 168

1    BY MS. LONG:
2        Q   I apologize, I'm actually asking you about
3    the physiological.
4        A   His urinary tract.
5        Q   His urinary track, yeah.
6        A   Because he wasn't complaining of that that
7    day. He just was coming in from the bathroom when I
8    saw him.
9        Q   On the 23rd.
10       A   The 21st. On the 23rd he couldn't walk.
11       Q   The 23rd was Sunday?
12       A   Sunday, yeah. He had so much pain he
13   couldn't stand up on that day, or even to sit him up
14   on Sunday.
15       Q   So on Sunday, with respect to his urinary
16   problems and in response to Question No. 8, look at
17   Request For Admission No. 8, because I don't want to
18   confuse you. No. 8.
19       A   Eight, all right. I see that now. Go ahead.
20       Q   There's a lot of them there, so I just want
21   to be clear: Question No. 8 asks about what?
22       A   What that was, and I remember him, we were
23   having this conversation, he couldn't get to the
24   bathroom.
25       Q   Let me just set it up first. What does

Page 169

1    Question 8 ask about, the request for admission?
2        MS. LINDQUIST: Read it, please.
3        A   "Admit that as early as May 23rd, Gregory
4    Johnson subjectively complained of bladder
5    dysfunction, i.e., difficulty in stopping urination."
6    BY MS. LONG:
7        Q   So my question to you is: Why did you
8    believe that he was not suffering physiologically, why
9    he did not have a physiological reason for bladder
10   problems?
11       A   Okay. My interpretation was that he couldn't
12   get to the bathroom. Now, is there a distinction
13   between can't get to the bathroom and you can't hold
14   it anymore and you urinate, or is it just coming out,
15   and no matter what you do, you're urinating yourself
16   and you have no control? And that was the distinction
17   between the two, because he complained, "I can't get
18   to the bathroom, you know, I'm peeing myself. It
19   hurts too much, I can't get out of bed."
20       Q   Did you understand that his wife was
21   assisting him with Ziploc bags to urinate?
22       A   Yes. It made it easier to not have to get
23   out of bed to go in there. That was my
24   interpretation.
25       MS. LONG: Thank you.

Page 170

1        I need to take a short break and just make
2    sure I've asked what I need to ask.
3        MS. LINDQUIST: Off record.
4        VIDEOGRAPHER: Off record, 1:59.
5        (Off the record.)
6        VIDEOGRAPHER: We're on record, 2:10.
7    BY MS. LONG:
8        Q   Mr. Davalos, do you recall any discussions
9    with Mrs. Johnson where she raised her voice with you?
10       A   Well, she was really concerned.
11       Q   Is that a yes?
12       A   Yes.
13       Q   What do you recall of the conversation?
14       A   I don't remember. Many of the patient
15   families will raise their voice at us when they're
16   concerned, and so I can't tell you I remember.
17       Q   Do you recall any discussion with either Kim
18   or Greg Johnson about his not feeling -- him feeling
19   like he was not going to be able to sit in a
20   commercial seat for the flight to Anchorage?
21       A   On which date?
22       Q   Any day.
23       A   The second day, yes. He was in too much
24   pain.
25       Q   I have one other question, and that is:

Page 171

1    During this break, we received a copy of your
2    privileges that is dated 12/20/02, and I'm going to
3    mark it as Exhibit 18 for the record. And I just want
4    you to identify in fact whether that's what that is.
5        (Exhibit No. 18 marked.)
6        A   Yes, it is.
7    BY MS. LONG:
8        Q   And the other thing -- we've been gathering
9    records while we've been here today. So the other
10   record that we obtained appears to be an inventory, a
11   control drug inventory, for acetaminophen with
12   codeine, which I believe is Tylenol 3; is that
13   correct?
14       A   Yes, ma'am.
15       (Exhibit No. 19 marked.)
16   BY MS. LONG:
17       Q   I'm just going to have you take a look at
18   that, and everything is marked out except for Greg
19   Johnson, the entry related to Greg Johnson. Can you
20   just identify the date of that entry?
21       A   5/22.
22       Q   And does that cover the entire period from
23   5/22 to 5/24?
24       A   Yes.
25       MS. LONG: Thank you. I have no further

45 (Pages 168 to 171)

EXHIBIT _E_
PAGE _8_ of _8_