Ray R. Brown
DILLON & FINDLEY, P.C.
1049 W. 5th Avenue, Suite 100
Anchorage, AK  99501
Phone 277-5400
Fax   277-9896

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

GREGORY JOHNSON and KIMBERLY     )
JOHNSON, individually and        )
on behalf of their minor         )
children, MADISON JOHNSON and    )
ALEXANDER JOHNSON,               )
                                 )
              Plaintiffs,         )
vs.                              )
                                 )
UNITED STATES OF AMERICA,        )
                                 )
              Defendant.          )
_____)     Case No. 3:06-CV-00120-RRB

**MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DR. STEVEN DAY'S FINANCIAL COMPENSATION INFORMATION**

I.    **INTRODUCTION**

     Defense  expert  witness  Dr.  Steven  Day  is  a  professional
witness  that  derives 99% of his income from testifying on issues
of  life  expectancy  for  litigation  purposes.    In  the  present

case, Dr. Day has opined that Greg Johnson's life expectancy is half of that testified to by the plaintiffs' expert witness, a board certified and practicing physician, board certified as a physiatrist with an additional certification in spinal cord injuries.[1] Dr. Day's opinion, remarkably, falls six years short of the original opinion by the Government's own retained expert physiatrist, an opinion the Government has subsequently sought to withdraw.[2] Dr. Day's life expectancy testimony seeks to significantly reduce the damages in this case, placing Greg Johnson at serious and probable risk of outliving any life care and future medical expense award.

To challenge the basis of Dr. Day's opinions, plaintiffs have sought, among other things, discovery of financial information from Dr. Day to which they are legally entitled. The ability to cross-examine witnesses as to their potential bias, partisanship or financial interest is fundamental, and thus generally relevant and discoverable, with very limited exception. Yet the Government has denied plaintiffs access to this information without claiming a valid privilege.

---

[1]    A physiatrist is a medical doctor that specializes in physical medicine, rehabilitation, and pain medicine.

[2]    See Exhibit A, Deposition of Alex Barchuk, M.D., January 11, 2008, p. 23, ln. 1-25.

Gregory Johnson, et al. v. USA, et al.
Case No. 3:06-CV-00120-RRB
MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DR. STEVEN DAY'S FINANCIAL COMPENSATION INFORMATION
Page 2 of 26

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

Plaintiffs respectfully move this Court for an order compelling the United States of America, to produce the W-2's and 1099's for Dr. Steven Day and/or to produce an answer to Interrogatory No. 13, stating the basis for compensation and amounts of compensation Dr. Day has received over the last five years from Strauss & Shavelle, the consulting firm for which Dr. Day works. Additionally, plaintiffs seek the employment contract between Dr. Day and Strauss & Shavelle and/or the basis of Dr. Day's "discretionary bonus." Plaintiffs have in good faith attempted to confer with the defense in an effort to resolve this dispute without court action pursuant to Rule 26(c).[3]

## II.  **FACTUAL BACKGROUND**

The facts of this case have been presented in previous motions practice. However, a brief summary of the pertinent facts is provided as follows. On May 21, 2004, Greg Johnson injured his back while lifting portable computer labs in Unalakleet, Alaska. Over the next few days, he received treatment from Norton Sound Health Care Corporation medical staff, who failed to recognize the signs and symptoms he

---

[3]    See Exhibit B, Email from U.S. Attorney Susan Lindquist, May 7, 2008.

Gregory Johnson, et al. v. USA, et al.
Case No. 3:06-CV-00120-RRB
MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DR. STEVEN DAY'S
FINANCIAL COMPENSATION INFORMATION
Page 3 of 26

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

displayed of serious and progressive neurological injury. On May 24, 2004, three days after the onset of symptoms, Greg Johnson was finally medevaced out of Unalakleet to an appropriate treatment facility, Providence Alaska Medical Center.

Upon arrival in Anchorage, Greg Johnson was seen by Dr. Cohen, a neurosurgeon, who diagnosed Greg's condition as cauda equina syndrome, a disorder affecting the bundle of nerve roots at the lower end of the spinal cord and one of the few orthopedic/neurosurgical emergencies. As a result of delayed treatment, Greg Johnson now suffers permanent paraplegia, and has neurogenic bladder and bowel, as well as sexual dysfunction.

Dr. Steven Day was retained by defendant United States of America to opine as to the life expectancy of Greg Johnson for the sole purposes of limiting future life care expenses. Dr. Day's deposition was taken on January 9, 2008. During his deposition, Dr. Day refused to provide a copy of the contract between him and the consulting firm, Strauss & Shavelle, for which he works.[4]

---

[4]    See Exhibit C, Deposition of Steven Day, M.D., January 9, 2008, p. 213, ln. 8-25 and p. 214, ln. 1-9.

<u>Gregory Johnson, et al. v. USA, et al.</u>
Case No. 3:06-CV-00120-RRB
MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DR. STEVEN DAY'S
FINANCIAL COMPENSATION INFORMATION
Page 4 of 26

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

1    Subsequent to Dr. Day's deposition, "Plaintiffs' Fourth

2 Request for Interrogatories and Production," requested the

3 following information:

> **REQUEST FOR PRODUCTION NO. 32**: Please
> provide a copy of any and all W-2's and
> 1099's showing all amounts paid to Dr.
> Steven Day for the past 5 years and any
> other documents that reflect compensation
> Dr. Day received from Strauss & Shavelle,
> Inc.

Defendant objected to the request, citing *Rogers v. U.S. Navy*[5] as

authority:

> **RESPONSE:** Objection irrelevant.   Dr. Day
> will not produce these documents.   In lieu
> of producing the W-2's or 1099 forms, Dr.
> Day has provided in the interrogatory the
> information courts find relevant for
> impeachment.   He is also providing his fee
> schedule.[6]

The information defendant has provided is insufficient for

the purposes of impeachment on the basis of financial bias.

Because no other claim of privilege exists for these documents,

the items requested by the plaintiffs should be produced within

two weeks of this Court's order to do so.

---

[5]    223 F.R.D. 533 (S.D.Cal. 2004).

[6]    See Exhibit D, United States' Answers to Plaintiffs' Fourth
Request for Interrogatories and Production, p. 4.

<u>Gregory Johnson, et al. v. USA, et al.</u>
Case No. 3:06-CV-00120-RRB
MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DR. STEVEN DAY'S
FINANCIAL COMPENSATION INFORMATION
Page 5 of 26

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

III. <u>**HISTORY AND STRUCTURE OF STRAUSS & SHAVELLE, INC. AND "THE LIFE EXPECTANCY PROJECT"**</u>

It is critical for the Court to know the history and structure of Strauss & Shavelle, Inc. and "The Life Expectancy Project" for the purposes of establishing that Dr. Day is a "professional witness," a fact that is significant to this motion to compel. This analysis will also be relevant to challenging Dr. Day's ability to opine on life expectancy, which will be raised in a subsequent *Daubert* motion.

Strauss & Shavelle, Inc. is a corporation that was conceived in large part, if not entirely, for the purpose of profiting from rendering opinions as to life expectancy in a forensic setting. The principals of Strauss & Shavelle, Inc. are David Strauss (45% ownership), Robert Shavelle (45% ownership), and Gail Strauss (10% ownership).[7] David Strauss and Robert Shavelle retain Dr. Steven Day as an "independent contractor," although Dr. Day is given a salary, a bonus, and works for only Strauss & Shavelle, Inc.[8]

---

[7]  See Exhibit E, *English, et al. v. Takata, et al.*, Deposition Testimony of Robert Shavelle, Ph.D., p. 8, ln. 16-19 (August 21, 2002).

[8]  *Id.* at p. 10. ln. 15-17.

<u>Gregory Johnson, et al. v. USA, et al.</u>
Case No. 3:06-CV-00120-RRB
MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DR. STEVEN DAY'S
FINANCIAL COMPENSATION INFORMATION
Page 6 of 26

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

Drs. Strauss, Shavelle, and Day are not medical doctors.[9] They are not licensed to practice medicine of any kind, nor do they have a background in medicine.[10]   They have never provided primary care to disabled or severely disabled individuals.[11]   All three are mathematicians, with Ph.D.'s in Statistics.[12]

The "Life Expectancy Project" is difficult to define; however, it is, at least in part, a continuation of research originally performed at the University of California, Riverside.[13]   Initially, the project was a National Institute of Health funded grant.[14]   The project lost its funding in 1997. Drs. Strauss and Shavelle continued the research without assistance from grant providers.   They funded the project through generating fees for expert testimony as to life expectancy, primarily for the defense.[15]   Dr. Day began assisting

---

[9]   See Exhibit F, *Freeland v. United States,* Deposition Testimony of David Strauss, Ph.D., p. 13. ln. 20-25, p. 14, ln. 1-6 (December 4, 2000).  Exhibit E, p. 30, ln. 5-36, p. 30, ln. 25-2, p. 31, ln. 3.

[10]    *Id*.

[11]    *Id*.

[12]    Exhibit F, p. 13, ln. 14-20, p. 47, ln. 21-23.

[13]    Exhibit E, p.13, ln. 24-18.

[14]    *Id*. at p. 14, ln. 3-4.

[15]    *Id*. at p. 14, ln. 6-10.

with the research during his doctoral program.  Thus, "The Life Expectancy Project" in its present form was born.

"The Life Expectancy Project" is a database comprised of over 200,000 individuals with disabilities such as cerebral palsy, spinal cord injury, and traumatic brain injuries. Although Drs. Strauss, Shavelle, and Day are not licensed actuaries, they use actuarial methods on data from the National Spinal Cord Injury Statistical Center and other sources to derive and apply a life table and life expectancy to individuals, claiming that it takes account of age, sex, type and severity of injury, among other factors.[16]

The results are not scientific.  Drs. Strauss, Shavelle, and Day make the ultimate determination of the makeup of the dataset for each individual analysis, often including markedly dissimilar individuals, which results in lower life expectancies and reduces damages.  In the present case, Dr. Day's opined life expectancy of Greg Johnson is 16 to 18 years, nearly half that

---

[16] Dr. Day alleges that he did not rely on databases generated through the "Life Expectancy Project" in the present case. According to his testimony, he relied instead on other more generalized databases for which, like the "Life Expectancy Project," there are no known error rates to the methodology. See Exhibit G, United States' Answers to Plaintiffs' Fifth Request for Production and Interrogatories Re: Dr. Day, pp. 4 and 9.

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 • FAX (907) 277-9896

of the plaintiffs' expert, a board certified and practicing physiatrist with an additional board certification in spinal cord injuries. Dr. Day's projected life expectancy is less than the Model Spinal Cord Injury Care Systems' projections and less than the "original" opinion of the government's other medical doctor expert, which was 24 years. The "Life Expectancy project" database has never been provided, and David Strauss has conceded that no one can check or verify his test results without access to this database.[17] Dr. Day and his colleagues have never conducted research on past patients on whom they have rendered life expectancy opinion to determine the historical accuracy of their calculations.[18]

Testimony elicited from the owners of Strauss & Shavelle in other lawsuits has established that the corporation derives over 90% of its income from litigation-related activities. Robert Shavelle alone consults on an average of 100 cases per year, billing $300 an hour for consults and $450 an hour for deposition and trial testimony.[19] Dr. Shavelle has testified

---

[17]     Exhibit F, p. 41, ln 15-25 p. 42, ln. 1-25, p.43, ln. 21.

[18]     Exhibit G, p. 9.

[19]     Exhibit E, p. 31, ln. 18-2.

that 95% of his work is litigation related.[20]  In 1999, in the infancy of the Life Expectancy Project, David Strauss garnered more than $200,000 in fees for consultation and testimony with respect to life expectancy.[21]  Strauss has admitted in past depositions that his research is supported "almost entirely by … fees [generated] as a testifying expert."[22]  In 1999, Dr. Strauss' income from rendering life expectancy opinions was 250% of his University of California salary for that year.[23]

Strauss & Shavelle can hardly be classified as unbiased witnesses.  They have authored articles entitled "Discounting the Cost of Future Care for Persons with Disabilities," "Longer Life? Is the Life Expectancy of Severely Injured Claimants Really Increasing," and "Life Expectancy: What Lawyers Need to Know."  Additionally, prior to realizing the potential ramifications of doing so, Strauss & Shavelle's website, www.lifeexpectancy.com, provided suggestions of questions for defense attorneys to ask in depositions or during cross-

---

[20]    *Id*. at p. 12, ln. 18-21, p. 13, ln. 22-23.

[21]    Exhibit F, p. 104, ln. 15-18.

[22]    *Id*. at p. 45, ln. 10-14.

[23]    *Id*. at p. 136, ln. 7-3.

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 • FAX (907) 277-9896

1   examination.[24]          After  successful  *Daubert*  challenges,  the

2   materials  aimed  at  defense  attorneys  have  been  removed  from  the

3   website.

4        Because  Dr.  Day  holds  the  status  of  a  "professional

5   witness,"  Dr.  Day's  gross  annual  income  and  compensation

6   arrangement  with  Strauss  &  Shavelle  is  relevant  and  admissible

7   for  impeachment  based  on  financial  bias.        Presently,  the

8   plaintiffs  have  an  incomplete  picture  of  the  compensation  Dr.

9   Day  receives  providing  "independent  contract"  work  to  Strauss  &

10  Shavelle.      Dr.  Day  is  salaried  and  is  provided  discretionary

11  bonuses  pursuant  to  his  employment  contract.      Plaintiffs  have

12  been  unable  to  procure  information  regarding  his  annual  salary,

13  his  employment  contract  with  Strauss  &  Shavelle,  or  the  basis  of

14  the  discretionary  bonuses  that  he  receives.      For  all  intents  and

15  purposes,  Dr.  Day  has  immunized  his  financial  information  from

16  discovery,  and  thus,  precluded  meaningful  cross-examination

17  based  on  financial  bias.

18  **IV.  <u>LEGAL ARGUMENT</u>**

19       There  are  relatively  few  cases  addressing  the

20  discoverability  of  financial  information  of  an  expert  witness

---

[24]    See  Exhibit  H,  www.lifeexpectancy.com,  "Questions  On  Life
Expectancy  For  Depositions."

<u>Gregory Johnson, et al. v. USA, et al.</u>
Case No. 3:06-CV-00120-RRB
MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DR. STEVEN DAY'S
FINANCIAL COMPENSATION INFORMATION
Page 11 of 26

because it is axiomatic that this information is discoverable and relevant.  The few cases that have challenged the discoverability of an expert witness' financial information have raised the issue of whether, under the circumstances of the case, the information requested went beyond that necessary for impeachment purposes, and thus was an infringement on the witness' right to privacy.  As will be thoroughly discussed, because Dr. Day is a "professional witness," whatever privacy rights he may have in his financial information are outweighed by the utility of the information for the purposes of impeachment based on financial bias.  Further, the information requested by the plaintiffs does not go beyond that necessary to establish financial bias.

> A.    **Because Dr. Day is a "professional witness," his right to privacy in the information sought is outweighed by the utility of the information to the plaintiffs for the purpose of impeachment based on financial bias.**

A witness may always be impeached by evidence that she or he is biased, prejudiced, has a financial interest in the outcome of the case, or a motive to testify in a peculiar manner.[25]  Further, bias/prejudice impeachment is not collateral,

---

[25]    *Hickman v. Taylor*, 329 U.S. 495, 511 (1947); *Behler v. Hanlon*, 199 F.R.D. 553 556-57 (S.D.Cal. 2001) (citing *United States v. Abel*, 469 U.S. 45, 49-52 (1984)).

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

1    thus it may be proved both by examination of a witness as well

2    as by introduction of extrinsic evidence.[26]

3        Financial bias is particularly significant in cases in

4    which the expert witness derives the majority of his or her

5    income from offering expert services and is thus deemed a

6    "professional witness."[27]  A "professional witness" is defined as

7    one who "… devotes a significant amount of time to forensic

8    activities or earns a significant portion of income from those

9    activities."[28]

10       Numerous courts have recognized the distinction between

11   expert witnesses brought "fortuitously into the litigation" and

12   "professional   witnesses."   Unlike   practitioners   whose

13   involvement in a lawsuit is merely incidental to his or her

14   profession, a "professional witness's" livelihood may depend on

15   his or her desirability as a favorable or convincing witness.[29]

16   The need for future employment for expert services may tempt a

17   "professional witness" to color findings and testimony to suit

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

---

[26]    *Id*. (citing *Weinstein's Federal Evidence* §607.03[2][a] (2d.ed. 1997)); Fed. R. Evid. 607.

[27]    39 A.L.R. 4th 742, 746 (1985).

[28]    *Wrobleski v. Lara*, 727 A.2d 930, 938 (Md. 1999).

[29]    39 A.L.R. 4th 742, 746 (1985).

the needs of the proponent party, rather than to evaluate and present the subject matter of testimony with impartiality.[30]

The status of an expert as a "professional witness" has such a significant bearing on a witness' credibility that it has even been recognized as one of the factors in assessing the reliability of an expert opinion under *Daubert*. The courts have recognized that "…whether the expert has 'developed his opinions expressly for purposes of testifying,'" is relevant to a *Daubert* analysis because "a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office."[31]

The Supreme Court of Alaska has recently held that in cases where the expert witness is not a treating physician brought "fortuitously into the litigation," but is a business offering its services with the full understanding that litigation is ongoing, income taxes are relevant and discoverable.[32] The court determined that the production of income tax returns by the expert witness would be helpful for clarifying any stake the witness might have in the outcome of the case. Therefore, in

---

[30]   *Id*.

[31]   *Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 597 (9th Cir. 1996) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 42 F.3d 1311, 1317 (9th Cir. 1995)).

[32]   *Noffke v. Perez*, 2007 WL 4554391 (Alaska 2007).

Gregory Johnson, et al. v. USA, et al.
Case No. 3:06-CV-00120-RRB
MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DR. STEVEN DAY'S
FINANCIAL COMPENSATION INFORMATION
Page 14 of 26

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 • FAX (907) 277-9896

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

circumstances where the expert witness is a "professional witness," the utility of his or her financial information for impeachment purposes is outweighed by the witness' privacy rights in those materials.

Alaska is not the only jurisdiction to rule accordingly. The Court of Appeals of Maryland addressed the discoverability of financial information in *Wrobleski v. Lara*.[33]  The court in *Wrobleski* held that if there is a reasonable basis for a conclusion that a witness may be a "professional witness," the party may inquire both into the amount of income earned in the recent past from services as an expert witness and into the approximate portion of the witness' total income derived from such services.[34]

In *Collins v. Wayne Corp.*, the Fifth Circuit observed that "… a showing of a pattern of compensation in past cases raises an inference of the possibility that the witness has slanted his testimony in those cases so he would be hired in future cases."[35]

---

[33]    727 A.2d 930 (Md. 1999).

[34]    *Id.* at 938.

[35]    621 F.2d 777, 784 (5th Cir. 1980).

<u>Gregory Johnson, et al. v. USA, et al.</u>
Case No. 3:06-CV-00120-RRB
MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DR. STEVEN DAY'S FINANCIAL COMPENSATION INFORMATION
Page 15 of 26

The courts in Missouri,[36] Texas,[37] and Michigan have all adopted the same position.

In ruling in accordance with those cases, the Supreme Court of Illinois stated, "We have long recognized that the principal safeguard against errant expert testimony is the opportunity of opposing counsel to cross-examine, which includes the opportunity to probe bias, partisanship or financial interest."[38] In reaching the determination that the expert witness' annual income from service relating to rendering expert testimony for the two years preceding the trial was discoverable, the court held:

> … we reach our decision based on an appreciation of the fact that the financial advantage which accrues to an expert witness in a particular case can extend beyond the remuneration he receives for testifying in that case. A favorable verdict may well help him establish a "track record" which, to a professional witness, can be all-important in determining not only the frequency with which he is asked to testify but also the price which he can demand for such testimony.[39]

---

[36]    *State ex rel. Lichtor v. Clark*, 845 S.W.2d 55 (Mo. App. 1992).

[37]    *Barrios v. Davis*, 415 S.W.2d 714 (Tex. Civ. App. 1967); see also *Russel v. Young*, 452 S.W.2d 434 (Tex. 1970).

[38]    520 N.E.2d 297, 300 (Ill. 1988).

[39]    *Id*.

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

Dr. Day is the quintessential "professional witness." Dr. Day admitted that 99% of his earned income over the past five years has been from Strauss & Shavelle, Inc.,[40] a consulting firm which itself generates "well over 90% percent" of its revenue from life expectancy litigation.[41] Less than 1% of Dr. Day's income is derived from small stipends he is paid for giving invited lectures on life expectancy.[42] Dr. Day has testified at approximately 15 trials in the limited amount of time he has been providing such testimony, though his testimony has failed to pass muster under *Daubert* on two known occasions.[43] Dr. Day has testified at approximately 80 depositions since the year 2002.[44] He apparently also consults on hundreds of cases that do

---

[40]    Exhibit D, pp. 2-3.

[41]    Exhibit F, p. 48, ln. 3-6. David Strauss is a principal owner of Strauss & Shavelle and would, therefore, have more knowledge as to the percentage of revenue that his company generates from litigation related activities. He testified in *Freeland v. United States* that well over 90% of Strauss & Shavelle's income is generated through expert witness work. Dr. Day, who is contracted by Strauss & Shavelle, testified that 80% of Strauss & Shavelle's income is generated by expert witness work.

[42]    Exhibit D, p. 2-3.

[43]    Exhibit C, p. 115, ln. 17-19.

[44]    *Id*. at p. 13, ln. 3-5.

Gregory Johnson, et al. v. USA, et al.
Case No. 3:06-CV-00120-RRB
MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DR. STEVEN DAY'S
FINANCIAL COMPENSATION INFORMATION
Page 17 of 26

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

not proceed to deposition or trial, but for which he receives substantial remuneration.

Dr. Day first began providing expert opinions on life expectancy in 2002. Recognizing the financial advantage of this work, Dr. Day increased his forensic practice dramatically each year. Dr. Day testified in a 2004 trial that he consulted on approximately 50 cases that year.[45] In 2003, Dr. Day consulted on "Fewer than this year (2004), but I don't know exactly how many."[46] In 2002, he provided his expert services on "fewer still."[47] Plaintiffs cannot determine how much money Dr. Day receives as a result of his forensic practice, or how much it has increased as a result of this life expectancy testimony year to year because he has refused to provide that evidence. This Court should not shield this professional witness' financial data.

Dr. Day has no employment, outside of an occasional lecture, that is not associated with his providing opinion and testimony, primarily for the defense, to mitigate awards of future damages in lawsuits. Dr. Day has been retained by the

---

[45]    See Exhibit I, *Campbell v. Rush-Prudential HMO, Inc.*, Testimony of Steven Day, Motion for Mistrial, p. 40, ln. 22-24, p. 41, ln. 1-10 (October 19, 2004).

[46]    *Id.* at p. 41, ln. 12-13.

United States Department of Justice numerous times, and therefore, may have a financial interest extending beyond the remuneration received from this particular case.

Based on his testimony, all of Dr. Day's paid wages are from his forensic activities. He is not paid to do epidemiological or other scientific research. Dr. Day not only qualifies as a "professional witness," he is the archetype of a "professional witness." The plaintiffs' right to challenge the depth of this professional witness' financial motive and bias outweighs any privacy rights that Dr. Day may have in this information.

**B.** ***Rogers v. U.S. Navy*, cited by the defense in support of its position, further illustrates the distinction between expert witnesses that have a clinical practice and "professional witnesses."**

The Government has cited *Rogers v. Navy* for the proposition that Dr. Day's financial bias could be challenged by the financial information that Dr. Day has already disclosed to the plaintiffs. However, careful reading of *Rogers* only further illustrates the distinction between an expert witness who also has a clinical practice and a "professional witness's" and the

[47] *Id*. at p. 41, ln. 14-15.

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

importance of disclosure of a "professional witness's" financial information.

In *Rogers*, plaintiffs attempted to elicit information from the defense expert Dr. Schwab, a board certified and practicing orthopedic surgeon, concerning his total annual income derived from *both* his medical legal work and from his clinical practice. Dr. Schwab provided the plaintiffs with estimates of the percentage of his medical practice that involved forensic work versus clinical work, the percentage of his income that was derived from forensic work, the percentage of his forensic practice that was on behalf of plaintiffs versus defendants, the number of forensic evaluations he performed per week, and his hourly billing rate for performing forensic services.[48]   The actual dollar amount that Dr. Schwab was paid by the government for his services in the case was also disclosed.

The court in *Rogers* felt that the information already provided was "more than sufficient" to allow the plaintiff to effectively cross-examine Dr. Schwab at the time of trial regarding his opinions and the financial motive or bias that may have influenced those opinions.[49]   Critically, the court

---

[48]   *Rogers* at 536.

[49]   *Id*.

Gregory Johnson, et al. v. USA, et al.
Case No. 3:06-CV-00120-RRB
MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DR. STEVEN DAY'S
FINANCIAL COMPENSATION INFORMATION
Page 20 of 26

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

determined that the plaintiffs did not demonstrate how they were unfairly limited in arguing bias without the information they sought. Further, the court pointed out that based on the financial information that had been provided, any disclosure of the amount that Dr. Schwab earned for forensic work would reveal his total gross annual income. Ostensibly, the court recognized that when a witness has both a clinical and forensic practice, the total gross annual income is not relevant to financial bias because a portion of the income is derived from activities completely unrelated to litigation. Therefore, the only possible purpose of the witness' gross annual income in a case where the income is derived from both clinical and forensic practice is to prejudice the jury against the witness based on his or her financial position.

In *Behler v. Hanlon*, the case cited by the *Rogers* court, the United States District Court for the District of Maryland discussed the scope of Federal Rule of Civil Procedure 26(b)(1). The court concluded, "No intellectually honest argument can be made that the information sought by the plaintiffs regarding Dr. Keehn's activities as a defense expert witness is not relevant to bias/prejudice impeachment, and therefore, within the scope

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 • FAX (907) 277-9896

of discovery permitted by Rule 26(b)(1)."[50]  However, the court determined that the items sought by the plaintiff under the specific facts of that case were burdensome, duplicative, unnecessarily costly, or insufficiently probative to the issues to warrant the expense of production.

In the present case, Dr. Day's gross annual income is relevant for the purposes of financial bias because his entire income is based on his forensic practice.  In the event that any information sought to be disclosed contains the financial information of Dr. Day's wife, plaintiffs are amenable to having that information redacted.  Therefore, although *Rogers* is not controlling authority, it only further supports the plaintiffs' need for Dr. Day's financial information under the facts of this case.

**C.   <u>Unlike the present case, the financial information provided by the defense in *Rogers* and *Behler* can be extrapolated to provide meaningful cross-examination</u>.**

*Behler* and *Rogers* can also be readily distinguished from the present case in that the financial information that was provided in those cases could produce a meaningful cross-examination based on financial bias.  The financial information that was provided could be extrapolated to reflect the magnitude

---

[50]  *Behler* at 561.

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 • FAX (907) 277-9896

of compensation those experts received for their forensic practice.

In *Rogers*, Dr. Schwab provided information such as the percentage of his income that was derived from forensic work, the number of forensic evaluations he performed per week, and his hourly billing rate. With that information, plaintiffs counsel could at least extrapolate a "ball park" or hypothetical calculation to reflect his total compensation for performing forensic work. For example, if 70% of Dr. Schwab's income was derived from forensic work, he performed ten forensic evaluations a week and billed $400 per hour, his estimated annual income from performing forensic activities would be $257,142.[51] In this case, however, Dr. Day's income, completely derived from his expert services, is not directly tied to the numbers provided by the government.

Dr. Day responded to Interrogatory No. 13:

> I receive a monthly salary and periodic discretionary bonuses. My compensation *does not depend in any way on how many hours I work* on a given case, how many times I am retained by any given law firm or by the

---

[51] This estimate incorporates two reasonable assumptions: 1) that an examination lasts one hour, and 2) that Dr. Schwab works a 45 week work year.

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

U.S. Dept. of Justice, or whether the attorney finds the opinion useful.[52]

Likely using *Rogers* as a framework, Dr. Day further provided:

> I am retained by defense counsel on approximately 70% of the litigation cases on which I consult … more than 99% of my earned income over the past 5 years has been from Strauss & Shavelle. Less than 1% coming from small stipend I have been paid for giving invited lectures on life expectancy. Approximately 80% of the revenue of Strauss & Shavelle, Inc. is from consulting on life expectancy in litigation. I have provided fee schedule (sic) (Bates 4735). My rate is $400.00 per hour, but on rare cases I have agreed to work at a lower rate, $300.00 per hour, when the organization which is hiring me is restrained by limits.[53]

This financial information provides no insight into Dr. Day's financial bias. Dr. Day revealed that his hourly rate is $300 to $400. However, Dr. Day then represented that his salary is in no way based on his hourly rate. Dr. Day receives a salary and a discretionary bonus. The plaintiffs have not been provided with any information concerning Dr. Day's salary or how the discretionary bonus is calculated. Without additional information regarding his contract with Strauss & Shavelle, it

---

[52]    Exhibit D, pp. 2-3.

[53]    *Id*.

is impossible to deduce how financially invested Dr. Day is in the outcome of a case.

It is also quite possible that Dr. Day's "discretionary bonus," while not based on his billable hours or ability to have repeat clients, may be based on the amount of business he brings to the consulting firm. Under such circumstances, Dr. Day would have a financial interest in the outcome of this case … future business with the United States Department of Justice. With no additional information concerning Dr. Day's income, or the terms of his contract with Strauss & Shavelle, more specifically, the basis of his discretionary bonus and the amount of his salary, the plaintiffs have no way to impeach Dr. Day based on his financial bias. As this impeachment information is both relevant and admissible, it should be discovered to the plaintiffs.

## V.    CONCLUSION

For the above-stated reasons, it is respectfully requested that this Court grant the plaintiffs' Motion to Compel Production of Dr. Day's Financial Compensation Information. The government should be compelled to produce the W-2's and 1099's for Dr. Steven Day or to produce an answer to Interrogatory No. 13 stating the basis for compensation and amounts of

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

compensation Dr. Day has received over the last five years from Strauss & Shavelle. Additionally, plaintiffs seek the production of any other documents that reflect compensation Dr. Day has received from Strauss & Shavelle for the last five years, specifically, his employment contract with Strauss & Shavelle and/or the basis of his discretionary bonus. The Government should be compelled to produce this information within two weeks of this Court's order to do so.

DATED this 29th day of May 2008, at Anchorage, Alaska.

DILLON & FINDLEY, P.C.
Attorneys for Plaintiffs


By: s/Ray R. Brown
Ray R. Brown, ABA No. 8206012
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska  99501
Phone:  277-5400
Fax:    277-9896
Email:  ray@dillonfindley.com

**CERTIFICATE OF SERVICE**

I hereby certify that on May 29, 2008 a copy of the foregoing **MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DR. STEVEN DAY'S FINANCIAL COMPENSATION INFORMATION** was served electronically on Susan J. Lindquist.

s/Ray R. Brown

Gregory Johnson, et al. v. USA, et al.
Case No. 3:06-CV-00120-RRB
MEMORANDUM IN SUPPORT OF MOTION TO COMPEL PRODUCTION OF DR. STEVEN DAY'S FINANCIAL COMPENSATION INFORMATION
Page 26 of 26