Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT ANCHORAGE

GREGORY JOHNSON and KIMBERLY JOHNSON,
individually and on behalf of their
minor children MADISON JOHNSON and
ALEXANDER JOHNSON,

    Plaintiffs,

v.          No. 3:06-CV-00120-RRB

UNITED STATES OF AMERICA,

    Defendant.
_____/

VIDEOTAPED DEPOSITION OF STEVEN M. DAY, PhD
Wednesday, January 9, 2008
San Francisco, CA

Reported By:
DEBBIE MAYER, RPR CRR CRP
California CSR No. 9654

ATKINSON-BAKER, INC.
180 Montgomery Street, Suite 800
San Francisco, CA 94104
(800) 288-3376
A10A6A0

///

EXHIBIT C
PAGE 1 of 6

Page 10

1  with various types of spinal cord injury, and it may
2  have included persons with cauda equina syndrome, but
3  again, I don't know that for certain and I couldn't
4  identify anyone, and I'm sure that that condition was
5  not discussed specifically in this study.
6     Q. All right. Other than with respect to
7  articles that you have authored -- and you may have
8  partially answered this -- or study, have you been
9  involved in any studies of individuals specifically with
10 cauda equina as a significant factor?
11    A. Well, studies, I'm certain that I have been
12 involved in other consulting cases that involved persons
13 with this condition, and I don't know that I could call
14 that exactly a study, but I certainly did investigate
15 the situation, but nothing that I've published on that.
16    Q. When you say "consulting cases," could you
17 please explain what you mean by that.
18    A. Well, it would include cases such as this in
19 which I've been involved as an expert witness in
20 litigation, but also we are contacted on other case
21 outside of litigation, and some of those may have also
22 included persons with cauda equina syndrome.
23    Q. Let me ask you if you specifically recall any
24 consulting that you have done where a primary factor in
25 your consultation was one or more persons with

Page 11

1  cauda equina syndrome?
2     A. Well, I do recall. I don't recall any
3  specifics of it, but I do recall having been involved in
4  cases in which that was one of the factors involved, but
5  I couldn't tell you names at this point.
6     Q. What kind of analysis -- first off, how many
7  times have you been involved in consulting with a
8  cauda equina issue involved?
9     A. I don't know.
10    Q. Are you talking about -- "I don't know" is
11 pretty broad; I just want to narrow it as much as we
12 can. Do you think you may have done it more than once?
13    A. Yes.
14    Q. More than five times?
15    A. Not sure.
16    Q. More than ten times?
17    A. Again, not sure.
18    Q. Could it have been as many as ten times?
19    A. That's possible. Certainly not 50 times, but
20 beyond that, I'm not sure.
21    Q. In the consultations that you've just
22 described, were any of them medical/legal?
23    A. Yes.
24    Q. How many?
25    A. I don't know.

Page 12

1     Q. Did you bring with you today a copy of your
2  testimony --
3     A. Yes, I did.
4     Q. -- list? Okay. Let me ask you, did you
5  provide testimony ever on a consultation in which you
6  evaluated cauda equina in any way?
7     A. It's very possible, but I don't have any
8  specific recollection of either deposition testimony or
9  trial testimony involving that condition.
10    Q. Would it assist your recollection if you
11 reviewed the list of -- I want to make sure I understand
12 what you're saying -- if you reviewed the list of
13 testimony that you've given, or is it that no matter how
14 many times you looked at it, you wouldn't remember how
15 many times you've given testimony on a cauda equina
16 case?
17    A. I don't believe I'll remember by reviewing
18 this. I mean if I review it, I can tell you certainly
19 some cases did not involve that, but there will be many
20 that I just don't recall all the issues involved, and it
21 could have possibly been that, so I don't think that
22 looking at the list will help me in that sense.
23    Q. When is the last time you looked at anything
24 involving cauda equina?
25    A. I don't recall, aside from this case, of

Page 13

1  course. It may have been a few months, may have been a
2  year.
3     Q. How many cases have you testified in a
4  deposition?
5     A. Approximately 80.
6     Q. Over a period of time from 2001 to the
7  present?
8     A. 2002 to the present.
9     Q. And how many times have you testified at trial
10 in cases since 2001 or 2002?
11    A. Fifteen times, I believe, 14 or 15. We can
12 count them, of course, but that's my recollection.
13    Q. Can you recall whether you testified in any
14 case at trial involving cauda equina?
15    A. No, I can't recall. It is possible, but some
16 of them were several years ago and I don't recall.
17    Q. How many cases have you evaluated in addition
18 to the ones -- or including, whatever is an easier way
19 for you to answer -- including the ones in which you've
20 just identified, the approximately 80 depositions and 14
21 or 15 trial testimonies?
22    A. I really don't know how many, and I'm not sure
23 what would constitute evaluating a case; but in terms of
24 those I'm contacted on and do any preliminary work, I
25 really don't know how many there have been since 2002.

**Page 14**

1  Certainly more than 80, obviously, but I couldn't give
2  you a very accurate estimate of that.
3  Q. Do you have a sense, as you sit here today,
4  how many cases you have open, if you will, meaning that
5  you've been consulted and it hasn't completed? In other
6  words, the trial isn't over or appeal, or whatever level
7  is the end of your involvement, in any given month?
8  A. That's very hard to estimate. I don't keep
9  track of that, either, but it's also difficult to know,
10 because some cases in which I have opened a file and
11 done some preliminary work, I may not have heard from
12 the people involved for some time, and I don't know if
13 it is still open or not, and even if I were to try to
14 count them, it would be very difficult for that reason,
15 so I'm not sure. Probably at this point in time, active
16 cases, probably more than 20, but I really don't know.
17 Q. On a given day, presently -- actually, let me
18 broaden that to in a given week -- how much time do you
19 spend doing medical/legal consultation?
20 A. Well, I'm not certain of that, either. I can
21 try to give you some kind of estimate, I guess. My work
22 week is broken into basically three, three parts, in
23 terms of the work that I do. Part of it is this kind of
24 consulting, medical/legal consulting, or personal injury
25 in some cases, and then other paid consulting for other

**Page 15**

1  clients outside of litigation, and finally research for
2  which I'm not really reimbursed in terms of monetary
3  terms. And the research is done for the Life Expectancy
4  Project. And in a typical week, it's probably about --
5  it varies, but roughly 60 percent of my time will be
6  paid work and 40 percent research, but it will vary,
7  depending upon what stage of research we're at with a
8  given project and so forth.
9      Then in terms of that part that's paid
10 consulting, most of that is litigation; probably 80
11 percent of that is litigation related. I don't have any
12 way of exactly calculating that, but I know that the
13 overall work that Strauss and Shavelle Incorporated does
14 do, it's 80 percent litigation in terms of the paid
15 work, and 20 percent outside of litigation.
16 Q. And you think that's consistent with your
17 actual work as well?
18 A. I think so. I mean it probably varies from
19 week to week, but typically that's probably what I do as
20 well.
21 Q. In terms of paid consulting that is not -- I
22 just want to make sure I understand your answer -- of
23 the 60 percent of your time that you spend doing
24 personal injury, medical/legal or other paid consulting,
25 80 percent of that is litigation related?

**Page 16**

1  A. Yes, that's correct. That's what I said.
2  Q. Okay, and the 20 percent that is paid
3  consulting that is not personal injury or medical/legal
4  works what is the nature of that consulting?
5  A. Well, we consult with some structured
6  settlement companies, annuity companies, giving opinions
7  on life expectancy of persons they bring to us with
8  various medical conditions. We have done that, and I'm
9  not sure that we're continuing to do that. But with
10 groups who are involved in Medicare, Medicaid set aside
11 arrangements after settlement has been reached for
12 Workers' Compensation. And there's at least one
13 investment firm that consults with us that we give
14 opinions again on life expectancy, calculations of life
15 expectancy, and there are some other small things we've
16 done, but I can't list everything that is going on.
17 Q. Who is the major company you mentioned?
18 A. Well, I don't know that I can say that. I
19 think there's some kind of arrangement with them to
20 perhaps not discuss that, so I would feel
21 uncomfortable --
22 Q. You think or you know?
23 A. I don't know for a fact, but it is my
24 recollection that there may be some kind of -- some kind
25 of issue there with respect to divulging who they are,

**Page 17**

1  and so I would defer to Strauss and Shavelle. It's one
2  of their clients, and I'm an independent contractor with
3  them. I would not feel comfortable giving out that
4  information.
5  Q. Have you been asked that question before in
6  deposition?
7  A. I've been asked who the other clients are
8  outside of litigation, and I've given essentially the
9  same response. I may have been asked specifically who
10 they are, and I know that I've never responded to that,
11 to actually give their name. I'm sure that I have not.
12 Q. Have you ever gone back and talked to
13 Dr. Strauss or Dr. Shavelle or whomever makes those
14 decisions and asked whether in fact there is a written
15 agreement that you're not allowed to give that
16 information?
17 A. No, I don't recall doing that.
18 Q. Why not?
19 A. Well, no one ever pursued it, and it seemed
20 that most people are comfortable with the reasons that I
21 gave that I don't feel comfortable giving that
22 information, and certainly that Strauss and Shavelle
23 could be contacted and asked that question. I'm sure
24 that they would tell you whether that's something they
25 can divulge or not.

1  is there more detail? I guess that's the substance of
2  the question.
3     A. Well, it's perhaps an unfortunate consequence
4  of my experience with this kind of testimony, partly. I
5  mean, partly it really is describing what I do. But
6  also, I'm often -- perhaps "accused" is too strong, but
7  in motions filed against me, it's often suggested that
8  I've made up some kind of crazy method that I use, and
9  so it became clear to me that I need to show that it's
10 not, it's something that is used, and I'm just doing
11 what everyone else does.
12        So, in part, I put it there for that, but it
13 does show standard methods, and I think that if you, for
14 instance, have retained another expert who was familiar
15 with these kinds of things -- maybe not so familiar but
16 knew enough to get started, this would be a very good
17 thing for him to read and find out more.
18    Q. Has your testimony been challenged in the
19 context of providing a life expectancy in a personal
20 injury or medical/legal case such as conclusions you've
21 reached in this case?
22    A. By "challenged" you mean --
23    Q. In Court. You said that attorneys have
24 accused you and filed motions in Court --
25    A. They have filed motions, yes --

Page 114

1    Q. All right.
2    A. -- some have filed motions.
3    Q. In those cases, were they cases where you did
4  life expectancies opinions similar, not necessarily in
5  subject matter, but similar to the type that you did in
6  this case?
7    A. Well, yes, similar in some senses. But as you
8  say, with regard to the subject matter, never in a case
9  involving spinal cord injury, never in a case involving
10 obesity either. But in other cases for various reasons,
11 people have filed motions to try either -- well, various
12 things. I mean, it's apparently a common thing on both
13 sides, so I don't know how much meaning there is behind
14 it all, but --
15    Q. Has your opinion ever been excluded from a
16 case by a Court?
17    A. I've been prevented from testifying, and my
18 testimony has been prevented from going to trial, to
19 Court, in two cases.
20    Q. Can you tell me about those cases?
21    A. One was in Texas. If I refer to my list I can
22 tell you what year, but I don't know what you want me to
23 tell you about the case.
24    Q. Let me first ask it -- one is in Texas; where
25 was the other one?

Page 115

1    A. Colorado.
2    Q. Okay. In the Texas case, do you recall what
3  the injury was that you're addressing?
4    A. Yes, it was a woman with a brain stem injury
5  that left her in what's called the locked-in state or
6  locked-in syndrome.
7    Q. And do you know why your testimony was
8  excluded from that case?
9    A. No, I don't know why. I recall some aspects
10 of the motion that the plaintiffs filed, but I don't
11 recall the exact reasoning in the end. Give me a second
12 here. It was June 30, 2004, the date of my deposition
13 in the case. And so, sometime after that, a decision
14 was made. This was a case called Van Voris et al.
15 United States of America. Two words, V-A-N, second
16 word, V-O-R-I-S.
17    Q. Did you ever talk with counsel that retained
18 you about what the issues were in that motion?
19    A. I'm sure we did talk about it, certainly.
20    Q. What do you understand the problem was?
21    A. Well, I understand part of the argument was
22 that this woman was, as I say, in locked-in syndrome.
23 She had locked-in syndrome, meaning she was brain stem
24 injured and completely immobile yet cognitively intact.
25 She knew everything that was going on about her.

Page 116

1  There's a movie about this out now, The Butterfly and
2  the Diving Bell, I think it's called, based on a novel.
3  And I had done a report and analysis based on literature
4  on people in this condition.
5        But in the report, I had also, for
6  comparison's sake, made some analyses using people with
7  spinal cord injuries at high levels which are comparable
8  in some way, and also people in vegetative state which
9  are comparable but worse because they don't have any
10 cognitive awareness, comparable in their lack of
11 mobility.
12       The plaintiffs, as I recall, argued that their
13 client was not -- did not have a spinal cord injury and
14 was not in the vegetative state, and therefore that my
15 analysis was not appropriate. I think that the Court
16 gave some weight to that argument, and I don't recall
17 exactly if that was the main part of their decision
18 ultimately or if it was something else, but ultimately
19 the Court decided that -- the judge decided that he
20 would not hear my testimony on it, although apparently
21 he had already read my report, so I'm not sure what
22 further damage it might have done had I been allowed to
23 testify. But anyway, that's what the outcome was.
24    Q. With respect to the Colorado case, what was
25 the nature of the injuries in that case?

Page 117

**Page 210**

1 formulae in it. But again, it can be reproduced very
2 easily.
3   Q. Did you utilize the trends article in any
4 other way beyond the table that you identified that sent
5 us off talking about Exhibit 4?
6   A. I didn't use in it any other way in
7 determining any mortality rates in this case. Those
8 were the calculations derived from that particular
9 article.
10   MS. LONG: I would like to take a short break
11 so that I can just look and see. I know we're pretty
12 close to time here but I have a lot of stuff that I may
13 or may not have asked and I want to clarify what else is
14 there.
15   VIDEOGRAPHER: Off the record at 4:49 p.m.
16 (Recess taken.)
17   VIDEOGRAPHER: We're back on the record at
18 5:12 p.m.
19 BY MS. LONG:
20   Q. I'll ask you, in the -- I should just tell you
21 I'm going to jump around a little bit here because I'm
22 kind of wrapping up, but in the consulting work you have
23 done with respect to annuity or life insurance risk
24 analysis, have you applied the same methodologies that
25 you applied in this case?

**Page 211**

1   A. Yes, and again, I think annuity companies,
2 structured settlement companies, some of them may have
3 had an umbrella insurance company, but I'm not sure
4 we've done that for life insurance per se; but that kind
5 of thing, the same kind of analyses we do here that I've
6 done in this case.
7   Q. Is there an error rate that can be calculated
8 from your analysis?
9   A. Well, various aspects of the analyses in the
10 studies do have some error measurements that are
11 reported. The rate of error -- it's not clear to me
12 exactly what that means in the context of what I'm doing
13 here; if you could clarify, then I could perhaps tell
14 you what that is, but I'm not sure what that means in
15 this context.
16   Q. Did you start with a hypothesis and attempt to
17 disprove the hypothesis in this analysis?
18   A. No.
19   Q. Have you personally ever received any
20 national, state or local government research grants in
21 the areas of spinal cord injury -- excuse me -- or
22 obesity?
23   A. I personally have not.
24   Q. And have you personally received any research
25 grants from any nonprofits or anything like that on

**Page 212**

1 either of those subjects or on mortality or longevity?
2   A. Personally I have not, but the Life Expectancy
3 Project has in the past.
4   Q. When was the last time you were aware that
5 there was a research grant provided to the Life
6 Expectancy Project?
7   A. I don't know of any particular date. I think
8 within the last year or few years, I'm sure. But I
9 don't know when the last one may have been.
10   Q. What we've gone through today, do you feel
11 that another statistician could review the information
12 that you have given and and go through the process of
13 analysis and come up with the same results that you did?
14   A. It would depend on the background of the
15 statistician. I mean statisticians specialize in all
16 kinds of areas. If they had adequate experience in
17 epidemiology and life table analyses and so forth, if
18 they had the background necessary to read and understand
19 these articles, yeah, they could do this, based on my
20 report and the additional things that I'm provided, yes.
21   Q. Have you ever been retained by an insurance
22 company or anyone else to construct actuarial tables for
23 the general population or for any specific population or
24 person?
25   A. Several years ago, a reinsurance company

**Page 213**

1 called Swiss Re, I think, through the Life Expectancy
2 Project, I believe -- it might have been through Strauss
3 and Shavelle Incorporated, but they commissioned a study
4 of Down's syndrome mortality rates by us. This was not
5 done for any fee; it was done on a pro bono basis and we
6 did provide that information to them, but this was years
7 ago and I don't remember the details of it now.
8   Q. I think earlier you mentioned that you work on
9 contract for Strauss and Shavelle; can you tell me what
10 the terms of your contract are?
11   A. If I knew them exactly, I still wouldn't be
12 comfortable telling you because this is information that
13 I'm not sure would be appropriate to put on a public
14 record. I wouldn't refuse to do so, but at this point I
15 would decline to say any more about that.
16   Q. Would you agree to provide a copy of your
17 existing contract to Ms. Lindquist for the purposes of
18 reviewing that? I think you're probably aware that we
19 have a right to know the basis of your income,
20 particularly as it relates to the work that you've done
21 here. And so my question is would you provide that to
22 Ms. Lindquist so that we could review it and determine
23 whether there are any issues that we need to follow up
24 with?
25   A. Well, I'm not aware of exactly what

**Page 214**

information that you are privileged to in that sense. I know that you have a right to know what percentage of my income is derived through this type of work and I think I told you to the extent that I know what that number is. I can discuss with Strauss and Shavelle Incorporated how they feel about that, but that's their contract, as well as mine, and I wouldn't feel in a position to divulge it to anyone without their okay on that.

Q. Have you previously raised that issue with them?

A. No.

Q. Have you ever been asked in a deposition for a copy of your contract or for the terms of your contract?

A. I don't recall having been asked that.

Q. You don't recall ever being asked for the terms of your contract with Strauss and Shavelle?

A. I've been asked about it. I haven't been asked specifically to provide a copy of anything, and I've been asked for things like my salary and so forth, but never have I been required ultimately to provide that kind of information.

Q. Is it fair to say that you earn your salary -- let me ask a different question.

Salary is kind of an odd concept in the legal

**Page 215**

field when you're talking about contract work. So, when you say "salary," does that mean that you get a regular paycheck regardless of the amount of work that you do for Strauss and Shavelle?

A. I get an annual salary regardless. Then I get, additionally, perhaps twice a year, a discretionary bonus that probably is based on the amount that I bill and also the amount others in the group are billing, I think.

Q. And do you know how much that online salary was for 2007?

A. I kind of approximately may know that, but again, that's not something I'd put on a public record at this point.

Q. Do you feel the same way about the discretionary bonus?

A. Yes.

Q. All right. Do you know how much you billed for Strauss and Shavelle last year?

A. No, I don't.

Q. Approximately how many -- I think I already asked that.

Have you done any original research on obesity -- I'll leave that on obesity?

A. I certainly have done some research on

**Page 216**

obesity, one would consider original, perhaps. But again, it depends what you mean by that. I haven't published anything on that, so it hasn't culminated in any kind of publication.

Q. When I use the term "research," did you look at raw data, formulate a hypothesis, attempt to prove the hypothesis or disapprove the hypothesis? Did you do the kind of research where you were actually looking at raw data and analyzing the data rather than the kind of research that is associated with reviewing published literature and utilizing information in that literature or otherwise reanalyzing the data that is in that existing literature?

A. I think at some point I looked at that question in the course of doing studies of Down's syndrome and mortality risk associated with Down's syndrome. Again, I don't have any of that. It didn't result in anything that could be published, so I don't have any results, but it's probably something I did look at, yes.

Q. Have you done any original research by using the same definition on spinal cord injury and any of the following subjects: Obesity, nutritious, diabetes, exercise, effective education, marital status, outlook on life, job satisfaction, having children, and

**Page 217**

psychological health?

A. I don't recall having done so.

Q. Did you take into account in your analysis of Greg Johnson his driving history or the fact of him not driving?

A. I did not.

Q. What is your understanding as to how your opinion is used in the context of -- will be used in the context of this case, the purpose of it in the context of this case?

A. Specifically in the context of this case, I don't know exactly how it may be used, but I know that in general, one of the uses is to try to estimate a fair award of present value for future costs of care should negligence be found to have occurred, for example. So that's part of the reason that it might be used.

Q. You understand that your opinion has been relied on by the life care expert that Ms. Lindquist hired, do you not?

A. I don't have specific information about that, but I wouldn't be surprised if the life care expert or the economist, if there is one, may have used some aspect of my report.

Q. Have you spoken with Ms. Toby Shearer (phonetic), Dr. Barchuck (phonetic) or anyone else