```
            THE CIRCUIT COURT OF THE FIRST CIRCUIT
                       STATE OF HAWAII
                CIVIL NO. 00-1-003058 (EEH)
              (Medical Malpractice) (Consolidated)
                CIVIL NO. 00-1-003584 (RWP)
                    (Medical Malpractice)


         DEPOSITION OF ROBERT MICHAEL SHAVELLE, Ph.D.
                        VOLUME NO. I
              TAKEN: Wednesday, August 21, 2002
                  TIME: 10:07 a.m. to 3 p.m.
```

WILLIAM L. ENGLISH, Individually
and as Guardian of the Person of
ORIET "BOBBEE" ENGLISH, HEINE
ENGLISH and PAUL AKONA,

          Plaintiffs,

   v.

ROBIN H. TAKATA, M.D.; THE QUEEN'S
MEDICAL CENTER; SHARON S. LAWLER,
M.D.; ROLLAND K. NAKASHIMA, M.D.,
INC.; JOHN DOES 1-10; JANE DOES 1-10;
DOE PARTNERSHIPS 1-10; DOE
CORPORATIONS 1-10; and DOE
GOVERNMENTAL ENTITIES 1-10,

          Defendants.

WILLIAM L. ENGLISH, Individually
and as Guardian of the Person of
ORIET "BOBBEE" ENGLISH, et al,

          Plaintiffs,

   v.

ROLLAND K. NAKASHIMA, M.D.,
INC., et al.,

          Defendants.

Reported by: Marlene Puaoi, CSR 7370

1              I N D E X

2

3 Deposition of ROBERT MICHAEL SHAVELLE, Ph.D.

4 Volume No. I

5 Wednesday, August 21, 2002

6

EXHIBIT E
PAGE 1 of 10

shavelle.txt

18 that everything in this CV is currently updated and
19 there's nothing to add or to modify, is that right?
20     A.    Yes.
21     Q.    Okay. What I'm going to do is have this
22 marked as Exhibit 1 to your deposition and attach it to
23 your deposition transcript. I'd like to ask you a
24 couple of questions about your background, if I could,
25 starting with your corporation of Strauss & Shavelle,

                                                        9
1 Inc., of which, according to your CV, you are currently
2 the principal, as you put it; is that right?
3     A.    I'm a principal in the corporation, yes.
4     Q.    When you say you're a principal, I assume that
5 you mean you're an officer, director, and shareholder.
6     A.    Yes.
7     Q.    All right. The other member of Strauss &
8 Shavelle, Inc., is Dr. Strauss; is that correct?
9     A.    Yes.
10    Q.    And there's another officer or director that
11 would be Dr. Strauss's wife?
12    A.    Gail Strauss, correct.
13    Q.    Right. And those would be the three
14 principals of Strauss & Shavelle; is that right?
15    A.    Yes.
16    Q.    And your proportion of shareholding in the
17 stock of Strauss & Shavelle would be you at 45 percent,
18 Dr. Strauss at 45 percent, and Gail Strauss at
19 10 percent. Would that be right?
20    A.    Yes.
21    Q.    Has there been anybody else involved in this
22 corporation?
23    A.    No.

                          Page 8

shavelle.txt

```
 4 employees of Strauss & Shavelle, and we work with the
 5 Life Expectancy Project.
 6     Q.   All right.  Anybody else?
 7     A.   Not employees, no.
 8     Q.   Okay.  Anyone that is associated with
 9 Strauss & Shavelle in any way, whether they are
10 employees or not, that have worked on the Life
11 Expectancy Project?
12     A.   Yes, Dr. Steven Day.
13     Q.   Okay.  And what's his relationship with
14 Strauss & Shavelle?
15     A.   He's not an employee of the corporation.  He
16 is an independent contractor.
17     Q.   Strauss & Shavelle pays Dr. Day for his work?
18     A.   Yes.
19     Q.   And as you indicated, his work includes work
20 on the Life Expectancy Project?
21     A.   Yes.
22     Q.   What does he do?
23     A.   I assume you're asking for the Life Expectancy
24 Project.  He's a researcher, just like Dr. Strauss and
25 I.
```

                                                          12
```
 1     Q.   Okay.  Is there a division of duties between
 2 the three of you with respect to the Life Expectancy
 3 Project?
 4     A.   Yes.
 5     Q.   What is the division?
 6     A.   Dr. Strauss is the director of the project,
 7 I'm the technical director, and Dr. Day is a researcher
 8 with the project.
 9     Q.   Okay.  As a technical director, do you get
```

Page 10

shavelle.txt
16 witness than actually doing the research?

17    A.    Expert witness and consulting, yes.

18    Q.    Right. When you say "consulting," that's for
19 litigation purposes?

20    A.    For the most part, yes.

21    Q.    What do you mean, "for the most part"? What
22 other part would there be?

23    A.    I have and I continue to do consulting that's
24 not litigation-related.

25    Q.    In what way? What kind of situation or case

                                                14
1 would that be?

2    A.    At present, I'm working with cardiologists at
3 Harbor UCLA Medical Center. I give assistance on
4 statistical and biostatistical analysis of their data.

5    Q.    At what medical center?

6    A.    Harbor UCLA Medical Center.

7    Q.    Okay. Any other consulting work that you do?

8    A.    We've done a number of projects related to
9 survival and cause of death of children and adults who
10 have developmental disabilities. Most recently, we've
11 worked with the Autism Tissue Foundation, or maybe it's
12 the Autism Tissue Program -- I don't recall -- on the
13 cause of death of persons with autism, and that was not
14 litigation-related.

15    Q.    Okay. Anything else?

16    A.    There's quite a bit else on my CV, but at
17 present, no.

18    Q.    All right. Would it be fair to say, Doctor,
19 that a very large majority or bulk of your consulting
20 work is in fact litigation-related as opposed to
21 nonlitigation?

Page 12

shavelle.txt

22   A.   That's correct, it would be upwards of
23 95 percent.
24   Q.   Okay. This Life Expectancy Project, this was
25 the project that was started and originated with the

15

1 University of California at Riverside system; is that
2 right?
3   A.   I believe it began earlier than that, with
4 Dr. George Tarjan at UCLA. And later, I believe it
5 moved to the Lanterman Development Center in Pomona,
6 California.
7   Q.   And then to UC Riverside?
8   A.   In the early 1980s, I believe, was when
9 Dr. Richard Eyman of the University of California,
10 Riverside became the principal investigator on what was
11 then an NIH-funded grant.
12   Q.   And much of the data that exist today
13 originated from the Life Expectancy Project in its form
14 when it existed at the UC Riverside; is that right?
15   A.   Well, the data hasn't changed over the years.
16 It's just increased.
17   Q.   Right.
18   A.   So your statement would be correct.
19   Q.   All right. And since that time, my
20 understanding is that the Life Expectancy Project has
21 been taken over by Strauss & Shavelle, Inc., or is that
22 not fair?
23   A.   That's not a correct characterization.
24   Q.   Okay. How would you characterize it?
25   A.   Dr. Strauss was the principal investigator or

16

1 co-principal investigator on the grant along with
2 Dr. Eyman for several years, and he remains the director

Page 13

shavelle.txt

3 of the project. The project is no longer NIH-funded, so
4 the project itself doesn't have any employees.
5     Q. Is it still run at the University of
6 California at Riverside?
7     A. No. Dr. Strauss directs the project from his
8 present location at the Life Expectancy Project in San
9 Francisco.
10    Q. All right. So the affiliation with the UC
11 Irvine school is no longer existent?
12    MS. ABURANO: Did you mean to say Irvine?
13    MR. CHUR: Riverside, sorry. UC Riverside. I
14 apologize.
15    THE WITNESS: No, we're still affiliated.
16 Dr. Strauss and I are still affiliated with the
17 university, as is the Life Expectancy Project.
18    MR. CHUR: Q. All right. Who owns the Life
19 Expectancy Project currently?
20    A. I don't know that it's possible to say it's
21 something that could be owned. Dr. Strauss is the
22 director of the project.
23    Q. And as a director, it's also in his capacity
24 as a principal, as you put it, of Strauss & Shavelle,
25 Inc.; is that right?

17

1    A. Those are separate capacities.
2    Q. So Strauss & Shavelle, Inc., does not own the
3 Life Expectancy Project, has no control over the Life
4 Expectancy Project, has no authorization over the Life
5 Expectancy Project; is that correct?
6    A. I don't quite know how to answer the question
7 as phrased. I could say that the Life Expectancy
8 Project is the continuation of an NIH-funded grant, and

Page 14

EXHIBIT E
PAGE 6 of 10

shavelle.txt

```
 9 Dr. Strauss and I have chosen to continue the research
10 unpaid --
11      Q.   You and Dr. --
12      A.   -- whereas before, Dr. Strauss and I were both
13 paid by the project through the NIH-funded grant.
14      Q.   But you're paid through Strauss & Shavelle for
15 your work on the Life Expectancy Project?
16      A.   No, that's not correct.
17      Q.   Strauss & Shavelle, Inc., gets paid to do the
18 work relating to the Life Expectancy Project?
19      A.   No, that's not correct.
20      Q.   Strauss & Shavelle funds the Life Expectancy
21 Project?
22      A.   To the extent that there are limited expenses,
23 yes.
24      Q.   Well, whatever the needs --
25      A.   They're paid by Strauss & Shavelle, Inc., or
                                                        18
 1 by Dr. Strauss or myself personally.
 2      Q.   Right.  So it's either Strauss, Dr. Strauss,
 3 or yourself, or Strauss & Shavelle, Inc., that provides
 4 all the necessary money that the Life Expectancy Project
 5 requires to continue; is that correct?
 6      A.   To the extent that the Life Expectancy Project
 7 needs funds, yes, that's correct.
 8      Q.   Okay.  So in essence, between you and
 9 Dr. Strauss and Strauss & Shavelle, Inc., that's the
10 financial basis for the existence of the Life Expectancy
11 Project.  Right?
12      MS. ABURANO:  Are you asking him would the Life
13 Expectancy Project exist but for the funding from
14 Strauss & Shavelle?
```

Page 15

shavelle.txt

10    A.   No, I didn't say that.

11    Q.   Okay. You're not a statistician on life
12 expectancy. Correct?

13    A.   I don't know what that term means.

14    Q.   You don't know what "statistician" means?
15 You've never heard of it; is that right?

16    A.   I couldn't agree with that.

17    Q.   You don't know what "statistician" means; is
18 that right?

19    A.   That's incorrect. I do know what
20 "statistician" means.

21    Q.   I'm asking you, do you consider yourself a
22 statistician on life expectancy?

23    A.   I don't know that I've ever heard that
24 terminology, "statistician on life expectancy," but I
25 would not characterize myself as that.

34

1    Q.   You're not an expert statistician in life
2 expectancy?

3    MS. ABURANO:  Why don't you just say "expert
4 statistician"? I'm not sure if that, you know --

5    MR. CHUR:  Q.  Do you consider yourself an expert
6 statistician on life expectancy?

7    A.   I wouldn't use those terms. I wouldn't use
8 that phrasing.

9    Q.   Okay. Help me. How would you characterize
10 that, if you are in any way an expert in statistical
11 analysis in life expectancy? Or are you not?

12    A.   I believe I am an expert on life expectancy.
13 And it is true that I have a Ph.D. in applied
14 statistics, so --

15    Q.   But you don't claim to be an expert in

Page 28

shavelle.txt
22 certainly are not claiming to have any expertise in
23 medicine in any way. Would that be fair? You're not a
24 medical doctor or have any medical training; is that
25 right?

                                                    36
1    A.   The answer to your second two questions is
2 yes.
3    Q.   What about the first?
4    A.   I don't completely understand the question.
5    Q.   You're not holding yourself out to be an
6 expert in medicine?
7    A.   That's correct.
8    Q.   You're not a physician's assistant, a nurse
9 practitioner, or a neuroscientist?
10   A.   No.
11   Q.   You don't have any expertise in life-care
12 plans or rehabilitation?
13   A.   In general, no.
14   Q.   What do you mean, "in general"? In specific,
15 you are? I don't understand when you say "in general."
16 Why the use of that phrase?
17   A.   I wanted to give a correct answer to your
18 question, and since I don't know everything involved in
19 life-care planning or rehabilitation, I can't say I
20 don't have any expertise on any of the aspects of those.
21   Q.   Let me make it clear. You're not an expert in
22 any of those fields that I just mentioned. Is that
23 fair?
24   A.   That's fair.
25   Q.   Okay. Have you ever performed a physical

                                                    37
1 examination of a patient or any person for the purposes
2 of rendering an opinion?

Page 30

shavelle.txt

3    A.   No.

4    Q.   Okay. By the way, I think you indicated
5 that -- what was the percentage that you told me that
6 you spend with respect to doing litigation work as
7 opposed to actual research? I think you gave me a
8 percentage breakdown. Was that three-quarters?

9    A.   I did. It depends on the week, the month, but
10 anywhere from half my time to three-fourths of my time
11 is on consulting, most of which is litigation-related.

12   Q.   On your forensic work, how many cases would
13 you estimate that you have been retained to be a
14 consultant with respect to, well, just litigation work?

15   A.   In total, approximately 350.

16   Q.   Over how many years?

17   A.   That total is since 1999, I believe.

18   Q.   So roughly 100 a year would be a fair
19 approximation?

20   A.   That would be the average, yes.

21   Q.   Okay. What are your charges currently?
22 What's your fee schedule like? And if there are
23 different rates for different duties, then delineate
24 what they are.

25   A.   Three hundred dollars an hour for analysis,

38

1 and $450 an hour for deposition and trial, with a
2 two-hour minimum on the latter.

3    Q.   Does it make a difference whether you're
4 charging the opposing counsel versus the attorney that
5 has retained you?

6    A.   No.

7    Q.   The rates stay the same?

8    A.   That's correct.

Page 31

EXHIBIT E
PAGE 10 of 10