### Page 2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ROGER FREELAND, on his own behalf, )
ROSELYN FREELAND, on her own behalf,)
and as mother and next friend of )
REX FREELAND, a minor with severe )
brain damage. )
)
Plaintiffs, )
)
vs. ) No. 99-1500
) MV/WWD ACE
THE UNITED STATES OF AMERICA, )
)
Defendants. )
_____)

Deposition of DAVID STRAUSS, PH.D., taken on behalf of the plaintiffs, at University of California at Riverside, 2638 Statistics Building, Riverside, California 92501, commencing at 11:40 a.m., Monday, December 4, 2000, before Mary Tellez-Giron, Certified Shorthand Reporter No. 10222.

### Page 3

APPEARANCES:

For Plaintiffs  MOFFAT & DICHARRY
By STEPHEN MOFFAT, ESQ.
1005 Luna Circle NW
Albuquerque, New Mexico 87102
(505) 242-2774

For Defendant  U.S. DEPARTMENT OF JUSTICE
By PHYLLIS A. DOW, ASSISTANT
U.S. ATTORNEY
P.O. BOX 607
Albuquerque, New Mexico 87103
(505) 346-7274

### Page 4

INDEX

DEPONENT              EXAMINED BY      PAGE
DAVID STRAUSS, PH.D.  MR. MOFFAT       5

EXHIBITS FOR IDENTIFICATION
Plaintiffs'                            PAGE
1 - Article entitled, "Life Expectancy  26
    and Median Survival Time in a
    Permanent Vegetative State"
2 - Report by David Strauss, Ph.D.      26
    dated September 27, 2000

3 - Document entitled "Depositions & Trial  119
    Testimony"

INFORMATION REQUESTED
NONE

INSTRUCTIONS NOT TO ANSWER
NONE

### Page 5

RIVERSIDE, CALIFORNIA: MONDAY, DECEMBER 4, 2000;
11:40 A.M.
(Prior to going on the record, the parties stipulated to waive the provisions of Rule 30(b)(4), except for the swearing of the witness.)

DAVID STRAUSS, PH.D.,
deponent, was sworn and examined
and testified as follows:

DEPOSITION OFFICER:  Do you solemnly swear that the testimony that you are about to give in this matter shall be the truth, the whole truth, and nothing but the truth, so help you God?

DR. STRAUSS:  I do.

EXAMINATION

BY MR. MOFFAT:
Q  Dr. Strauss, you've had your deposition taken before, I believe?
A  Yes.
Q  I'm going to ask you some questions about a bunch of things but primarily it's about Rex Freeland. You understand that?
A  Yes.

### Page 10

(1) particular case.
(2) A   I imagine so. I don't talk to
(3) insurance companies very often.
(4) Q   Wouldn't that be right, though, that --
(5) the only real method of determining how much a given
(6) policy would cost would be to get a quote from an
(7) insurance company?
(8) A   Well, in the sense that it's the
(9) insurance company that you'd be dealing with,
(10) obviously they -- it's their decision.
(11) Q   Right.
(12) A   Have I answered your question?
(13) Q   Well, I think so. I mean, our goal, at
(14) least maybe or could be in terms of determining life
(15) expectancy, would be to provide -- if our goal is to
(16) provide income for Rex's life, one way to do it is
(17) through an insurance annuity. You understand that?
(18) A   Yes.
(19) Q   And to determine how much that would
(20) cost, it ultimately doesn't matter what you say.
(21) It's what the insurance company says, isn't it?
(22) A   If the insurance company is entering
(23) the contract, it matters what they think, yes.
(24) Q   They have to make their own assessment
(25) of the risks with them?

### Page 11

(1) A   Yes. But I would add that they would
(2) do so by consulting the actuarial literature, to
(3) which we contributed quite a bit, and the results are
(4) pretty consistent. Well, they're relatively
(5) consistent.
(6) Q   If we didn't provide for his future
(7) income through the purchase of an annuity, what other
(8) method would there be to determine how much money
(9) would have to be awarded to take care of him for as
(10) long as he lives?
(11) MS. DOW:   I'll object to the form of the
(12) question as being overly broad and speculative, and
(13) you also are using the word "we," and I am not
(14) necessarily -- I don't think you intend to include me
(15) in the "we."
(16) MR. MOFFAT:   No.
(17) MS. DOW:   And also, too -- I'll let him
(18) answer, if he can, but this is going beyond his
(19) report, I think.
(20) THE DEPONENT:   Yes. It would be helpful to
(21) me if you could, perhaps, repeat and maybe focus your
(22) question.
(23) Q   MR. MOFFAT:   Well, we talked about
(24) purchasing an annuity from an insurance company. So
(25) that's one option that's open to the parties in this

### Page 12

(1) case. The other would be -- one other would be to
(2) simply establish an amount of money that would
(3) guarantee his care for as long as he lived. Let me
(4) make that assumption and then ask you, how would you
(5) determine how much money he would need in order to
(6) provide care for as long as he lived?
(7) A   A couple comments. To your first
(8) question, are there bases for doing this? Well, I
(9) understand that in some situations -- I have no idea
(10) whether this would apply here -- the concept of more
(11) likely than not would apply, and then the median
(12) survival of five years would correspond to that
(13) because it's as likely as not that Rex will live 5.1
(14) more years, according to this analysis.
(15) So it's more likely than not that he
(16) would not survive 5.2 years. It's going a little bit
(17) higher. So the courts may want to consider that. Of
(18) course, that's not my decision.
(19) Answering your other question, which is
(20) covering Rex's life as long as he lives, there is no
(21) age for which you can say a person could live up to
(22) this age but definitely wouldn't be alive a year
(23) beyond that.
(24) So there's no amount of money that
(25) could possibly 100 percent mathematically guarantee

### Page 13

(1) for a lifetime. It seems to me that the Court needs
(2) to -- the Court will work with whatever it thinks is
(3) quite fair. And what "fairs" means to the Court, of
(4) course, is not my call.
(5) Q   Well, if the court were to choose the
(6) median age that you've determined and award money
(7) that would last for 5.1 years, that would mean that
(8) for Rex or for 49 percent of the people in your study
(9) they would have no money after 5.1 years, correct?
(10) A   On that basis, yes.
(11) Q   So in that respect, an annuity is a
(12) safer proposition, at least for the client?
(13) A   Yes.
(14) Q   You are a doctor of philosophy?
(15) A   I have a Ph.D., yes.
(16) Q   That makes you a doctor of philosophy?
(17) A   Yes.
(18) Q   And statistics?
(19) A   That's my Ph.D., yes.
(20) Q   You're not a medical doctor?
(21) A   I'm a medical researcher. I'm not
(22) qualified to practice medicine.
(23) Q   You didn't go to medical school?
(24) A   I didn't go to medical school.
(25) Q   And you don't have a medical degree?

### Page 14

(1)  A   I don't have an M.D.
(2)  Q   And you're not a nurse?
(3)  A   That's true.
(4)  Q   And have you ever provided primary care
(5)  to disabled or severely disabled individuals?
(6)  A   No.
(7)  Q   Has any journal of any sort,
(8)  statistics, any peer review journal, statistics or
(9)  medical journal, published an opinion of yours in
(10) which you have given an opinion regarding the life
(11) expectancy of one particular individual?
(12) A   Yes. I would say most of our work
(13) could be interpreted that way.
(14) Q   Well, I'm not asking how it could be
(15) interpreted. I'm asking if you have published an
(16) article, any articles, that discuss a particular
(17) individual as opposed to groups of individuals?
(18) A   Well, the scientific community isn't
(19) interested in one particular individual. It's
(20) interested in analyses that have some wide
(21) applicability.
(22) Q   So the answer is no?
(23) A   I wouldn't say the answer is no because
(24) you can speak of an individual based on the findings
(25) in our published research.

### Page 15

(1)  Q   Well, then tell me the name of the
(2)  article and the journal in which it was published in
(3)  which you discussed a specific named individual's
(4)  life expectancy.
(5)  A   I have not discussed a named
(6)  individual's life expectancy.
(7)  Q   Have you discussed in an article a
(8)  particular person, whether he was named or not, his
(9)  life expectancy for his particular individual
(10) background, history, condition?
(11) A   I'm sorry. Could you reword that?
(12) Q   I've read a bunch your articles, and
(13) they have to do -- in various articles, depending on
(14) the topic, you pick groups of individuals and devise,
(15) I guess, life tables for a given group or subgroup.
(16) Isn't that correct?
(17) A   Roughly, yes.
(18) Q   But none of the articles I have read
(19) address a particular individual.
(20) A   I don't know what "address" means.
(21) They certainly apply to particular individuals.
(22) Q   But none of them, let's say, discuss
(23) one particular individual?
(24) A   Not by name.
(25) Q   You're not an actuary, are you?

### Page 16

(1)  A   I would say in issues related to life
(2)  expectancy I am.
(3)  Q   You're not licensed as an actuary by
(4)  the State of California?
(5)  A   I'm not licensed, but I teach
(6)  actuaries, and I publish research on which actuaries
(7)  rely upon.
(8)  Q   You're not licensed as an actuary in
(9)  any other state, are you?
(10) A   No.
(11) Q   I have a copy of your report, and I
(12) wanted go through it. Do you have a copy of it?
(13) I've got one dated September 27, 2000. Is that the
(14) one you have?
(15) A   Yes.
(16) Q   Have you changed your opinions at all?
(17) A   I don't believe so.
(18) Q   I need to ask you some questions about
(19) what's in this report. In the second paragraph, you
(20) refer to a 95 percent confidence interval as being
(21) 6.5 and 11.1, and that has to do with the life
(22) expectancy?
(23) A   Correct.
(24) Q   Does that mean that having determined a
(25) life expectancy for this particular group to be 8.5

### Page 17

(1)  years, you were saying that 95 percent of them,
(2)  according to your statistical analysis, will live
(3)  between six and a half and 11.1 years?
(4)  A   No. It doesn't mean that. What it
(5)  refers to is the margin of error. Just like in
(6)  opinions polls, there's a plus or minus figure
(7)  because you don't have everyone in the country, and
(8)  the 95 percent confidence interval means that you bet
(9)  95 percent probability that if you did this again and
(10) again and again, that -- let me rephrase that.
(11)     I'm sorry. You have 95 percent
(12) confidence because the answer could be off by a
(13) certain amount, but it's very unlikely to be off by
(14) more than was given by those bounds.
(15) Q   Those are the bounds within which 95
(16) percent of the time you -- statistically at least,
(17) you would expect the life expectancy to fall?
(18) A   Let me give it -- this is something
(19) that always comes up in our classes. Let me say it
(20) very carefully. If you had all the data in the
(21) world, then you would be able to do a calculation
(22) that would have no margin of error.
(23)     Just like if you have an opinion poll
(24) with two hundred million people, there would be
(25) essentially no margin of error, and there would be a

### Page 38

(1) A    "Contradicts" is a strong word. I have
(2) some research that I think bears on that issue, which
(3) you've not yet seen because -- I don't think it's
(4) published yet. But it does indirectly address that
(5) issue. That's this article (Indicating).
(6) Q    This is not yet published?
(7) A    Correct. I think it isn't.
(8) Q    Where do you expect it will be
(9) published?
(10) A    Pediatric Neurology.
(11) Q    When is it scheduled to be published?
(12) A    They haven't given me a date. It may
(13) have been published. Maybe over the next couple of
(14) months.
(15) Q    What information or conclusions have
(16) you drawn in this article that was just handed to me?
(17) A    I think there is probably one really
(18) most salient thing, which is that we looked at three
(19) groups: people in a minimally functioning state in
(20) that there was no voluntary mobility and no evidence
(21) of cognitive function, at least using the measures we
(22) used; then we have a group who's a little bit better
(23) cognitively, and they have a limited amount of
(24) cognitive ability but no mobility; and then finally a
(25) third group that has some mobility and some cognitive

### Page 39

(1) level. And we found that the middle group, the ones
(2) who have some cognitive but no physical mobility, are
(3) more like the ones who have no cognitive than they
(4) are like the ones who have both.
(5)      What we deduced from that is that we --
(6) one is that mobility is the more important factor,
(7) and, secondly, that some people had speculated that
(8) the people with some minimal cognitive level would be
(9) getting better care because they are responding, and
(10) that that alone might make a difference in their
(11) survival. The fact we found no difference made us
(12) think that there wasn't an issue of difference in
(13) level of care.
(14) Q    So to some extent at least you feel
(15) that the conclusions in this newer article are
(16) inconsistent at least with what Dr. Haig reported and
(17) the conclusions he's reached?
(18) A    To some extent, but I would need to
(19) know more about Dr. Haig's study.
(20) Q    Have you attempted to learn more about
(21) Dr. Haig's study?
(22) A    I haven't at the moment. It was, as
(23) you know, a very small one.
(24) Q    I'm looking at your -- I think it's
(25) Exhibit 1, the 1999 article. On the first page of

### Page 40

(1) that article over on the right, you compare the life
(2) expectancy to median survival. You say, "It's more
(3) difficult to compute because it's based on a life
(4) table and requires mortality rates at all ages." Am
(5) I -- well, the study that you've looked at, the group
(6) of 1,021, at the time of this report at least only
(7) 394 had died?
(8) A    Right.
(9) Q    How many of the patients who suffered
(10) injury at age 15 had survived 10 years?
(11) A    Do you mean people who suffered injury
(12) at age exactly 15?
(13) Q    Well, let's say in the 12 months
(14) surrounding age 15.
(15) A    That would be a very small number of
(16) people.
(17) Q    Do you know?
(18) A    I could easily find out. I don't know
(19) at the moment.
(20) Q    Do you know how many had suffered
(21) injury between ages, let's say, of 14 and 18?
(22) A    Again, I could find out. I don't have
(23) that at the moment.
(24) Q    Do you know how many of the population
(25) we're talking about had suffered injury between the

### Page 41

(1) ages of 14 and -- I guess you don't know any of those
(2) numbers?
(3) A    As I sit here, I don't. I have it all
(4) available to me, but not at the moment.
(5) Q    How would you obtain -- you say it's
(6) available. What would you do to answer the questions
(7) I've been asking you?
(8) A    It's in our database. So it's very
(9) simple to find out.
(10) Q    And your database is on some of your
(11) computers here? It's available through your
(12) computers here?
(13) A    Yes.
(14) Q    Could another statistician, let's say
(15) that I contacted, have access to that same database?
(16) A    It belongs to my company. I don't
(17) speak for that at the moment.
(18) Q    The company is owned by yourself and
(19) Dr. Shavelle?
(20) A    Primarily, yes.
(21) Q    And have you allowed other
(22) statisticians access to your database in order to
(23) review or evaluate your calculations?
(24) A    No statistician has ever asked us.
(25) Q    And if a statistician asked you, would

### Page 42

(1) you allow them to have access to your database so
(2) they could check the validity of your conclusions?
(3)     MS. DOW:    Objection; asked and answered.
(4)     THE DEPONENT:   The situation hasn't arisen.
(5) I can't answer that.
(6)     Q    MR. MOFFAT: Why not?
(7)     A    It would depend on who it was and what
(8) the circumstances were.
(9)     Q    Well, it would be in the context of
(10) this litigation.
(11)    A    If you had a court order, I'm sure we'd
(12) be happy to provide the data.
(13)    Q    You wouldn't do it without a court
(14) order?
(15)    A    I'd have to consult Dr. Shavelle on
(16) that.
(17)    Q    Has anyone -- I guess nobody then at
(18) this point has reviewed any of your calculations and
(19) projections or reports that are based on the database
(20) in the -- is this the Riverside Life Expectancy
(21) Project?
(22)    A    I'm not sure that I'm answering your
(23) question. But when you submit research to journals
(24) -- is that what we're talking about --
(25)    Q    Yes.

### Page 43

(1)     A    -- the reviewers go through the paper
(2) you write, and if they have any questions about
(3) anything, they ask, and you provide that
(4) information. Nobody ever asks for your whole
(5) database to go over it.
(6)     Q    So nobody has asked?
(7)     A    Nobody has asked. They ask specific
(8) questions if they want answers to them.
(9)     Q    In other lawsuits -- you've testified
(10) in a number of other cases, have you not?
(11)    A    Yes.
(12)    Q    Has any party asked you to provide the
(13) database for evaluation?
(14)    A    You mean a formal request?
(15)    Q    Formal or informal.
(16)    A    People talk about it sometimes. There
(17) was one case about three years ago before we -- near
(18) the beginning when we were starting to do this work
(19) -- where the counsel asked for the particular people
(20) that we analyzed, and in that case I did, indeed,
(21) give them the information they wanted.
(22)    Q    Who was that; do you recall?
(23)    A    I'd have to look it up.
(24)    Q    Since you gave that information out
(25) before, is there any reason why you wouldn't give it

### Page 44

(1) to me or to a representative that I contacted?
(2)     MS. DOW:    Objection; asked and answered.
(3)     THE DEPONENT:   That was me three years ago.
(4) Now we have a company, and I don't have the sole
(5) vote. I really can't answer your question.
(6)     Q    MR. MOFFAT: Let me step back a second
(7) and try to get a handle on this. I'm asking you
(8) questions here today, and you're speaking in your
(9) individual role as a statistician and mathematician;
(10) is that correct?
(11)    A    I wouldn't characterize myself as a
(12) statistician/mathematician. If we're talking labels,
(13) I would categorize myself as a statistician,
(14) mathematician, actuary, epidemiologist, medical
(15) researcher.
(16)    Q    I'm going to pay you for your time.
(17) How much do I pay you?
(18)    A    $400 an hour.
(19)    Q    Do I make the check out to you?
(20)    A    No.
(21)    Q    Who do I make it out to?
(22)    A    My company.
(23)    Q    And your company is what?
(24)    A    Strauss & Shavelle, Incorporated.
(25)    Q    Who owns the company?

### Page 45

(1)     A    Dr. Shavelle and myself and my wife.
(2)     Q    Do you divide the money equally between
(3) all three of you? Or if you've done the services,
(4) does the money then go to you?
(5)     A    It all goes to the company, and then we
(6) have a lot of expenses, and some of it comes to us in
(7) salary.
(8)     Q    What expenses do you have as a
(9) testifying expert?
(10)    A    I don't have expenses as a testifying
(11) expert. The money supports research projects here.
(12) We do a great deal of research, and research is
(13) expensive in all kinds of ways, and that is supported
(14) almost entirely by our fees as a testifying expert.
(15)    Q    You've been publishing these papers for
(16) a number of years?
(17)    A    Right.
(18)    Q    You just started doing consultation and
(19) depositions three years ago?
(20)    A    Right.
(21)    Q    How was it all being funded before?
(22)    A    Up until 1996, 1997, it was funded by
(23) the National Institute of Health. That's how I got
(24) into this and got started. Since then, the funding
(25) -- there have been various private things. But in

### Page 46

(1) the last three years, it's been -- the great bulk of
(2) the funding has come from expert witness fees.
(3)   Q   Do these fees go to your company on top
(4) of your salary as a professor here at the University
(5) of California-Riverside?
(6)   A   The company pays me in addition to my
(7) salary here, yes.
(8)   Q   And the research projects -- is it the
(9) Riverside Life Expectancy Project?
(10)  A   University of California Life
(11) Expectancy Project.
(12)  Q   Does the University of California not
(13) contribute any money to the project?
(14)  A   That's true.
(15)  Q   Why is it called the University of
(16) California Life Expectancy Project then?
(17)  A   Partly because it was originally funded
(18) by a grant from the National Institute of Health to
(19) the university. That's how it works. And partly
(20) because it is -- the research is part of the official
(21) work I do as a professor here at the University of
(22) California.
(23)  Q   So to that extent, you're doing the
(24) research, you're being paid by the University of
(25) California?

### Page 47

(1)   A   To some extent, yes.
(2)   Q   And the database comes from the State
(3) of California, does it not?
(4)   A   The raw data that we work with
(5) originally comes from the State, yes.
(6)   Q   And do you have any graduate students
(7) working on the project?
(8)   A   Yes.
(9)   Q   You don't pay them, do you?
(10)  A   I do.
(11)  Q   Does the University of California pay
(12) them as graduate students?
(13)  A   No.
(14)  Q   And you pay them or the company pays
(15) them?
(16)  A   The company pays them.
(17)  Q   Can you give me the names of any of
(18) those people who are currently working as graduate
(19) students on the UC-R Life Expectancy Project?
(20)  A   The main one is Steven Day.
(21)  Q   And he's a mathematician?
(22)  A   He's a Ph.D. student in our department.
(23)  Q   Does he receive any money from the
(24) University of California as a graduate student?
(25)  A   No.

### Page 48

(1)   Q   Does your company pay him to do work?
(2)   A   Yes.
(3)   Q   What other sources of income does your
(4) company have?
(5)   A   At the moment, well over 90 percent, I
(6) would say, comes from expert witness work.
(7)   Q   What's the relationship of -- your
(8) company is Shavelle & Strauss?
(9)   A   Strauss & Shavelle.
(10)  Q   What's the relationship of Strauss &
(11) Shavelle to the UC-R life Expectancy Project?
(12)  A   I don't know about relationship. Could
(13) you ask me a specific question?
(14)  Q   Do you own the project?
(15)  A   I wouldn't use the word "own." Dr.
(16) Shavelle and I are the two core members at the
(17) University of California. We collaborate with
(18) doctors all over the world, really, but mostly in the
(19) United States, on research projects.
(20)  Q   Just physicians or are there a variety
(21) of people including physicians?
(22)  A   Mostly physicians.
(23)  Q   In other parts of the country and other
(24) parts of the world who contribute to the project?
(25)  A   Contribute in research, yes.

### Page 49

(1)   Q   In various ways?
(2)   A   Yes.
(3)   Q   But am I right that the data that you
(4) use primarily comes from the State of California?
(5)   A   Quite a lot of our published research
(6) comes from data which originally came from this
(7) state, but we've modified it in all kinds of ways. I
(8) would add we also publish a lot of research that
(9) doesn't use that database.
(10)  Q   I got off on a long detour there. I
(11) was looking at your article that said of 1,021
(12) people, 394 I think had died. I guess then I asked
(13) you how many patients injured at age 15 -- or 14 to
(14) 18 or 14 to 20 there were in the study, and you said
(15) you didn't know. That's how I got to asking if we
(16) could get that information, and you said you didn't
(17) know.
(18)  A   Can I just -- if you ask me a specific
(19) question like how many of them were in a given range,
(20) I'm sure we could provide that to you.
(21)  Q   I assume you can't tell me how many
(22) people who were injured at age 14 to 20 are still
(23) alive?
(24)  A   Well, you have to understand that those
(25) people could have been injured at any time in our

## Page 102

(1) no, they've not said that.
(2) Q  According to this invoice that was
(3) provided to me, as of September 27th you had put in
(4) 8.6 hours, charged $250 per hour, for a total of
(5) $2,150; is that correct?
(6) A  Yes.
(7) Q  Between then and today, have you put in
(8) any more time?
(9) A  Yes.
(10) Q  How many hours?
(11) A  I'm guessing about four.
(12) Q  What were you doing for four hours?
(13) A  Preparing for the deposition, reading
(14) other materials that were sent to me, consulting with
(15) Ms. Dow.
(16) Q  You're charging me $400 an hour for
(17) your time today?
(18) A  Yes.
(19) Q  How much do you charge for trial
(20) testimony?
(21) A  I say somewhere that it's $400 an hour,
(22) although sometimes it's a flat rate for a trip to a
(23) place.
(24) Q  You charge $400 for -- would that
(25) include -- how do you charge for your travel time?

## Page 103

(1) A  I can give an example of the most
(2) recent trip I did to Cincinnati, which was two very
(3) long days, probably about 16 hours each, and charged
(4) a flat 10 hours for each, so it was 20 hours.
(5) Q  Times 400?
(6) A  Times 250.
(7) Q  Why are you charging me $400 an hour?
(8) A  That's deposition.
(9) Q  But you only charge 250 for the trial?
(10) A  Well, in the Cincinnati case, I was in
(11) some sense traveling and working about 30 hours of
(12) which only about one was actually in court.
(13) Q  How did you arrive at a charge of $400
(14) an hour for deposition testimony?
(15) A  It was based on my sense of what is
(16) usual and customary in this sort of work.
(17) Q  You think other statisticians charge
(18) $400 an hour for depositions?
(19) A  As I said, I don't regard myself as
(20) primarily as statistician, and I don't know what
(21) other people charge -- other statisticians would
(22) charge.
(23) Q  Well, who else charges $400 an hour
(24) that you consider to be in your field?
(25) A  I've read a number of depositions of

## Page 104

(1) doctors who are asked their rates for review and
(2) deposition and trial, and my sense is that what we're
(3) talking about is at highest average amongst them. I
(4) think I've seen more who charge more than less.
(5) Q  In the year 1999, how much income did
(6) you receive from consulting in medical/legal areas,
(7) depositions and trial testimony?
(8) A  Well, it all went through our company.
(9) Q  How much did you charge for that?
(10) A  How much did our company charge?
(11) Q  How much was paid for your services?
(12) A  I'm not sure. How much was paid for
(13) mine as opposed to Dr. Shavelle's?
(14) Q  Right.
(15) A  In which year? 1999?
(16) Q  Right.
(17) A  This is very rough, but I would say
(18) about 200,000.
(19) Q  And how much did you receive as a
(20) faculty member? That is, what does the university
(21) pay you?
(22) A  In 1999?
(23) Q  Yes.
(24) A  Something about 80,000.
(25) Q  Does your company have any source of

## Page 105

(1) income other than this legal stuff that you do?
(2) A  At the moment, virtually none.
(3) Q  How much did your company pay you in
(4) 1999?
(5) A  Less than 100,000, I think. I couldn't
(6) tell you exactly.
(7) Q  How much did your company pay Dr.
(8) Shavelle in 1999?
(9) A  Probably the same amount, roughly.
(10) Q  So even though you generated more
(11) income, you each received the same amount?
(12) A  I think we did because he's doing all
(13) kinds of other things.
(14) Q  But it just so happens that what he
(15) does doesn't generate income?
(16) A  Back then it didn't very much.
(17) Q  What was he doing then that he wasn't
(18) generating income for that he is generating income
(19) for now?
(20) A  Could you repeat that, please?
(21) Q  What did Dr. Shavelle do then in 1999
(22) that didn't generate income then that is generating
(23) income now?
(24) A  He wasn't doing anything then that he
(25) isn't doing now that I can think of, but he's now

Page 106

(1) doing more expert witness work than he did.
(2) Q   Just to be sure, what you've said about
(3) Rex Freeland you believe is a precise mathematical
(4) statement, but it's not -- it doesn't really say
(5) anything about when Rex Freeland will die?
(6) A   Nobody could predict that.
(7) Q   In fact, it's almost probably 99
(8) percent likely that he will not die 8.5 years from
(9) the date that you started from?
(10) MS. DOW:   Object to the form the question.
(11) THE DEPONENT:   It's a 100 percent certain
(12) that he will not die at precisely 8.5 years from
(13) now. Just as it's certain that you and I will not
(14) die at our life expectancies.
(15) Q   MR. MOFFAT: What's the rate of error
(16) in your calculations?
(17) A   I don't understand your question.
(18) Q   Do you have any consideration in your
(19) calculations that, even as a matter of averages, your
(20) numbers may be wrong with application to any given
(21) patient?
(22) A   I still don't understand your question.
(23) Q   You don't pretend that what you're
(24) doing is exact?
(25) A   I think it meets reasonable scientific

Page 107

(1) standards.
(2) Q   To meet scientific standards, don't you
(3) have to be able to have your work replicated?
(4) MS. DOW:   Object to the form.
(5) THE DEPONENT:   It depends on the context.
(6) Q   MR. MOFFAT: How so?
(7) A   If you announce that you've discovered
(8) cold fusion, then you would expect other people would
(9) try to replicate to see whether they could discover
(10) cold fusion. If you publish a paper where you say
(11) that the life expectancy of people age 15 or so on
(12) was estimated to be that, it would be exceedingly
(13) unusual for anybody to try to replicate that.
(14) Q   Well, I guess I asked you this before,
(15) but I want to make sure. Could someone take your
(16) data and perform calculations that were either the
(17) same as yours or similar to yours to try to determine
(18) whether both your methods and your results were
(19) scientifically valid?
(20) A   Well, the methods are standard,
(21) accepted actuarial methods. So I don't know what
(22) else you're asking me.
(23) Q   You've eliminated from your study group
(24) consideration of etiology of the injury for these
(25) patients, correct? You're saying that it doesn't

Page 108

(1) matter for your purposes of determining life
(2) expectancy what the etiology was?
(3) A   I don't think I said quite that. I
(4) think certain etiological differences don't appear
(5) from our studies to make an appreciable difference.
(6) Q   How would anybody check that to see if
(7) that's an accurate statement?
(8) A   The same way as we do. You would
(9) include a factor in the analysis, for example, near
(10) drowning versus something else, motor vehicle
(11) accident, and see whether that made a major
(12) difference in the results.
(13) Q   In order to do that, they'd have to
(14) have access to your database, would they not?
(15) A   To do that, yes.
(16) Q   And at this point, no one else has
(17) access to your database other than you and Dr.
(18) Shavelle?
(19) A   Nobody has asked us for it.
(20) Q   Well, except for one?
(21) A   That wasn't the database. That was the
(22) particular group that applied to a particular case.
(23) Q   You've stated in other depositions that
(24) you're doing work that no other statisticians are
(25) doing, correct?

Page 109

(1) A   Our life expectancy analysis?
(2) Q   Right.
(3) A   Much of what we're doing nobody else is
(4) doing; that's true.
(5) Q   Does that mean that no other qualified
(6) statistician could replicate it if they had access to
(7) the database? Or is it just that they're not doing
(8) it, and they don't have access to the database?
(9) A   That's a long, complex question. That
(10) nobody else is doing it is about as best I can do
(11) right now.
(12) Q   You've said in one of your articles, or
(13) more than one probably, that physicians have
(14) traditionally been the sort of people that testify in
(15) court about life expectancy?
(16) A   That used to be the case, yes.
(17) Q   Are you saying that they should not
(18) have been allowed to testify about life expectancy?
(19) A   I wouldn't put it quite like that. I
(20) would say that they are generally accepted by the
(21) scientific community not to be qualified to do so,
(22) and it's a historical accident that they have been
(23) asked. It's certainly in no way part of a
(24) physician's training or education to do that sort of
(25) thing.

Page 134

(1)  A    It's a very large study. It talks
(2)  about all kinds of things, some of which I'm
(3)  unqualified to have an opinion about.
(4)  Q    Have you been asked to come to testify
(5)  at trial in May in Albuquerque?
(6)  A    I think the first I heard of May in
(7)  this connection was today when Ms. Dow mentioned --
(8)  if I got this right -- that trial is scheduled for
(9)  then.
(10) Q    Will you be able to come?
(11) A    I would be able to come if asked.
(12) Q    I think we've assumed this, but I want
(13) to clarify. The 1,021 patients in this study we've
(14) been talking about are all people who are receiving
(15) some sort of assistance from the State of California?
(16) A    Right.
(17) Q    People who have private insurance or
(18) who have received maybe a settlement or a judgment
(19) separate from the State of California may or may not
(20) be represented in this study?
(21) A    Agreed.
(22) Q    Does your study of the 1,021 people
(23) indicate the cause of death?
(24) A    We have some information on that.
(25) Q    Is it enough information for you to

Page 135

(1)  reach conclusions about why people -- reliable
(2)  conclusions about what causes death in people in a
(3)  vegetative state?
(4)  A    To some extent.
(5)  Q    And is that what you've described to me
(6)  before -- pulmonary, urinary tract?
(7)  A    I don't think we've actually looked
(8)  specifically at cause of death in vegetative state.
(9)  So I was quoting other sources.
(10) Q    Do you know, of the patients, those
(11) 1,021, how many of them receive or rely on Medi-Cal?
(12) A    I don't know that.
(13) Q    Do you know how many of them rely on
(14) Medicare?
(15) A    I don't know that.
(16) Q    Do you know how many of them have
(17) independent funds, that is, either personal money or
(18) money from insurance settlements of liability
(19) insurance?
(20) A    I don't know that.
(21) Q    How much time in 2000 have you spent
(22) doing -- what percentage of your time doing this
(23) medical or this legal work, consulting, regarding
(24) life expectancy for court cases?
(25) A    It's hard to answer that because it's

Page 136

(1)  difficult to separate from our research. I would say
(2)  that putting the two together more than half of my
(3)  professional time is spent --
(4)  Q    Doing work related to life expectancy?
(5)  A    Yes. But as I said, much of it is
(6)  research.
(7)  Q    I think you said in 1999 you generated
(8)  about $200,000 in income from depositions and
(9)  consulting work. And your salary from the University
(10) of California was 80,000, which would be -- in your
(11) legal work made 250 percent more -- no. It was 250
(12) percent of your University of California salary for
(13) 1999?
(14) A    These are rough figures, but, yes. Let
(15) me just clarify. I didn't make. It was paid to our
(16) company.
(17) Q    Has that ratio changed in the year
(18) 2000?
(19) A    I imagine it's probably larger this
(20) year, somewhat.
(21) Q    That is, you're doing more
(22) medical/legal work?
(23) A    Somewhat more, yes. That's our company
(24) as a whole.
(25) Q    I haven't even asked you what you've

Page 137

(1)  reviewed. Those are medical records. I don't need
(2)  that. Is this it then in this folder?
(3)  A    Yes.
(4)  Q    Plus the medical records over there
(5)  (Indicating)?
(6)  A    Yes.
(7)  Q    On this folder, you've got some dates.
(8)  You've sort of kept track of what you've done, and
(9)  how much time you've spent on it?
(10) A    That's right.
(11) MR. MOFFAT:    Well, I may somehow ask you to
(12) provide the answers to the questions that you said
(13) you were not able to provide today, but I guess I'll
(14) have to do it through Ms. Dow. Otherwise, thank
(15) you. You've been very patient. It's been a long
(16) deposition. I'm sure you didn't learn anything, but
(17) I did. You earned. I learned. Thank you.
(18) MS. DOW:    I would like you to read and sign.
(19) THE DEPONENT:    Okay.
(20) MR. MOFFAT:    I've given you the list, which
(21) is No. 3, and you say that you have a copy of your
(22) report and a copy of the article. That's this
(23) article (Indicating).
(24) THE DEPONENT:    I'm sorry. What are you
(25) asking?