NELSON P. COHEN
United States Attorney

SUSAN J. LINDQUIST
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9
Anchorage, Alaska  99513-7567
Phone: (907) 271-5071
Fax: (907) 271-2344
susan.lindquist@usdoj.gov

Attorney for the Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| GREGORY JOHNSON and KIMBERLY JOHNSON, individually and on behalf of their minor children, MADISON JOHNSON and ALEXANDER JOHNSON,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 3:06-CV-00120-RRB<br><br><br><br><br><br>**UNITED STATES' RESPONSE IN OPPOSITION TO JOHNSONS' MOTION TO COMPEL PRODUCTION OF DR. STEVEN DAY'S FINANCIAL INFORMATION** |

**INTRODUCTION**

The Johnsons seek to compel production of defense expert witness Dr. Steven Day's income documents, including tax records such as W-2s and 1099s. There is no basis under federal discovery law to compel production of these documents. While information about an expert witness' compensation may be relevant for impeachment purposes, courts have established limits to prevent intrusive "fishing expeditions" into the finances of witness. The United States has already supplied significant information about Dr. Day's compensation, which will provide more than enough information for the court to determine his possible bias. New intrusions into Dr. Day's financial records are simply unwarranted.

**STATEMENT OF FACTS**

Dr. Day is a professional epidemiologist who specializes in the study of life expectancy.[1] He holds a Ph.D. in applied statistics from the University of California, Riverside, and has over a decade of experience researching and consulting on life expectancy issues.[2]

---

[1] Def. Ex. A, Curriculum Vitae of Dr. Steven Day.

[2] *Id.*

Dr. Day works as a consultant to Strauss & Shavelle, Inc. He estimates that he spends 60% of his time consulting for the firm and 40% conducting academic research on life expectancy issues.[3] The firm earns about 80% of its revenue from litigation-related activities, and the remainder on other consulting projects.[4] Dr. Day estimates that he earns 99% of his income from his consulting work for Strauss & Shavelle, and the other 1% from delivering lectures on life expectancy.[5] He is paid an annual salary, plus a discretionary bonus determined by the firm's principals; neither the salary nor the bonus is tied to the amount of hours he bills or the degree to which he garners repeat business with attorneys.[6] Strauss & Shavelle typically bills Dr. Day's time at $400 per hour, though in a minority of projects he is billed at $300.[7]

Dr. Day appears as an expert witness for both plaintiffs and defendants, spending approximately 70% of his time working for defendants.[8] He represents

---

[3] Def. Ex. B, Deposition of Dr Steven Day, at 15: 3-8.

[4] *Id.* at 15: 9-15.

[5] Dkt. 49 Ex. D at 2.

[6] *Id.*

[7] *Id.* at 3.

[8] *Id.*

defendants about 85% of the time in cases in which he gives testimony, but only because he has been deposed or called as a witness more often in such cases.[9] He has consulted for the Alaska U.S. Attorney's Office on a small number of cases in the past.[10] Dr. Day has also represented the United States in several other jurisdictions, but the vast majority of his practice is for other clients. The following table summarizes Dr. Day's work for the United States as a percentage of the total cases on which he has testified at trial or deposition.[11]

| Year | No. of Cases | No. for U.S. | % for U.S. |
|---|---|---|---|
| 2008 | 4 | 1 | 25.0% |
| 2007 | 21 | 1 | 4.8% |
| 2006 | 18 | 1 | 5.6% |
| 2005 | 18 | 1 | 6.3% |
| 2004 | 18 | 3 | 16.7% |
| 2003 | 15 | 2 | 13.3% |
| 2002 | 4 | 0 | 0.0% |
| Total | 96 | 9 | 9.4% |

Dr. Day was deposed on January 9, 2008.[12] The Johnsons' Fourth Set of Discovery Requests to Defendant, dated January 11, 2008, included an

---

[9] Def. Ex. C, Declaration of Steven Day, at 5.

[10] Def. Ex. B at 51:24-52:10.

[11] Def. Ex. D, Summary of Trial and Deposition Testimony of Steven Day, Ph.D.

[12] Dkt. 49 Ex. C.

interrogatory to "identify the basis for compensation and the amounts of compensation, including bonuses and benefits, over the past 5 years Dr. Steven Day has received work with Strauss & Shavelle, Inc."[13] Accompanying the interrogatory was a request for production of "any and all W-2's and 1099's showing all amounts paid to Dr. Steven Day for the past 5 years and all other documents that reflect compensation Dr. Day has received from Strauss & Shavelle, Inc."[14]

The United States and Dr. Day responded by disclosing the facts about Dr. Day's income stated above.[15] They refused, however, to produce Dr. Day's tax records on grounds of irrelevance.[16]

On May 29, 2008, the Johnsons filed a motion to compel production of Dr. Day's tax records or a discovery response disclosing the information contained therein.[17] Several factual statements in their motion are incorrect, and Dr. Day has

---

[13] Def. Ex. E, Johnsons' Fourth Discovery Request, at 7.

[14] *Id.* at 8.

[15] Dkt. 49 Ex. D at 2-3.

[16] *Id.* at 4.

[17] Dkt. 48 at 1.

provided a declaration with correct information about his practice.[18] Dr. Day did not refuse to provide his employment contract with Strauss & Shavelle or documents describing how his salary and bonus are determined. There are no written contracts or salary guidelines, so such documents cannot be produced.[19] Additionally, the Johnsons rely on an outdated 2002 estimation by Dr. Shavelle that litigation makes up 95% of Strauss & Shavelle's revenue.[20] Since that time, the portion of Strauss & Shavelle's consulting work on non-litigation matters has increased, so the proper figure is 80%.[21] It is thus wholly inaccurate to state, as the Johnsons do in the opening to their memorandum, that Dr. Day "derives 99% of his income from testifying on issues of life expectancy for litigation purposes."[22] The Johnsons also create the false impression that Dr. Day has abandoned his research career to perform forensic consulting: that he "works only for Strauss & Shavelle."[23] In reality, although the virtually all of his *compensation*

---

[18] Def. Ex. C.

[19] *Id.* at 6-7; Dkt. 49 Ex. D at 5.

[20] Dkt. 49 at 9-10.

[21] Def. Ex. D at 8; Dkt. 49 Ex. D at 3.

[22] Dkt. 49.

[23] Dkt. 49 at 6.

comes from Strauss & Shavelle, Dr. Day maintains a vigorous research career as well. He spends about 40% of his time performing unpaid research, regularly publishes in statistical and medical journals, peer reviews several journals, and delivers academic lectures.[24]

## DISCUSSION

### I. THE JOHNSONS FAIL TO MEET THE FEDERAL RULES' CRITERIA FOR DISCOVERY OF TAX RECORDS.

Proceedings under the Federal Tort Claims act are governed by the Federal Rules of Civil Procedure.[25] The federal judiciary is charged with making authoritative interpretations of all federal laws, including the Federal Rules.[26] Thus decisions on procedural law by state courts–whether they interpret the Federal Rules or various state procedural doctrines–are not binding on the federal courts.

---

[24] Def. Ex. A; Def. Ex. B at 15:3-8. *See generally* Def. Ex. C at 2-4 (outlining Dr. Day's qualifications and research activities).

[25] Fed. R. Civ. P. 1 ("These rules govern the procedure in all civil actions and proceedings in United States district courts."); *United States v. Yellow Cab Co.*, 340 U.S. 543, 553 (1951) (explicitly confirming that the Federal Rules apply in FTCA actions).

[26] *See Williams v. Taylor*, 529 U.S. 362, 378-79 (2000) (noting the importance of the "federal courts' independent responsibility . . . independent from the separate authority of the several States -- to interpret federal law").

Federal Rule of Civil Procedure 26(a)(2)(B)(vi) states that a witness who will provide expert testimony is obliged to provide "a statement of the compensation to be paid for the study and testimony in the case." Rule (26(b)(1) defines the scope of allowable discovery to include "any nonprivileged matter that is relevant to any party's claim or defense." While relevance is typically defined broadly, courts recognize the sensitive nature of financial information such as tax returns and often apply a narrower concept of relevance.[27] In such cases, courts have weighed the marginal probative value of the financial data, if any, against the risk of prejudicing the jury or unduly intruding into the witness' personal affairs.

The majority of federal courts which considered this issue have held that it generally not necessary for an expert witness to disclose his tax or annual income records.[28] In most circumstances, information such as the percentage of a witness' income from forensic work, the percentage of work done for plaintiffs versus defendants, the hourly billing rate, and the amount paid in the present case offer enough information about the witnesses' financial stake in litigation, such that a

---

[27] *E.g. Behler v. Hanlon*, 199 F.R.D. 553, 561 (D. Md. 2001); *Wacker v. Gehl Co.*, 157 F.R.D. 58 (W.D. Mo. 1994).

[28] *Sullivan v. Metro N. R.R. Co.*, No. 3:05cv665, 2007 U.S. Dist. LEXIS 88938, at *5 (D. Conn. Nov. 30, 2007; *Rogers v. U.S. Navy*, 223 F.R.D. 533, 536 (S.D. Cal 2004); *Cary Oil Co., Inc. v. MG Refining & Mktg., Inc.*, 257 F. Supp. 2d 751, 757 (S.D.N.Y. 2003); *Behler,* 199 F.R.D. at 652; *Wacker*, 157 F.R.D. at 59.

fact finder "readily should be able to assess possible bias on the part of an expert witness."[29]

These courts have used various formulations, but will not compel production of total income data unless the movant can show particular reasons why bias is abnormally likely or the information divulged is inadequate.[30] Total income figures would "provide the jury with little information relevant to a fair assessment of the expert's credibility, while concomitantly introducing the real possibility of creating confusion, distraction and even prejudice."[31] In addition to the potential for prejudice, forcing expert witnesses to disclose their gross income or tax records represents an invasion of privacy that greatly outweighs the probative value of the information. If such harassment were commonly allowed, it "might well prevent many highly-qualified and objective experts from serving as

---

[29] *Behler*, 199 F.R.D. at 562.

[30] *Rogers*, 223 F.R.D. at 536 (requiring the movant to show "he would be unfairly limited in arguing bias unless he learns the actual dollar amount of [the expert's] gross income from forensic work"); *Cary Oil*, 257 F. Supp. 2d at 757 (requiring, in cases with multiple expert witnesses, that the moving party demonstrate that "an expert's opinion has materially changed in such a way so as to raise a reasonable suspicion" of bias); *Behler*, 199 F.R.D. at 562 (refusing to compel production unless "additional information is required to enable [movant] to undertake reasonable bias impeachment); *Wacker v*, 157 F.R.D at 59 (requiring "specific evidence of possible bias, such as evidence of a special relationship between the expert and defense counsel or between the expert and plaintiff"). *See also Sullivan,* 2007 U.S. Dist. LEXIS 88938, at *5 (following *Behler*'s standard and granting protective order).

[31] *Behler*, 199 F.R.D. at 562.

witnesses, while yielding very little, if any, information which might aid the trier of fact."[32]

By its plain terms, Rule 26(a)(2)(B)(6)(vi) only compels disclosure of an experts' compensation "in the case" at bar, not in other forensic work. Thus, to obtain discovery of Dr. Day's tax records, the Johnsons must show that they are relevant under Rule 26(b)(1). Since total income is not generally considered relevant, they must show the information already divulged is insufficient for the court to make an informed assessment of possible bias. Accordingly, the Johnsons advance two theories: first, that as a "professional witness" Dr. Day is subject to more stringent discovery; and second, that the information is necessary because the Johnsons cannot extrapolate Dr. Day's total forensic earnings from the information already provided. Yet these factors have no bearing on the relevance of Dr. Day's tax information and the Johnsons' theories find no support in the case law.

### A.     There Is No Basis Under Federal Law for a Different Discovery Standard for "Professional Witnesses."

The central theme in the Johnsons' motion is that, because Dr. Day concentrates on forensic work, he is a "professional witness," and therefore

---

[32] *Wacker*, 157 F.R.D. at 59.

subject to an unusually broad scope of discovery. Although the Johnsons' characterization of Dr. Day's practice ignores the fact that Dr. Day spends a significant portion of his time on academic research, the United States does not deny that Dr. Days' consulting work is litigation-focused. Since 2002, he has testified in 17 trials and given depositions in 74 other cases.[33] It is obvious that he testifies frequently, and if the Johnsons wish to use this fact for impeachment purposes, the necessary facts are already available. Dr. Day has also furnished other information, such as the distribution of his work between plaintiffs and defendants and the amount the United States has paid in this action, that might be relevant to a showing of bias

While some state courts have apparently held "professional witnesses" subject to additional discovery, the Johnsons have presented no federal cases reaching a similar conclusion. It is telling that the Johnsons' main support for the "professional witness" concept is an American Law Report focusing on state law, which itself notes that there is significant disagreement in the courts on whether "professional witness" status may even be invoked on cross-examination.[34] But neither the Johnsons' brief nor this article, references any federal authority that

---

[33] Def. Ex. D.

[34] 39 A.L.R. 4th 742 (1985).

suggests such a distinction is relevant to the scope of discovery.

The Johnsons' invocation of *Daubert* misconstrues its essential holding on this issue.[35]  Under *Daubert*, expert testimony backed by independent, non-litigation-related research is entitled to a higher presumption of scientific validity opinions developed "expressly for purposes of testifying."[36]  The court, however, cautioned against making unwarranted assumptions of witness bias, noting that the fact "[t]hat an expert testifies for money does not necessarily cast doubt on the reliability of his testimony."[37]  The distinction the case draws is not on the activities of the witness – how often he testifies or what compensation he receives – but on the origin of the *research* being proffered by that witness.[38]  Moreover, *Daubert* frames this inquiry as only one factor in a multifaceted analysis of scientific validity; it certainly makes no suggestion that courts ought to divide the field of expert witnesses into "professional witnesses" and "practitioners" and apply markedly different evidentiary standards to each.

The Johnsons attempt to buttress their distinction between professional and

---

[35] *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311 (9th Cir. 1995), *on remand from* 509 U.S. 579 (1993).

[36] *Id.* at 1317.

[37] *Id.*

[38] *Id.*

nonprofessional witnesses by reference to *Behler* and *Rogers*. These cases clearly state that the percentage of income derived from forensic work and from a particular side is relevant to determine bias. Gross income gross income figures are generally not relevant. *Behler* offers two principal reasons why gross income is usually not discoverable. First, since percentage figures are usually adequate to allow the jury to consider potential bias, gross income simply adds minimal probative value. This holds true no matter how a witness' income is distributed between clinical and forensic practice; if anything, when the percentage of income from forensic work is extremely high, the percentage figures themselves will be more amenable to a reading of bias. The cases do not suggest, and logic does not provide, any reason why percentage figures are inadequate for a "professional witness."

Second, *Behler* stresses that income data is inherently private: "Most people are sensitive about their income, and who knows the details about it."[39] Intrusive "fishing expeditions" into the finances of expert witnesses threaten to discourage qualified witnesses from stepping into court.[40] They also violate policy principles recognizing the importance of privacy, particularly when tax records are at issue.

---

[39] *Behler*, 199 F.R.D. at 561.

[40] *Wacker*, 157 F.R.D. at 59.

The Ninth Circuit has recognized "a public policy against unnecessary public disclosure arises from the need, if the tax laws are to function properly, to encourage taxpayers to file complete and accurate returns."[41]  An individual does not forfeit this privacy interest simply because he or she participates frequently in litigation.

Thus, even assuming the "professional witness" distinction has probative value, the Johnsons have offered no convincing reasons why this should require disclosure of Dr. Day's tax records.  Moreover, this is a judge-tried case, and there is accordingly less danger that this type of bias evidence would be significant to any finding.  A judge can assess credibility and scrutinize scientific methodology as applied to the facts to determine if Dr. Day's opinion is sound.  Certainly, by comparison, Dr. Day's gross income is irrelevant and immaterial.

> **B.     The Johnsons Are Not Entitled to Additional Financial Data in Order To Extrapolate Dr. Day's Total Earnings from Forensic Practice.**

The Johnsons further attempt to distinguish *Behler* and *Rogers* on the ground that, in the present case, it is impossible to extrapolate the total amount of

---

[41] *Premium Serv. Corp. v. Sperry & Hutchinson Co.*, 511 F.2d 225, 229 (9th Cir. 1975).  *See also* 26 U.S.C. § 6103(a) (declaring that tax return information should generally be kept confidential).

compensation Dr. Day has received from forensic work.  These cases never state that the purpose of disclosing percentage figures and billing rates is to enable such extrapolations.  As the Johnsons themselves acknowledge, the *Rogers* court was concerned that, "based on the financial information that had been provided," such as the percentage of the expert's time spent on forensic work, "any disclosure of the amount that Dr. Schwab earned for forensic work would reveal his total gross annual income."[42]  The *Rogers* court refused to provide either total income or income from forensic work, thus preventing the plaintiffs from extrapolating either figure.

Under the established standards for relevance, extrapolated income figures are even more objectionable than actual ones, sincere their inherent inaccuracy compounds their lack of probative value and potential for prejudice.  Whether or not Dr. Day is a "professional witness," there is no reason to reach a contrary conclusion here.  If gross figures are not necessary for determinations of bias and need not be divulged directly, the parties are certainly not entitled to the information necessary to reach those figures through the back door of extrapolation.

---

[42] Dkt. 49 at 21.

## II. EVEN IF APPLIED, STATE LAW DOES NOT SUPPORT PRODUCTION OF W2S AND 1099S IN THIS CASE.

The various state cases that the Johnsons cite are of limited precedential value. They are based on state rules of procedure and evidence, and state constitutions. In *Perez* , relied upon by the Johnsons, the Alaska Supreme Court applied Alaska's state discovery rule, which is broader than the revised Federal Rule 26.[43] It also balanced the need for the information against balanced against the Alaska constitution's statements on privacy, rather than evaluating the evidence for relevance as federal courts do.[44] The Johnsons have not shown that the reasoning in the state cases they cite may be rationally be extended to a federal court's interpretation of Rule 26. Thus, while there appears to be no binding precedent on this issue, the decisions issued by other district courts offer the most useful guidance.

Moreover, even if the Court were to consider *Perez* as guidance, *Perez* would not mandate the production of tax records in all cases. *Perez* observed that "an expert witness might not normally be required to turn over their financial

---

[43] *Noffke v. Perez*, 178 P.3d 1141, 1150 (Alaska 2008), *on rehearing from* No. S-12185, 2007 WL 4554391 (Alaska Dec. 28, 2007). Compare Alaska R. Civ. P. 26 ("relevant to the subject matter involved in the pending action") *with* Fed R. Civ. P. 26(b)(1) ("relevant to any party's claim or defense"). *See also* Alaska Const. art.1 § 22 (explicitly creating a state-law right to privacy).

[44] *Perez*, 178 P.3d at 1150.

information."[45] Such records are only discoverable when "the witness generates such a significant portion of his or her income from a *particular side* or *particular attorney* that the expert's impartiality can reasonably be questioned."[46] Dr. Day's practice does not meet either of these criteria. He consults for plaintiffs on some 30% of his cases, which suggests his work is not systematically biased towards defendants. As for attorney patronage, Dr. Day has not provided any trial or deposition testimony for the Alaska U.S. Attorney's office in the last six years, and has only consulted with that office on a small handful of matters.[47] Even Dr. Day's total work on behalf of the United States is relatively small: he has given deposition or trial testimony for the United States in only 9.4% of cases he has worked on from 2002 through 2007.[48] Moreover, Dr. Day is currently retained to serve as an expert witness for the *plaintiffs* in a case, in this Court, in which the United States is the defendant and the U.S. Attorney's office is opposing counsel.[49] There is thus no basis to assume that Dr. Day's livelihood depends on a

---

[45] *Id.*

[46] *Id.* (emphasis added).

[47] Def. Ex. B at 51:24-52:10; Def. Ex. D.

[48] Def. Ex. D.

[49] Def. Ex. C at 5. See table in Statement of Facts for basis of calculation.

continuing relationship with the United States or the Alaska U.S. Attorney's office, or that he conforms his opinion to maintain the favor of these clients.

*Perez* also noted that tax records should not be disclosed if relevant evidence of bias is available from less intrusive sources. The court relied on the fact that "no other evidence of bias was on the record at the time of the trial court's ruling," to distinguish a prior case where it "affirmed the trial court's determination that disclosure of the tax returns was unnecessary in light of other evidence of bias."[50] This holding is somewhat cryptic because, as discussed above, the court required some evidence of bias before ordering disclosure of the tax records. In any event, there is already ample evidence to support the conclusion that the majority of Dr. Day's work deals with litigation. Since information about Dr. Day's total income would add virtually nothing to this evaluation, a court following *Perez* would be exceedingly unlikely to sanction any further intrusions in Dr. Day's financial privacy.

## **CONCLUSION**

For the reasons described above, the Johnsons' motion to compel

---

[50] *Perez*, 178 P.3d at 1152 (distinguishing *Marron v. Stromstad,* 123 P.2d 992 (Alaska 2005)).

production should be denied.

RESPECTFULLY SUBMITTED this 13th day of June, 2008 in Anchorage, Alaska.

NELSON P. COHEN
United States Attorney

s/ Susan J. Lindquist
SUSAN J. LINDQUIST
Assistant U. S. Attorney
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-3378
Fax: (907) 271-2344
E-mail: susan.lindquist@usdoj.gov
AK #9008053

**CERTIFICATE OF SERVICE**

I hereby certify that on  June 13, 2008,
a copy of the foregoing **UNITED STATES'**
**RESPONSE IN OPPOSITION TO JOHNSONS'**
**MOTION TO COMPEL PRODUCTION OF**
**DR. STEVEN DAY'S FINANCIAL INFORMATION**
was served electronically on Ray R. Brown.


s/ Susan J. Lindquist