IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

| | |
|---|---|
| GREGORY JOHNSON and KIMBERLY JOHNSON, individually and on behalf of their minor children, MADISON JOHNSON and ALEXANDER JOHNSON,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | '<br>'<br>'<br>'<br>'<br>'<br>'<br>'<br>'<br>'<br>'<br>'<br>'Case No. 3:06-CV-00120-RRB |

**DECLARATION OF STEVEN DAY, PhD**

I declare under penalty of perjury that the following is true.

Plaintiffs' Attorneys in this case have filed a "Motion to Compel Production of Dr Steven Day's Financial Compensation Information". In their Memorandum in Support of the Motion Plaintiffs' attorneys have made a number of misstatements, mischaracterizations, or errors in describing who I am and what my prior testimony in this case has been. I feel obliged to set the record straight.

In the paragraphs that follow, I will first outline my own background, which qualifies me to speak on the issue of life expectancy. I will at the same time address some of the incorrect statements made by the Plaintiffs in their memorandum.

## I. My Qualifications and Professional Activities

1.      I am a Principal Researcher with "The Life Expectancy Project," an internationally recognized research group which studies mortality and other health issues related to the developmentally disabled, persons in the vegetative state, and those who have suffered spinal cord or traumatic brain injuries. The Project evolved out of research the 1970's funded by the National Institutes of Health and now consists of four core researchers in San Francisco (curriculum vitae available at www.LifeExpectancy.org) who collaborate with medical doctors and other scholars around the world in studying life expectancy and related topics. I became affiliated with the project in 1996, and have been a Researcher or Principal Researcher since then. Core researchers for the Project, including myself, have spoken at medical conferences internationally,[1] and our articles have been published in peer-reviewed medical journals. Some of these articles have been designated Continuing Medical Education (CME) articles.[2] I am a Fellow of the American Academy of Cerebral Palsy and Developmental

---

[1] Some of the recent invited lectures have been: (a) Steven M Day, PhD: "Life Expectancy in the context of brain injury claims." Action against Medical Accidents (AvMA) Cerebral Palsy & Brain Injury Claims Conference, January 25, 2005, London; (b) Robert M Shavelle, PhD, MBA: "Life expectancy in catastrophic cases." Pediatric Grand Rounds. Santa Clara Valley Medical Center, February 9, 2005; (c) Steven M Day, PhD: "Predicting ambulation in cerebral palsy." 57th Annual Meeting of the American Academy for Cerebral Palsy and Developmental Medicine, September 11, 2003; Montreal. Nominated for the 2004 Gayle G. Arnold Award for Excellence in the Care of Children with Cerebral Palsy; and (d) David J Strauss, PhD, FASA: "Life expectancy in children with cerebral palsy." Conference -- The Experts Analyze Brain-Damaged Baby Cases – sponsored by the UC Davis Medical School and the American Bar Association. San Francisco, CA, September 1999. "The Life Expectancy of Persons with Chronic Disabilities." The Royal Statistical Society (Medical Section), London, England, March 1998. Full lists of these presentations are found on the CVs of Drs Day, Strauss, and Shavelle in attached Exhibits A, B, and C.

[2] CME credit is often obtained by attending workshops, lectures and conferences. It may also be obtained by reviewing selected articles in medical journals, and submitting proof of mastery of the

Medicine, and a member of the Gerson Lehrman Group's Council of Healthcare Advisors. I have been an invited peer reviewer for the journals Pediatrics, Neuroscience Letters, and Developmental Medicine and Child Neurology.

2.  I obtained a PhD in Applied Statistics, with substantive field Epidemiology, from the University of California at Riverside in 2001. By profession, I am an epidemiologist and medical researcher who studies survival, mortality, life expectancy, and other epidemiological topics, and who serves as a consultant in litigation **and for clients outside litigation**. Attached as Exhibit "A" is my Curriculum Vitae. In collaboration with my colleagues at the Life Expectancy Project I have authored 20 peer-reviewed studies in the medical and scientific literature, including an article on life expectancy after spinal cord injury.[3] This study was based on analyses of the National Spinal Cord Injury Database.[4] My colleagues at the Life Expectancy Project, in collaboration with the former Director of the Database, Dr Michael DeVivo, have completed many more studies of mortality and survival of persons after spinal cord

---

materials (e.g., a written test). Two of our recent publications were specially selected as CME articles: (a) Strauss DJ, Day SM, Shavelle RM, Wu YW (2003). Remote symptomatic epilepsy: Does seizure severity increase mortality? Neurology, 60: 395-399. (b) Shavelle RM, Strauss DJ, Whyte J, Day SM, Yu YL (2001). Long-term causes of death after traumatic brain injury. American Journal of Physical Medicine and Rehabilitation, 80:510-516.

[3] Shavelle RM, DeVivo MJ, Strauss DJ, Paculdo DR, Lammertse DP, Day SM (2006). Long-term survival of persons ventilator dependent after spinal cord injury. Journal of Spinal Cord Medicine, 29:511-519.

[4] As of October 2007 the database contained information on 25,415 persons who sustained traumatic spinal cord injuries. To assure comparability of data acquired by personnel in various centers, rigid scientific criteria have been established for the collection, management and analysis of information entered into the database. National Spinal Cord Injury Statistical Center staff has also developed quality control procedures that further enhance the reliability and validity of the database. Further information available at: http://www.spinalcord.uab.edu/show.asp?durki=24480

injury. In all, more than 150 studies on survival, mortality, life expectancy, and other epidemiological topics completed by Life Expectancy Project researchers have been published in a number of prominent medical journals.[5] A list of these articles is appended to this declaration as Exhibit B.

3. **Plaintiffs' first misstatement** occurs on the first page of their Memorandum. "Defense expert witness Dr. Steven Day is a professional witness that derives 99% of his income from testifying on issues of life expectancy for litigation purposes."

As I testified in my deposition (Day Deposition, p. 14) Strauss & Shavelle, Inc., with whom I consult, derives roughly 80% of its income from work involving litigation. To the best of my knowledge, 80% of my own income derives from such work.

From page 14 of my deposition:

```
 9      Then in terms of that part that's paid
10   consulting, most of that is litigation; probably 80
11   percent of that is litigation related.  I don't have any
12   way of exactly calculating that, but I know that the
13   overall work that Strauss and Shavelle Incorporated does
14   do, it's 80 percent litigation in terms of the paid
15   work, and 20 percent outside of litigation.
16       Q.  And you think that's consistent with your
17   actual work as well?
18       A.  I think so.  I mean it probably varies from
19   week to week, but typically that's probably what I do as
20   well.
```

---

[5] Some of the peer-reviewed medical journals in which our studies have been published are Pediatrics; Neurology; Journal of Autism and Developmental Disorders; Archives of Disease in Childhood; Developmental Medicine and Child Neurology; Archives of Physical Medicine and Rehabilitation; NeuroRehabilitation; American Journal of Physical Medicine and Rehabilitation; and Pediatric Neurology.

Given this line of questioning by Plaintiffs, and my responses, it is inaccurate to suggest that I derive "99% of [my] income from testifying on issues of life expectancy for litigation purposes."

In addressing the issue of whether I might somehow favor defendants, my best estimate is that 70% of my litigation consulting work is for defendants, and 30% is for plaintiffs. Roughly 85% of my trial or deposition testimony has been for defendants, and roughly 10% of my total testimony has been on behalf of the United States as a defendant. Although I do not know why, I tend to be asked to provide deposition testimony more frequently in cases against the United States. Of course statistics on testimony standing alone do not tell the entire story of my litigation work because the list excludes cases that settle before deposition or trial and cases in which no deposition is requested. For example, I am currently retained by a plaintiff in a case against the United States in the District Court of Alaska, but this fact is not reflected in the list of deposition and trial testimony.

As I also discussed in my deposition, a substantial part of my working week is also spent on paid work for non-litigant clients and research activities for which I am not paid. The fruit of these unpaid labors is reflected in the list of publications and presentations on my CV. Though unpaid, this work cannot be overlooked in describing my professional activities.

## II. Further inaccuracies Plaintiffs' Attorneys' Memorandum

4.      Throughout Plaintiffs' Memorandum many additional inaccurate statments about me, my colleagues, and the science of life expectancy in general, are made. I will mention only a few here. In each case, Plaintiffs' attorneys' statement is in ALL CAPS, and my response follows in ordinary type, sometimes with bold-faced print for emphasis.

5.      DR. STEVEN DAY WAS RETAINED BY DEFENDANT UNITED STATES OF AMERICA TO OPINE AS TO THE LIFE EXPECTANCY OF GREG JOHNSON FOR THE SOLE PURPOSES [sic] OF LIMITING FUTURE LIFE CARE EXPENSES. (Plaintiffs' memorandum, p. 4)

I believe the United States of America retained me to obtain a scientifically determined estimate of Greg Johnson's life expectancy. In this case I have painstakingly explained every step in the procedure I used to calculate life expectancy in this case. Every step I took is open to potential impeachment by Plaintiffs or their experts. I do not believe I could have been more open or transparent about how I arrived at my opinions in this case.

6.      DR DAY REFUSED TO PROVIDE A COPY OF THE CONTRACT BETWEEN HIM AND THE CONSULTING FIRM, STRAUSS & SHAVELLE, FOR WHICH HE WORKS. (Plaintiffs' Memorandum p. 4)

This statement is false and assumes the existence of a written contract between the firm and myself. It is false because during my deposition I did not refuse to provide anything, but rather indicated that I was not certain it would be appropriate to do so, and also that I was not certain whether I should be required to do so. Though I declined to provide that information at the time of my deposition, I have never categorically refused to do so.

There is no written contract. There has never been a written contract. I cannot produce what does not exist. If someone inferred from my deposition testimony that a written contract existed, I am sorry for this confusion. I have explained what I know about my verbal arrangement for pay with Strauss & Shavelle, Inc. in the United States' Answers To Plaintiffs' Fourth Request For Interrogatories And Production.

7.  DR DAY BEGAN ASSISTING WITH THE RESEARCH DURING HIS DOCTORAL PROGRAM. THUS "THE LIFE EXPECTANCY PROJECT" IN ITS PRESENT FORM WAS BORN. (Plaintiffs' memorandum, pp. 7-8)

The Life Expectancy Project, members of which have published over 150 articles in peer reviewed scientific journals since the 1960s, was "born" long before I ever joined it.

8.  "THE LIFE EXPECTANCY PROJECT" IS A DATABASE COMPRISED OF OVER 200,000 INDIVIDUALS WITH DISABILITIES SUCH AS CEREBRAL PALSY, SPINAL CORD INJURY, . . (Plaintiffs' memorandum p. 8)

This is simply incorrect. The Life Expectancy Project is not a database of any kind. As discussed previously, The Life Expectancy Project is an internationally recognized group of researchers who carry out studies related to persons with disabilities and publish these in scientific and medical journals. The group has a core in San Francisco, and collaborates with physicians and other experts locally in the United States, and around the world.

The group has published more than 150 peer-reviewed journal articles since its inception in the 1960's. Dr. George Tarjan, a professor at UCLA, began the research and directed the project until the late 1970's. It was directed by Dr. Richard Eyman at the University of California at Riverside until 1994. Since 1994, Dr. David Strauss has been the Director and Dr. Robert Shavelle the Technical Director.

9. [DR. DAY'S] RESULTS ARE NOT SCIENTIFIC. . . .DR. DAY'S PROJECTED LIFE EXPECTANCY IS LESS THAN THE MODEL SPINAL CORD INJURY CARE SYSTEMS' PROJECTIONS. . . . (Memorandum, pp. 8 and 9)

My estimate of Mr Johnson's life expectancy is lower than some reported by the Model Spinal Cord Injury Care System because I have scientifically accounted for his spinal cord injury and also his diabetes and obesity.

10. DR. SHAVELLE HAS TESTIFIED THAT 95% OF HIS WORK IS LITIGATION RELATED.

It is true that the percentage of litigation-related income of Strauss & Shavelle, Inc. has decreased over the years, and it is now 80%.

11.   There are many more inaccuracies and misleading statements in the Plaintiffs' Memorandum. I hope I will have a chance to respond to any further points that the court may find of importance at a future time.

*Steven Day*

_____
Steven Day, PhD                                                                                      June 13, 2008