Ray R. Brown
DILLON & FINDLEY, P.C.
1049 W. 5th Avenue, Suite 100
Anchorage, AK  99501
Phone 277-5400
Fax   277-9896

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

GREGORY JOHNSON and KIMBERLY  )
JOHNSON, individually and     )
on behalf of their minor      )
children, MADISON JOHNSON and )
ALEXANDER JOHNSON,            )
                              )
            Plaintiffs,       )
                              )
vs.                           )
                              )
UNITED STATES OF AMERICA,     )
                              )
            Defendant.        )
_____)    Case No. 3:06-CV-00120-RRB

**PLAINTIFFS' REPLY TO OPPOSITION TO MOTION TO COMPEL PRODUCTION
OF DR. STEVEN DAY'S FINANCIAL COMPENSATION INFORMATION**

The Government's opposition is in large part framed as an

attempt to bolster Dr. Day's credibility by attempting to

demonstrate that he is other than a "professional witness" as

argued by plaintiffs.   Indeed, virtually all of the factual

support relied on by the Government is based upon Dr. Day's Declaration.    In it, Dr. Day states that the plaintiffs' attorneys have made a number of misstatements, mischaracteriza- tions, or errors in describing who he is and what his prior deposition testimony has stated.[1]    Actually, the Declaration underscores the need for Dr. Day to produce his wage and contract information because it shows the length to which he will go to avoid such production.    As will be shown, many of the statements made by Dr. Day in his Declaration appear to be misleading, inaccurate, and inconsistent with his prior sworn testimony.

This reply will not address those portions of the Declaration (or his attached *Curriculum Vitae*) that do not pertain to the issues currently before this court, *i.e.*, wage, income, and contract disclosure.    His qualifications as an expert to render scientific medical opinions will be addressed in a companion *Daubert* motion to be filed in the near future.

For ease of presentation, this reply is broken down into two parts.    The first part responds to the legal arguments

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

---

[1]    See Exhibit A, Declaration of Steven Day, Ph.D., dated 6/13/08, at p. 1.

proffered by the Government while the second deals more directly with the statements contained in Dr. Day's Declaration.

### REPLY TO GOVERNMENT'S LEGAL ARGUMENT

In contradiction to the breadth of federal and state case law, the Government has taken the position that the information sought by the plaintiffs in the present case is not relevant.[2]

Although a state court case, and as previously addressed in plaintiffs' motion, the Alaska Supreme Court in *Noffke v. Perez* addressed a substantially similar issue.[3]  While Alaska has a somewhat broader rule of discovery, as noted by the Government in its opposition, Alaska also recognizes a constitutional right to privacy that the United States Constitution does not. Article I, Section 22 of the Alaska Constitution states that the "right of the people to privacy is recognized and shall not be infringed." The Alaska constitutional law is clear that greater rights can be protected under the Alaska Constitution than are

---

[2]    See Exhibit B, United States' Answers to Plaintiffs' Fourth Request for Interrogatories and Production, dated 2/6/08, at p. 4. The Government also asserted in its Response in Opposition to Johnsons' Motion to Compel Production of Dr. Steven Day's Financial Information that the plaintiffs must show that Mr. Day's tax returns are relevant under Federal Rule of Civil Procedure 26(b)(1) at p. 10. Further, the Government stated that total income is not generally considered relevant at p. 10.

[3]    178 P.3d 1141 (Alaska 2008).

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

recognized under the United States Constitution.[4]    Therefore, though *Noffke* may analyze the discoverability of tax returns under the broader state discovery rule, the Alaska Supreme Court found that the constitutionally protected privacy rights of witnesses who were not brought "fortuitously into the litigation" were outweighed by the utility of the information for financial bias impeachment purposes.

In *Noffke*, the plaintiffs served on the defendant a request for production of the defense expert's income from the company he worked for, The Independent Medical Examiners ("TIME"), for the years 2002-2005.[5]    The request also sought the tax returns for TIME for the same time period.[6]    The Supreme Court of Alaska determined that the tax returns were relevant and were not privileged.[7]    However, this did not end the inquiry into discoverability.    The court set forth a well-reasoned test for determining when such private financial information would be discoverable.[8]    The court balanced the plaintiffs' right to

---

[4]    *Roberts v. State*, 458 P.2d 340, 342 (Alaska 1969).

[5]    *Id.* at 1149.

[6]    *Id.*

[7]    *Id.* at 1150.

[8]    *Id.*

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

discovery with the expert's right to privacy, concluding that the returns were in fact relevant and discoverable for impeachment purposes.[9]

In the present case, the information requested is even more narrowly tailored. Dr. Day, by his own admission derives 99% of his income from Strauss & Shavelle.[10]   Although he now argues that his overall litigation related income is *only* 80% litigation derived (as disputed *infra*), he continues to acknowledge that he has virtually no other income other than from this company.   He has also admitted in prior depositions that he receives a discretionary bonus for his litigation related efforts.[11]

Dr. Day was certainly not brought into this litigation by fortuity, rather by design.   As a professional witness, this is his primary reason to exist in the litigation world.   In short, the issue of production before this court is not a close

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

---

[9]    *Id.* at 1151.

[10]    See Exhibit C, Deposition Excerpt of Steven Day, Ph.D., dated 11/10/05, *Smotherman v. Schuchman*, at p. 40.

[11]    See Exhibit D, Deposition Excerpt of Steven Day, Ph.D., dated 3/27/02, *Phillips v. Rhodes*, at p. 12; See Exhibit E, Deposition Excerpt of Steven Day, Ph.D., dated 1/20/06, *Knox v. Obukofe*, at p. 8.

question under state law and should not be any different under the jurisprudence of the Federal District of Alaska.

The federal cases argued by the Government are likewise inapposite. In *Behler*, the plaintiff sought discovery of the expert witness' tax returns, the documents relating to income during the past five years earned by the expert from defense attorneys and insurance companies, the amount of time the expert spent doing forensic activities, and a list of cases in which he had provided forensic services.[12] The court stated, "In the present case, no intellectually honest argument can be made that the information sought by the plaintiffs regarding Dr. Keehn's activities as a defense expert witness is not relevant to bias/prejudice impeachment, and, therefore, within the scope of discovery permitted by Rule 26(b)(1)."[13] The issue in *Behler* was thus limited to whether, under the facts of that case, the plaintiff had established that the tax returns and income over the past five years of the expert were required to enable him to undertake reasonable bias impeachment.[14] The court left the door open for the plaintiff to reapply to the court for discovery of

[12]     *Behler*, 199 F.R.D. at 555.

[13]     *Id*. at 561.

[14]     *Id*. at 562.

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

the tax returns after taking the expert's deposition, acknowledging that the requested information may in fact be discoverable at a future date and with additional information. The court stated:

> Once again, there may be cases where it is appropriate to compel discovery of an expert witness' total compensation, and the portions thereof earned from functioning as an expert witness. There may even be a case where tax returns and other documents relating to expert activities should be compelled as well. However, Rule 26(b)(2) would require a far stronger showing of need than is present in this case, and it is unlikely that such intrusive information would be ordered in *routine cases*.[15]

As previously discussed, *Behler* is factually distinct from the present case. In *Behler*, the expert was a board certified orthopedic surgeon that maintained a clinical practice and supplemented his income with forensic work. Under the facts presented in *Behler*, the total gross income, comprised in large part of clinical work, was determined to not be discoverable because the majority of the expert's income was *wholly independent of litigation*. The court stated, "… permitting routine disclosure of the expert's gross compensation, from all sources—*including those unrelated to litigation activities*—would provide the jury with little information relevant to a fair

---

[15]    *Id*. at fn. 16 (emphasis added).

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

assessment of the expert's credibility, while concomitantly introducing the real possibility of creating confusion, distraction and even prejudice."[16]  Logic dictates that the only possible purpose of disclosing the expert's total gross income under the circumstances presented in *Behler* would be to prejudice the court against the witness based on the magnitude of his overall income.  As asserted in plaintiffs' memorandum in support of the motion to compel, there is no risk of such confusion regarding Mr. Day's gross annual income because he derives 99% of his income from Strauss & Shavelle, Inc. Revealing his gross annual income would therefore reveal financial information that pertained exclusively to his work for Strauss & Shavelle.[17]

In *Rogers*, the United States District Court for the Southern District of California relied upon the court's analysis in *Behler*.[18]  The district court stated that the total gross income earned from forensic work sought in *Behler* was "certainly relevant."[19]  In *Rogers*, however, the plaintiff failed to explain

---

[16]    *Behler,* 199 F.R.D at 562 (emphasis added).

[17]    Exhibit C, p. 40.

[18]    *See Rogers v. United States*, 223 F.R.D. 533 (S.D. Cal. 2004).

[19]    *Id*. at 535.

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

how he would be unfairly limited in arguing bias unless he learned the information about the expert's total gross income.[20] Plaintiffs' memorandum in support of the motion to compel, established that the failure to disclose Dr. Day's financial compensation information could unfairly limit the plaintiffs' ability to argue financial bias. Moreover, Dr. Day has not only apparently testified at trial or deposition for the Government in 9.4% of his overall cases,[21] but more than likely consults in a great many more as suggested in previous deposition testimony and as evidenced by the fact that he possibly has in excess of 150 case files open at any given time.[22]

The Government also cites to *Wacker v. Gehl Co.* for the proposition that the courts will not compel production of total income data unless the movant can show particular reasons why bias is abnormally likely or the information divulged is inadequate.[23]   Not only have the plaintiffs established that the

---

[20]    *Id.* at 536.

[21]    See United States' Response in Opposition to Johnsons' Motion to Compel Production of Dr. Steven Day's Financial Information, at p. 4.

[22]    See Exhibit F, Deposition Excerpt of Steven Day, Ph.D., dated 2/17/04, *Dominguez v. U.S.*, at p. 67.

[23]    See United States' Response in Opposition to Johnsons' Motion to Compel Production of Dr. Steven Day's Financial Information at p. 9, fn. 30.

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

information divulged in the present case is insufficient for impeachment purposes, but, once again, the court's holding in *Wacker* was limited to the facts before it.  The court stated, "… defendant has not presented *any factual information whatsoever* suggesting such a relationship or supporting any other theory of bias or lack of objectivity in this case which would convince the court that the requested discovery is reasonably calculated to lead to admissible evidence."[24]

The United States District Court for the District of Kansas addressed the very issues that are presently before this Court regarding Robert Shavelle, one of the principals for Strauss & Shavelle, the consulting firm for which Dr. Day is employed as an independent contractor.  The Government in *Spencer v. United States* identified Robert Shavelle to testify that, due to the plaintiff's spinal cord injury, the plaintiff would likely die sooner than an individual who has not suffered a spinal cord injury.[25]  During the deposition of Robert Shavelle, plaintiff's counsel attempted to question Dr. Shavelle regarding how much income he earned annually from litigation consulting and how

[24]    *Wacker v. Gehl Co.*, 157 F.R.D. 58, 59 (W.D. Mo. 1994).

[25]    See Exhibit G, *Spencer v. U.S.*, 2003 WL 23484640 (D. Kan. 2003).

Gregory Johnson, et al. v. USA, et al.
Case No. 3:06-CV-00120-RRB
PLAINTIFFS' REPLY TO OPPOSITION TO MOTION TO COMPEL PRODUCTION
OF DR. STEVEN DAY'S FINANCIAL COMPENSATION INFORMATION
Page 10 of 25

many files he worked on annually.[26]   Like Dr. Day, Dr. Shavelle refused to answer the plaintiff's counsel's questions, but did testify that he derives 95% of his income from litigation consulting.[27]

The district court concluded that the information sought was relevant to Dr. Shavelle's bias, and was, therefore, within the scope of discovery permitted by Federal Rule of Civil Procedure 26(b)(1).[28]   The court stated, "Indeed, a finder of fact should be permitted  to assess possible bias on the part of an expert witness by hearing evidence regarding the expert's gross income derived from similar litigation activities."[29]   Dr. Shavelle was ordered to provide information regarding how much income he earns annually from litigation consulting and how many files he works on annually.[30]   Additionally, the court stated that if the plaintiff could demonstrate that additional information was required to enable him to undertake reasonable bias impeachment of Dr. Shavelle, he could seek leave from the

---

[26]    *Id.* at 11.

[27]    *Id.*

[28]    *Id.*

[29]    *Id.*

[30]    *Id* at 12.

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

court to conduct additional discovery.[31]  It is unknown how many other Federal District court or state court judges have entered similar orders.

Dr. Day's financial arrangement with Strauss & Shavelle is unique from the cases that other courts have addressed with the exception of the fact pattern addressed by the *Noffke* court. Strauss & Shavelle hired Dr. Day as a "consultant" or "independent contractor."  Dr. Day is given a salary and a discretionary bonus.[32]

Dr. Day's past deposition testimony makes it abundantly clear that Strauss & Shavelle's employment arrangement with Dr. Day has created a means to shelter the financial information generally available to attorneys for cross-examination.  While Dr. Day has revealed his hourly income, the percentage of income he derives from plaintiffs versus defendants, and what he was paid in the present case, none of this information means anything in the context of this witness.  Dr. Day is not the typical expert witness whose income relies solely upon the hourly fee he charges for the services he renders.  He is a salaried employee, who may receive a substantive portion of his

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

[31]    *Id.*

income from the discretionary bonuses he is awarded by the corporation as well as other factors. Plaintiffs are entitled to know the amount of and the terms of his compensation arrangement with Strauss & Shavelle along with the basis of his discretionary bonus to determine whether Dr. Day is financially motivated to tailor his opinions as an expert witness in this and other cases or to build a reputation to gain employment in future cases.

In short, the materials sought by the plaintiffs should be discoverable. Dr. Day's situation is not one of the "routine cases" that the *Behler* and *Rogers* courts contemplated. Dr. Day is a professional witness that garners 99% of his income from Strauss & Shavelle, a corporation whose primary existence is to profit from rendering expert opinions as to life expectancy. The financial information provided thus far by the Government is virtually worthless for impeachment purposes because Dr. Day's personal income is not tied in any meaningful way to the information provided. No confusion about gross annual income would result in the present case because, as the Government pointed out, this is a judge-tried case. The court will be able to decipher the significance of Dr. Day's gross annual income

---

[32]    Exhibit D, pp. 11-12; Exhibit E, p. 8.

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

and accord Dr. Day's testimony its proper weight in light of his financial bias.

**DR. DAY'S DECLARATION VERSUS DR. DAY'S PRIOR SWORN TESTIMONY**

Given Dr. Day's suggestion that plaintiffs' counsel has made a "number of misstatements, mischaracterizations, or errors" about who he is and what his prior testimony has stated, counsel feels obligated to address portions of Dr. Day's Declaration in this reply. As the court can see from his and his colleague's prior deposition testimony, plaintiffs have not mischaracterized or misstated anything. Indeed, the prior sworn testimony calls into question Dr. Day's credibility and underscores the need to discover the requested information.

Dr. Day argues that the plaintiffs are "inaccurate" in their claim that he derives 99% of his income from testifying on issues of life expectancy for litigation purposes.[33] Plaintiffs agree that he does not earn 99% of his income from "testifying" on those issues. He earns 99% of his income from Strauss and Shavelle in the form of salary and discretionary bonuses for not only testifying but consulting on hundreds of cases involving litigation matters that do not result in depositions or trials. In many of those, which are undisclosed in the Government's

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

opposition or in Dr. Day's Declaration, it is assumed that Strauss and Shavelle are retained by the Government.[34]

In truth, it is very difficult to determine the actual percentage of income earned by either Dr. Day or his colleagues from litigation since, like much of their historical testimony, this issue is a moving target.

In 2000, Dr. Strauss testified that over 90% of Strauss & Shavelle's total monetary income came from expert witness work.[35] He conceded that the "great bulk" of funding for the company came from expert witness fees for the "last three years."[36] Later, in the same deposition, he testified that the company had virtually *no* other income other than legal consulting work.[37]

In 2002, Dr. Day testified that 100% of the work that he performed for Strauss & Shavelle was for medical legal consulting.[38] From his perspective all of the income generated

---

[33]    Exhibit A, at ¶ 3.

[34]    Exhibit F, p. 74.

[35]    See Exhibit H, Deposition Excerpt of David Strauss, Ph.D., dated 12/4/00, *Freeland v. U.S.*, at p. 48.

[36]    *Id.* at 46.

[37]    *Id.* at 105.

[38]    Exhibit D, p. 100.

Gregory Johnson, et al. v. USA, et al.
Case No. 3:06-CV-00120-RRB
PLAINTIFFS' REPLY TO OPPOSITION TO MOTION TO COMPEL PRODUCTION
OF DR. STEVEN DAY'S FINANCIAL COMPENSATION INFORMATION
Page 15 of 25

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

by Strauss & Shavelle was from medical legal consulting.[39]  When questioned about his own compensation basis, he stated that he received a salary and 1099 from the company and that he received a bonus at the end of the year that was tied to how much the company took in for the entire year.[40]  He refused to divulge the amounts of compensation, however.  The same held true in his deposition testimony from August 2003 where he testified that *all* of his income was from medical legal consulting for Strauss & Shavelle.[41]

By November of 2003 he was testifying that 90% of the income of Strauss & Shavelle was from litigation related expert consulting.  In contrast, during the same time period, his employer was giving deposition testimony in a Federal District Court proceeding for the District of Kansas.  In that deposition, Dr. Shavelle testified that *95*% of his income was derived from litigation consulting.  Dr. Shavelle refused to

---

[39]    *Id.* at 99.

[40]    *Id.* at 11-12.

[41]    See Exhibit I, Deposition Excerpt of Steven Day, Ph.D., dated 8/18/03, *Mejia v. Manheim Auctions Government Services, Inc.*, at pp. 7-8.

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

provide any other income information until he was compelled to do so by the Federal District Court.[42]

The 90% figure previously supplied by Dr. Day was again changed in early February 2004. Dr. Day then testified that 100% of the company's income from litigation consulting was an "exaggeration," but it was probably above 90%.[43] Two weeks later, he testified that the predominance of income generated by Strauss & Shavelle and himself was generated by expert witness testimony.[44] He refused to acknowledge the amount of his compensation but testified that it was possible that he had over 150 open case files.[45] Moreover, he acknowledged that he had been retained by other U.S. Attorney's offices as well.[46]

---

[42]    Exhibit G, at 11. Dr. Shavelle is one of the co-owners of Strauss & Shavelle and has previously testified that he and Dr. Strauss receive a salary and bonus as well from the company. One can infer that 95% to Dr. Strauss is 95% to the company.

[43]    See Exhibit J, Deposition Excerpt of Steven Day, Ph.D., dated 2/9/04, *Croston v. Shah*, at p. 60.

[44]    Exhibit F, p. 51.

[45]    *Id.* at 67.

[46]    *Id.* at 74. Again, this strongly supports the inference that the 9.4% of Government cases that he has testified in at trial and deposition omits the number of total cases that he has been retained in by the Government as a consultant in which he has not provided deposition or trial testimony.

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

By May 2004 and throughout the remainder of 2004, he began equivocating on the percentages of litigation work performed by the company as well as the percentage of compensated litigation work that he himself performed. He now began testifying that he had "heard the [percentage] figure 90%" but could not say with certainty.[47] In terms of the basis of his own compensation he now testified that he did various types of work including research and was not sure how they [Strauss & Shavelle] "think of it when they pay me".[48] In October 2004, Dr. Day was now back to the 90% figure for litigation related work by his company.[49]

By November 2005, when asked about the percentage of his income derived from medical-legal consulting, Dr. Day answered as follows:

> Well, it is difficult for me to determine that, but I can tell you that all of my earned income, with some very, very small exceptions of stipends I may have got [sic] for presentations, all of my—the bulk, 99% of my income derives from Strauss and Shavelle, Incorporated."[50]

---

[47]    See Exhibit K, Deposition Excerpt of Steven Day, Ph.D., dated 5/4/04, *Campbell v. Dean-Onayemi*, at p. 13.

[48]    *Id.* at 10.

[49]    See Exhibit L, Deposition Excerpt of Steven Day, Ph.D., dated 10/19/04, *Campbell v. Rush-Prudential HMO, Inc., et al.*, at p. 39.

[50]    Exhibit C, p. 40.

In terms of total income to Strauss & Shavelle, he testified that 90% was for medical legal work and that he did not know about the other 10%.[51] By January 2006, Dr. Day testified that 90% of the income generated by Strauss & Shavelle was from consulting and "playing the role of an expert witness in cases of medical/legal matters" and the other 10% from structured settlement companies and Medicare/Medicaid set aside opinions.[52] All of his income was derived from Strauss & Shavelle along with a discretionary bonus that depended "to some degree, on the amount of billing".[53]

In his current Declaration and from his deposition testimony in this case, Dr. Day is now stating that the company derives roughly 80% of its income from litigation and that his income is roughly equivalently based percentage-wise. With all due respect, given the vacillating, changing and evasive historical testimony by Dr. Day and his colleagues, plaintiffs question the reliability and accuracy of this testimony. Moreover, the answers given by Dr. Day in no way shed light on the basis of his income package with the company. That coupled

---

[51]   *Id.*

[52]   Exhibit E, p. 9-10.

[53]   *Id.* at 8.

Gregory Johnson, et al. v. USA, et al.
Case No. 3:06-CV-00120-RRB
PLAINTIFFS' REPLY TO OPPOSITION TO MOTION TO COMPEL PRODUCTION
OF DR. STEVEN DAY'S FINANCIAL COMPENSATION INFORMATION
Page 19 of 25

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

by his admissions that his bonus is paid, at least in part, on work that he generates, it is imperative to discover the requested information to adequately cross-examine Dr. Day on his bias and motivation to testify and generate work for his company.

### EMPLOYMENT CONTRACT

As a further indication of Dr. Day's evasive and obstreperous conduct, plaintiffs urge the court to review Dr. Day's Declaration and compare it to his current and prior deposition testimony relating to his employment contract with Strauss & Shavelle. For instance, in his Declaration, Dr. Day states as follows:

> There is no written contract. There has never been a written contract. I cannot produce what does not exist. If someone inferred from my deposition testimony that a written contract existed, I am sorry for this confusion.[54]

To assert at this juncture that a written contract between himself and Strauss & Shavelle does not exist, is indeed disingenuous. Dr. Day gave every indication that a contract between himself and Strauss & Shavelle in fact existed as his testimony exemplifies. With regard to the existence of a contract, Dr. Day testified:

---

[54]    Exhibit A, at ¶ 6.

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

Q:   I think earlier you mentioned that you work on contract for Strauss & Shavelle; can you tell me what the terms of your contract are?

A:   If I knew them exactly, I still wouldn't be comfortable telling you because this is information that I'm not sure would be appropriate to put on a public record. I wouldn't refuse to do so, but at this point I would decline to say any more about that.

Q:   … And so my question is would you please provide that [contract] to Ms. Lindquist so that we could review it and determine whether there are any issues that we need to follow up with?

A:   Well, I'm not aware of exactly what information that you are privileged to in that sense. I know you have a right to know what percentage of my income is derived through this type of work and I think I told you to the extent that I know what that number is. I can discuss with Strauss & Shavelle Incorporated how they feel about that, but that's their contract, as well as mine, and I wouldn't feel in a position to divulge it to anyone without their okay on that.

Q:   Have you previously raised that issue with them?

A:   No.

Q:   … You don't recall ever being asked for the terms of your contract with Strauss & Shavelle?

A:   I've been asked about it. I haven't been asked specifically to provide a copy of anything, and I've been asked for things like my salary and so forth, but never have I been required ultimately to provide that kind of information.[55]

Dr. Day had every opportunity to correct plaintiffs' counsel at that time that no written contract exists between

---

[55]    See Exhibit M, Deposition Excerpts of Steven Day, Ph.D., dated 1/9/08, *Johnson v. U.S.*, at pp. 213-214.

Gregory Johnson, et al. v. USA, et al.
Case No. 3:06-CV-00120-RRB
PLAINTIFFS' REPLY TO OPPOSITION TO MOTION TO COMPEL PRODUCTION
OF DR. STEVEN DAY'S FINANCIAL COMPENSATION INFORMATION
Page 21 of 25

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

1 himself and Strauss & Shavelle.    To then characterize
2 plaintiffs' assertion that he refused to provide the contract as
3 a misrepresentation is absolutely false.

4      Dr. Day has also testified in past depositions dating back
5 to 2002 that some type of contract exists between himself and
6 Strauss & Shavelle.[56]

7      In a 2004 deposition, Dr. Day testified:

8 Q.    My question is, how much have you earned from
       Shavelle & Strauss?

9 A.    And I'm not at liberty to discuss the salary
       arrangement I have with them.

10

11 Q.   Who told you you weren't at liberty to discuss
       it?

12 A.   I don't recall exactly whether Dr. Strauss or Dr.
       Shavelle, but I know that I made that agreement
13     with them.

14 Q.   So they did not want you to discuss how much
       income is earned working for them.  Right?

15

16 A.   I don't know what was in their head when they
       suggested that to me.

17 Q.   Well, they told you not to discuss it, didn't
       they?

18

19 A.   They asked me to agree to that and I agreed.

20

21 Q.   You have a contract of—consulting agreement with
       them?

22

23 A.   I have at least a verbal contract.  I don't know
       if there's anything in writing at this point.

24 _____

25 [56]    Exhibit D, p. 100.

26 <u>Gregory Johnson, et al. v. USA, et al.</u>
Case No. 3:06-CV-00120-RRB
PLAINTIFFS' REPLY TO OPPOSITION TO MOTION TO COMPEL PRODUCTION
OF DR. STEVEN DAY'S FINANCIAL COMPENSATION INFORMATION
Page 22 of 25

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

Q.   You don't know whether you've ever signed anything?

A.   I have signed something.

Q.   Would you produce a copy of that for us, please.

A.   I don't even know what you are asking me to produce.

Q.   What did you sign?

A.   I don't know.  I don't recall.

                        *     *     *

Q.   … are you telling all of us that you signed something for your employment but you don't have any idea what it was?

A.   I told you I have some idea what it is. It's some kind of agreement as to how our working relationship will progress.  I don't know when I signed it, and I don't know any of the details of it at this point in time.  But I do know that I agreed, either verbally or in writing, not to discuss my salary outside of the office.  And so I won't do that.

Q.   Would you provide us with a copy of your agreement?

A.   If it still exists and if I can find it and if my attorney advises me—not my attorney—but if the attorney who retained me in the case advises me I must do so, then I will do that.  But again, part of that agreement may be that I don't release that agreement.  And if that's in there, then I'm not going to be able to do that.[57]

---

[57]   See Exhibit N, Deposition Excerpts of Steven Day, Ph.D., dated 3/25/04, *Gamble v. Kaiser Foundation Health Plan of the Mid-Atlantic States, et al.*, at pp. 95-98.

Perhaps everyone is confused about Dr. Day's legal relationship with Strauss & Shavelle, but one thing is certain from the above cited testimony -- Dr. Day has or had some type of written contract spelling out his services and probably, his compensation package with this employer.

## CONCLUSION

While there are other issues raised by Dr. Day's Declaration, which go to his qualifications and credibility, and as indicated above, they have not been addressed in this reply because they are not directly relevant to the issues currently before this court. In terms of the issues at hand, and for the above stated reasons, plaintiffs respectfully request the court to grant plaintiffs' motion to compel the financial compensation information previously requested from the Government.

DATED this 27th day of June 2008, at Anchorage, Alaska.

DILLON & FINDLEY, P.C.
Attorneys for Plaintiffs


By: s/Ray R. Brown
Ray R. Brown, ABA No. 8206012
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska  99501
Phone:  277-5400
Fax:    277-9896
Email:  ray@dillonfindley.com

Gregory Johnson, et al. v. USA, et al.
Case No. 3:06-CV-00120-RRB
PLAINTIFFS' REPLY TO OPPOSITION TO MOTION TO COMPEL PRODUCTION
OF DR. STEVEN DAY'S FINANCIAL COMPENSATION INFORMATION
Page 24 of 25

LAW OFFICES
DILLON & FINDLEY
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896

**CERTIFICATE OF SERVICE**

I hereby certify that on June 27, 2008 a copy of the foregoing PLAINTIFFS' REPLY TO OPPOSITION TO MOTION TO COMPEL PRODUCTION OF DR. STEVEN DAY'S FINANCIAL COMPENSATION INFORMATION was served electronically on Susan J. Lindquist.

s/Ray R. Brown

LAW OFFICES
**DILLON & FINDLEY**
A PROFESSIONAL CORPORATION
1049 W. 5th Avenue, Suite 100
Anchorage, Alaska 99501
TEL. (907) 277-5400 · FAX (907) 277-9896