Not Reported in F.Supp.2d, 2003 WL 23484640 (D.Kan.)

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
D. Kansas.
Mark A. SPENCER, Plaintiff,
v.
THE UNITED STATES OF AMERICA, et al., Defendants.
No. Civ.A.02-2106-CM.
Dec. 16, 2003.

Brett A. Davis, Michael S. Ketchmark, Scott A. McCreight, Davis, Ketchmark, Eischens & McCreight, P.C., Kansas City, MO, for Plaintiff.

Christina L. Medeiros, Christopher Allman, Kansas City, KS, for Defendant.

*MEMORANDUM AND ORDER*

MURGUIA, J.

*1 On March 12, 2000, plaintiff Mark Spencer was injured while incarcerated at the Leavenworth County Jail. On that date, plaintiff jumped or fell from a bed in the jail's holding cell and fractured his sixth cervical vertebrae. As a result of the fall, plaintiff is a partial quadriplegic. Plaintiff originally brought suit against the United States, the City of Leavenworth, the Board of Leavenworth County Commissioners, and Leavenworth County Detention Officers Shane Duncan and David Rawls in their individual capacities. Plaintiff has since stipulated to the dismissal of his claims against all defendants except the United States. This matter is before the court on United States of America's Motion for Summary Judgment (Doc. 127); United States of America's Motion to Disqualify Dr. Douglas Tucker and Dr. Larry Carver as Expert Witnesses Pursuant to K.S.A. § 60-3412 (Doc. 129); and Plaintiff's Motion to Strike Robert Shavelle as an Expert Witness (Doc. 132).

I. Facts [FN1]

> FN1. The court construes the facts in the light most favorable to plaintiff as the non-moving party pursuant to Fed.R.Civ.P. 56.

Plaintiff honorably served in the United States Army from 1984 to 1987. Plaintiff was admitted to the Leavenworth Veterans Affairs Medical Center (hereinafter "VAMC") on October 13, 1999. Plaintiff suffers from paranoid schizophrenia. Plaintiff was discharged from the VAMC psychiatric unit on or about October 21, 1999, to the Domiciliary on the grounds of the VAMC, and to the Substance Abuse Unit Treatment Program. Plaintiff was scheduled to be discharged from the Domiciliary on or about March 15, 2000.

On March 11, 2000, plaintiff went to the Wal-Mart store located in Leavenworth, Kansas. At approximately 3:19 p.m. on March 11, 2000, Leavenworth Police Officers Stephen Herring and Nick Nordmann were dispatched to the Wal-mart in reference to a suspicious subject. Officers Herring and Nordmann made contact with plaintiff in the Wal-mart parking lot. Plaintiff appeared to be disoriented, standing near Idaho street with his arms raised, shouting religious statements. A physical altercation ensued, and the officers hand cuffed plaintiff and placed him in the back of their car. The officers arrested plaintiff for battery on a law enforcement officer.

EXHIBIT G
PAGE 1 of 10

Because it appeared that plaintiff was not mentally stable, the Leavenworth city police officers determined that plaintiff should be evaluated by a doctor. The officers took plaintiff to the VAMC Emergency Room. Dr. Abraham Jacob was the attending physician who evaluated plaintiff. During Dr. Jacob's evaluation, plaintiff was loudly and incoherently howling and chanting. Other than his howling and chanting, plaintiff did not speak during Dr. Jacob's evaluation and did not answer any questions. As part of his evaluation, Dr. Jacob reviewed one of plaintiff's discharge summaries, which indicated that plaintiff suffered from schizo-affective disorder with delusions and decompensation as well as hallucinations. Dr. Jacob also knew plaintiff had a prescription for Haldol at bedtime to control his psychosis and schizophrenia and another medication for mood control. For purposes of this opinion, there appears to be no dispute that Dr. Jacob failed to conduct a thorough psychiatric examination or evaluation of plaintiff. Dr. Jacob concluded that plaintiff was merely angry and did not want to be in the hospital. Based on this diagnostic impression, Dr. Jacob medically cleared plaintiff for incarceration. Dr. Jacob failed to provide plaintiff with medication. Dr. Jacob also did not provide discharge instructions, the purpose of which would have been to advise the officers about the risks associated with plaintiff's condition, the dangers for relapse, what to do in the event of deterioration, including the need for further medical evaluation, and necessary medications. The standard of care required that Dr. Jacob provide discharge instructions to police authorities. Dr. Jacob testified that he (mistakenly) believed that patient confidentiality prohibited disclosure of plaintiff's psychiatric condition and medications to law enforcement authorities.

*2 After Dr. Jacob released plaintiff from the VAMC, Officer Herring took plaintiff to the Leavenworth County Jail for detention. Leavenworth County Detention Officers Gary Huss and William Kurt Eustice were on duty at the Leavenworth County Jail when plaintiff was booked into that facility. Officer Herring advised Officers Huss and Eustice that plaintiff had been taken to the VAMC for an evaluation and that the doctor said he was fine and could be taken to jail.

Officer Eustice completed the booking inquiry for plaintiff. Question No. 8 on the booking inquiry asks whether the inmate's behavior suggests a risk to staff/inmates or suicide. Officer Eustice typed beneath Question 8 "inmate yelling, crying, and uncooperative. Would not talk to staff." Officer Eustice kept plaintiff in the holding cell of the Leavenworth County Jail and did not put him in general population because plaintiff did not answer his questions and because plaintiff was yelling and screaming.

The Leavenworth County Jail had in place a policy entitled "24-HOUR EMERGENCY MEDICAL CARE" (Policy). The Policy provided, "The Jail Physician is on-call twenty-four (24) hours daily to respond to emergency medical situations that occur at the Leavenworth County Jail. Jail personnel will promptly implement emergency medical procedures to ensure that inmates and staff, who are in need of emergency medical attention, receive it." The Policy defined "emergency medical situation" as "any health/life threatening condition, such as but not limited to, severe bleeding, unconsciousness, serious breathing difficulties, head injury, severe pain, suicide attempt, onset of bizarre behavior, or severe burns." If an inmate needed emergency medical attention, the Policy directed officers to notify the Communications Center that there is an emergency medical situation, to contact the Jail Physician for instructions, and to notify the Jail Commander. The phone number of the Leavenworth County Jail physician is posted near the phone in the booking area, which is next to the holding cell.

On March 12, 2000, a few minutes before midnight, Leavenworth County Jail detention Officer Shane Duncan relieved Officers Eustice and Huss. Officers Eustice and Huss told Officer Duncan that plaintiff had been acting strange all night and that, because of this strange behavior, they left plaintiff in the holding cell. Just after Officers Eustice and Huss's departure, plaintiff began yelling very loudly in the holding cell. Officer Duncan and Leavenworth County Jail detention Officer David Rawls, the other shift officer, were unable to understand what plaintiff was yelling, but he seemed to be chanting something. Officers Duncan and Rawls observed plaintiff from the control room window dancing and chanting in the holding cell. Plaintiff's yelling lasted about 10-15 minutes, and then he laid on the bunk.

About an hour later, plaintiff again started yelling, louder this time. Plaintiff began banging his hands against the window to the control room, and Officer Duncan testified that plaintiff repeatedly banged his head hard against the window to the control room. It looked to Officer Duncan that

EXHIBIT G
PAGE 2 of 10

plaintiff was using all of his force to bang his fists and head against the glass.

*3 Officer Rawls went back to the holding cell to attempt to quiet plaintiff. Upon opening the holding cell door, Officer Rawls told plaintiff to turn around and be quiet. Plaintiff refused to turn around and continued banging even harder and louder on the glass with his hands. Plaintiff was hitting the glass with his fist hard enough to bow the Plexiglas, and Officer Rawls feared that plaintiff's pounding could break the glass and that plaintiff would actually be able to break through the metal that was containing him in the holding cell, thereby gaining access to the jail control room. Officer Rawls sprayed plaintiff with cayenne pepper spray.

Plaintiff remained quiet for about two hours after he was sprayed with the cayenne pepper spray and then began pounding on the window and yelling. Plaintiff's banging became so loud that, while Officer Duncan was on a jail check, she was able to hear the banging clearly from the top level of the jail. Plaintiff continued this behavior on and off for probably two hours, approximately from 3:30 a.m. to 5:30 a.m. During this two hour period, plaintiff continued to bang his hands and head against the window. Officer Duncan thought that plaintiff was banging on the glass hard enough with his hands and his head that she thought plaintiff was at risk of injury, and Officer Rawls feared that the pounding was hard enough to break the glass.

Officer Rawls went back to the holding cell to try and calm plaintiff, and plaintiff had removed his clothes and was naked. After giving plaintiff several commands to sit down and stop his banging, Officer Rawls again sprayed plaintiff with cayenne pepper spray.

Officer Duncan then began serving breakfast. She told the trustees to serve plaintiff on paper plates. Officer Duncan was concerned that, if plaintiff received the normal breakfast utensils, he could injure himself with the utensils or use the utensils as a weapon. Officer Duncan entered the holding cell and placed plaintiff's breakfast on his bunk. After serving breakfast on the lower level of the jail, Officer Duncan went past the holding cell to go upstairs. Plaintiff was still naked, had thrown his breakfast all over the holding cell, and was dancing on it. Plaintiff then removed the mattress from the bunk and laid it on the floor. Plaintiff would sit on the bunk, walk on the mattress, and then sit back down.

Finally, plaintiff got up on the bed and placed his back against the wall. He proceeded to either jump or step off the bed, and fell. Officer Duncan entered the holding cell, and with the assistance of two trustees, turned plaintiff over to see if he had any obvious injuries. Plaintiff had blood coming from his nose and mouth and seemed disoriented. Plaintiff was transported to the VAMC. Plaintiff permanently injured his spinal cord, rendering him a quadriplegic.

II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir.1998) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." Id. (citing Anderson, 477 U.S. at 248).

*4 The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Id. at 670-71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. Id. at 671 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

EXHIBIT G
PAGE 3 of 10

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256; see *Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327 (quoting Fed.R.Civ.P. 1).

III. Discussion

A. Applicable Law under Federal Tort Claims Act

Plaintiff brings this action against the United States seeking recovery under the Federal Tort Claims Act ("FTCA"). The FTCA waives sovereign immunity for damages "caused by the negligent or wrongful act or omission of any employee of the Government." 28 U.S.C. § 1346(b)(1). Plaintiff's complaint asserts a cause of action under the FTCA against the United States (hereinafter referred to as "defendant") based on the negligent and wrongful acts of its employee, Dr. Jacob. The analysis of a claim under the FTCA is conducted under the substantive law of the state where the accident occurred. *Mass. Bonding & Ins. Co. v. United States,* 352 U.S. 128, 77 S.Ct. 186, 1 L.Ed.2d 189 (1956). Accordingly, the substantive law of Kansas applies in this case.

To prevail on his negligence claim under Kansas law, plaintiff must show (1) the existence of a duty; (2) breach of that duty; (3) injury; and (4) a causal connection between the duty breached and the injury suffered. *Hall v. Kan. Farm Bureau,* 274 Kan. 263, 279, 50 P.3d 495 (2002). The breach of duty must be the actual and proximate cause of the injury. *Davey v. Hedden,* 260 Kan. 413, 426, 920 P.2d 420 (1996). Proximate cause is that cause which in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act. *Id.* (citing *Baker v. City of Garden City,* 240 Kan. 554, 557, 731 P.2d 278 (1987)).

B. Proximate Cause

**\*5** The crux of defendant's argument is that, even if Dr. Jacob deviated from the appropriate standard of care, the subsequent acts and omissions of the Leavenworth County Jail constituted gross and wanton negligence and deliberate indifference to the care and safety of plaintiff because the officers failed to protect plaintiff from his self-injurious behavior, and such gross and wanton conduct and deliberate indifference was not foreseeable to Dr. Jacob. Plaintiff asserts that defendant's reliance on proximate cause is misplaced. Plaintiff points to the fact that Kansas has adopted a comparative fault system and argues that, as a result, the fault of Dr. Jacob should be compared with the other (former) defendants.

The court turns to the recent case of *Reynolds v. Kansas Department of Transportation,* 273 Kan. 261, 43 P.3d 799 (2002). In *Reynolds,* the court stated: "With the adoption of comparative fault, Kansas has moved beyond the concept of proximate cause in negligence." *Id.* at 269, 43 P.3d 799. The court went on: "In a comparative fault system, 'distinctions between primary, secondary, active and passive negligence lose their previous identities. The nature of misconduct in such cases is to be expressed on the basis of degrees of comparative fault or causation, and the 'all or nothing' concepts are swept aside." ' *Id.* (quoting *Kennedy v. City of Sawyer,* 228 Kan. 439, Syl. ¶ 6, 618 P.2d 788 (1980)).

In this case, there is no dispute that the City/County of Leavenworth (hereinafter referred to as "City/County") had a non-delegable duty to care for plaintiff while incarcerated at the Leavenworth County Jail. Moreover, neither party contests that the City/County, at the very least, negligently

EXHIBIT G
PAGE 4 of 10

performed that duty. However, viewing all reasonable inferences in favor of plaintiff, the court believes a trier of fact could conclude that Dr. Jacob was negligent by either failing to give plaintiff any medication or by failing to provide discharge instructions, or both. Additionally, such conduct was a cause in fact of plaintiff's injury.

Dr. Jacob knew that plaintiff was mentally ill and that plaintiff previously had been prescribed medications to control that illness. However, Dr. Jacob did not inform the City or County officials of those facts. Instead, he affirmatively told them that plaintiff was "medically cleared for incarceration." Only then, in direct reliance on Dr. Jacob's medical opinion, did the officers take plaintiff to the Leavenworth County Jail. Indeed, the record indicates that the Leavenworth County Jail is not a medical facility and does not accept prisoners with psychological or psychiatric disorders or a known mental illness, nor does it accept prisoners in need of mental treatment at the time of intake. Morever, it is uncontroverted that the Leavenworth County Jail would never have accepted plaintiff as a prisoner if the receiving detention officer had known that he was schizophrenic and required medications for his illness. Officer Duncan testified that, had she known she was dealing with an inmate who was mentally impaired, it would possibly have affected how she treated plaintiff that evening. Accordingly, there exists evidence in the record to indicate that Dr. Jacob's conduct helped to bring about the harm, despite the fact that the negligent acts did not occur simultaneously.

*6 Notwithstanding that Dr. Jacob's conduct was a cause in fact of plaintiff's injuries, the court must decide whether the actions of the City/County were a superseding or intervening cause, thereby shifting liability from defendant. Under Kansas law, negligent acts need not occur simultaneously in order to be causally related. *Cox v. Lesko,* 263 Kan. 805, 818, 953 P.2d 1033 (1998). As such, in most circumstances, where one party's negligence combines with another's to produce an injury, notwithstanding that the negligent acts did not occur simultaneously, the comparative negligence statute applies. *Id.* at 819, 953 P.2d 1033. However, the court is again guided by *Reynolds,* which stated that "[i]ntervening and superseding causes, which cut off liability for earlier negligence, are still recognized *in extraordinary cases." Id.* (emphasis added). The court must therefore determine whether this is an "extraordinary case" such that defendant is shielded from liability as a matter of law.

The Kansas Supreme Court recognizes that one person's negligence is not the proximate or direct cause of an injury where there is a new, separate, wholly independent, and efficient intervening cause of the injury and the loss. *Citizens State Bank v. Martin,* 227 Kan. 580, 588, 609 P.2d 670 (1980). As stated in *Citizens Bank,* "Unforeseen acts of gross and wanton negligence [have been] found to be such an intervening cause, and to make the earlier negligence of other persons the remote cause to which no liability attaches." *Id.* at 588-89, 609 P.2d 670. Defendant contends that the City/County's gross and wanton negligence acted as an intervening or superseding cause.

The court looks to plaintiff's behavior while incarcerated at the Leavenworth County Jail. About an hour into Officers Duncan and Rawls's shift, plaintiff began to bang his hands and his head against the window to the control room. Plaintiff was quiet for about two hours after first being sprayed with pepper spray, at which time he again began pounding on the window and yelling. At one point, plaintiff removed his clothes and began dancing on his food. The court recognizes that such behavior is not normal. Yet, as testified to by Officer Rawls, plaintiff's behavior may not be considered exceptionally unusual or strange in the jail context. Accordingly, the court cannot say that the detention officers' failure to obtain medical attention was, as a matter of law, grossly or wantonly negligent. Viewing all reasonable inferences in favor of plaintiff, as this court must on summary judgment, the court concludes that such a determination should be made by a finder of fact.

Defendant argues that the Restatement (Second) of Torts § 452 applies to this case. Section 452 provides, "Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause." As set forth in *Olson v. U.S. Industries, Inc.,* "The duty to prevent harm may be found to have shifted in either of two situations: first, by contract or agreement between the actor and the third party; and second, under any various other circumstances in which it is reasonable to find all duty and responsibility for the prevention of harm has passed to the third person." 649 F.Supp. 1511, 1521 (D.Kan.1986) (citing

EXHIBIT G
PAGE 5 of 10

Restatement (Second) of Torts § 452, comments e, f).

**\*7** Foremost, the court notes that no Kansas court has ever applied § 452 and, due to the changing landscape of proximate cause law in Kansas, the court is unsure whether the Kansas Supreme Court would adopt § 452 if presented the question. See Reynolds, 273 Kan. at 269, 43 P.3d 799 ("With the adoption of comparative fault, Kansas has moved beyond the concept of proximate cause in negligence."). In any event, the court finds § 452 inapplicable in these circumstances. Section 452 encompasses the following situation: "By contract, by gratuitous promise, *or by fair implication from what is agreed,* it may be understood that the third person has taken over full responsibility for the situation, and that the actor is relieved of his obligation." Olson, 649 F.Supp. at 1521(citing Restatement (Second) of Torts § 452, comments e) (emphasis added in Olson ). Notwithstanding the City/County's duty to provide care to plaintiff, the entire responsibility for the situation did not shift to the City/County because the City/County did not agree to take custody of an unmedicated, mentally ill patient.

Mentioned by neither party is Restatement (Second) of Torts § 449, which the court finds pertinent to this case. Section 449 provides, "If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby." State v. Kirby, 272 Kan. 1170, 1183-84, 39 P.3d 1 (2002) (quoting Restatement (Second) of Torts § 449). Under this analysis, the court inquires whether the harm that occurred was a reasonably foreseeable consequence of Dr. Jacob's conduct at the time he acted.

Dr. Jacob knew plaintiff was mentally ill; he knew plaintiff was under the care of the VAMC and that he was prescribed medications to control his psychosis; and he knew the City's police officers had brought plaintiff to him for the express purpose of determining whether plaintiff was mentally ill. In the face of that knowledge, Dr. Jacob cleared plaintiff for incarceration; withheld all information concerning plaintiff's mental illness from the officers; gave no discharge instructions; failed to give plaintiff his prescribed medicines; and failed to tell the jail officials that plaintiff was in need of medication. Based on these facts, a reasonable physician could have foreseen that such conduct would likely result in some injury to plaintiff.

Moreover, a finder of fact could conclude that the City/County's actions were at least in part in response to Dr. Jacob's actions. When the detention officers failed to summon help for plaintiff, they did so in part because Dr. Jacob already had relayed information, either expressly or by implication, that plaintiff was not mentally ill. The City and County officials relied on Dr. Jacob's medical opinion (or lack thereof) regarding plaintiff, and Dr. Jacob knew or had reason to know that they would do so at the time he gave that opinion. Thus, the likelihood that the City/County would fail to obtain medical care was one of the hazards which made Dr. Jacob's actions negligent.

**\*8** The facts of this case do not support a finding of the extraordinary as required by Reynolds. Accordingly, the court concludes that the City/County's conduct did not act as an intervening or superseding cause of plaintiff's injuries such that defendant is shielded from liability as a matter of law. Rather, the actions of the City/County are inextricably intertwined with that of Dr. Jacob.[FN2] The court denies defendant's motion for summary judgment.

> FN2. Defendant asserts that plaintiff is precluded by his own admissions from attributing fault to defendant. Specifically, defendant points to Plaintiff's Memorandum in Opposition to The City of Leavenworth's Motion to Dismiss, wherein plaintiff stated, "The failure to maintain such proper facilities and procedures is the fault of the City and the County; it has nothing whatsoever to do with Dr. Jacob." However, under the law of this circuit, briefs are not pleadings or part of the record, and statements in briefs may be considered admissions in the court's discretion. *Plastic Container Corp. v. Continental Plastics of Okla., Inc.,* 607 F.2d 885, 906 (10th Cir.1979). In this instance, the court declines on summary judgment to preclude plaintiff's claims against defendant based upon plaintiff's counsel's statements contained in the aforementioned brief.

EXHIBIT G
PAGE 6 of 10

IV. Defendant's Motion to Exclude

Plaintiff has named Douglas Tucker, M.D. and Larry Carver, M.D. as two of his three expert witnesses in this case. Both of these physicians were retained to testify about whether Dr. Jacob deviated from the standard of care when he evaluated plaintiff on March 11, 2000. Defendant argues that both of these physicians should be disqualified from testifying as expert witnesses in this case.

Such expert testimony is governed by Kan. Stat. Ann. § 60-3412, which provides that an expert is not qualified to testify on the standard of care unless "at least 50% of such person's professional time within the two-year period preceding the incident giving rise to the action is devoted to actual clinical practice in the same profession in which the defendant is licensed." In *Endorf v. Bohlender*, 26 Kan.App.2d 855, 865, 995 P.2d 896 (2000), the Kansas Court of Appeals defined "actual clinical practice" as follows: "Actual clinical practice means patient care. However, patient care should not be limited to a physical presence or bedside requirement." The court further explained, "[T]he practitioner of healing arts advising on, or addressing care for, a distant patient is engaged in actual clinical practice." *Id.* Pursuant to § 60-3412, the court considers only that testimony given by the respective experts which pertains to the two years preceding March 11, 2000.

A. Douglas Tucker, M.D.

At his deposition, Dr. Tucker testified that during the relevant time period he spent about five percent of his time on research and writing; five percent of his time on public presentations; five percent of his time teaching at the medical school; and five percent of his time reviewing literature. This time spent on non-clinical practices adds up to twenty percent. Dr. Tucker estimated that, of the remaining eighty percent, he spent fifty percent of his time in actual clinical practice and fifty percent on "forensics." Defendant contends that, according to Dr. Tucker's testimony, he spends only forty percent of his time in actual clinical practice.

The court reviews the deposition testimony pertaining to Dr. Tucker's definition of "forensics":

Q. How much of your time is spent in consulting with attorneys regarding legal cases?

A: You mean how much of my time is spent in my forensic -

Q: Yes.

A: practice. I usually estimate roughly that half my professional time is clinical with my patients and half is forensic.

(Dr. Tucker Deposition at pg. 53, 995 P.2d 896).

*9 Subsequent to his deposition, Dr. Tucker executed an affidavit, wherein he asserted that he did not use the term "forensics" to exclusively mean or imply expert witness work, nor did he intend to imply that forensic work never involves actual patient care. "Rather, I used the term 'forensic' to describe any work that I performed that involves the legal system in any way." (Dr. Tucker Affidavit, ¶ 9). Dr. Tucker stated in his affidavit that, during the two years prior to March 11, 2000, he devoted more that fifty percent of his professional time to actual clinical care. This actual clinical care involved forensic work, which in turn included "treatment of patients who were under the jurisdiction of probation and parole." ( *Id.* ¶ 7, 995 P.2d 896(d)).

Defendant contends that the statements contained in Dr. Tucker's affidavit are inconsistent with his deposition testimony and should, therefore, be stricken. In determining whether to consider Dr. Tucker's affidavit, the court notes that contradictions found in a witness's testimony are not, in themselves, sufficient to preclude such testimony. *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir.2001). Indeed, "an affidavit may not be disregarded [merely] because it conflicts with the affiant's prior sworn statements." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir.1986). However, in assessing a conflict under these circumstances, "courts will disregard a

EXHIBIT G
PAGE 7 of 10

contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." *Id.* Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain. *Id.*

The court concludes that Dr. Tucker's affidavit does not constitute an attempt to create a sham issue. Rather, Dr. Tucker's affidavit appears to explain his earlier testimony wherein he may have been confused as to what defendant's counsel considered forensic practice. Dr. Tucker was not given an opportunity at his deposition to fully explain his definition of "forensic practice." Dr. Tucker's affidavit merely elaborates on his intended meaning of the term. Such an explanation is not inconsistent with his prior deposition testimony. Moreover, taking into account Dr. Tucker's more fully explained definition of "forensics," the court determines that Dr. Tucker's statement-that he devoted more that fifty percent of his professional time to actual clinical care-also is not necessarily inconsistent with his prior deposition testimony. In other words, if the court considers the forty percent of time devoted to forensic practice, some of which included treating patients under the jurisdiction of probation and parole, Dr. Tucker's actual clinical practice could indeed add up to at least fifty percent, as testified to in his affidavit. The court will consider Dr. Tucker's affidavit.

**\*10** The court finds that, based upon the additional testimony of Dr. Tucker, at least fifty percent of Dr. Tucker's time was devoted to actual clinical practice. Accordingly, defendant's motion to exclude the expert testimony of Dr. Tucker is denied.

B. Larry Carver, M.D.

At his deposition, Dr. Carver testified that he is currently and has been since January 1997 the Director of the Neuroscience Center Brain Tissue Bank and Research Laboratory. Dr. Carver stated that, in this capacity, he "collected brains" for research and that he spends about fifty percent of his time as the Director. Dr. Tucker further testified that he spends about fifty percent of his time performing duties as an Associate Professor at Louisiana State University, which include making rounds on patients and teaching a class to second-year medical students. Dr. Carver also testified that he spends about one percent of his time since March 1998 doing committee work at LSU; one percent of his time from 1997 giving presentations; and one to two percent of his time writing articles. Dr. Carver additionally testified that, from 1997 until 2001, he was the Medical Director for Mental Health Services at Charity Hospital. Dr. Carver stated that he quit the Medical Director position because it took up too much time-"It's essentially full-time work." (Dr. Carver Deposition at pg. 22). Defendant contends that Dr. Carver is mainly a research scientist and teacher and devotes nowhere near the required fifty percent of his time to actual clinical practice. In response, plaintiff submits an affidavit executed by Dr. Carver. In that affidavit, Dr. Carver asserts that, in answering deposition questions regarding the time he devoted as Director of the Neuroscience Center Brain Tissue Bank and Research Laboratory, "I was speaking about my current work in that role. In the two-years (sic) prior to March 11, 2000 I spent very little time working for the Brain Bank. Instead, my title was more honorary in nature. It was not until I left my Clinical Medical Director position at Charity Hospital in or about February 2000 that I began devoting any significant time to the Brain Bank." (Carver Affidavit ¶ 3). Dr. Carver asserted in his affidavit that, during the two years prior to March 11, 2000, he devoted seventy-five percent of his time to actual clinical care. Dr. Carver specified that, during that time period, his actual clinical practice included making and supervising clinical medical decisions at Charity Hospital, which involved the treatment of over 8,000 psychiatric patients per year in the emergency room, and participating in clinical practice in his capacity as Associate Professor.

Defendant contends that the statements contained in Dr. Carver's affidavit are inconsistent with his deposition testimony and should, therefore, be stricken. The court concludes that Dr. Carver's affidavit does not constitute an attempt to create a sham issue. Rather, Dr. Carver's earlier deposition testimony clearly reflects confusion which the affidavit attempts to explain.

**\*11** The deposition questions directed to Dr. Carver regarding his duties and proportionate time spent as Director of the Neuroscience Center Brain Tissue Bank and Research Laboratory appear to

EXHIBIT G
PAGE 8 of 10

have been asserted in the present tense. (Carver Deposition at pg. 9 ("What *do you do* as the Director of the Neuroscience Brain Tissue Bank and Research Laboratory?") (emphasis added)). Thus, Dr. Carver may easily have been confused as to the time period to which defendant's counsel was referring. Such confusion is evidenced by Dr. Carver's answers regarding the cumulative proportions of time spent in clinical practice. During his deposition, Dr. Carver testified that he spent fifty percent of his time doing research as the Director of the Neuroscience Center Brain Tissue Bank and Research Laboratory; fifty percent of his time performing duties as an Associate Professor; and three to four percent performing committee work, giving presentations, and writing articles. Immediately thereafter, Dr. Carver testified that, from 1997 until 2001, his duties as the Medical Director for Mental Health Services at Charity Hospital were "essentially full-time work" and, indeed, the reason he quit the Medical Directorship position was because it was too much work. Clearly, the proportionate times do not add up.

The court concludes that Dr. Carver's affidavit was submitted in an attempt to resolve testimony given at his deposition about which he was confused at the time he testified. The court will therefore consider Dr. Carver's affidavit. Accordingly, the court finds that, based upon the additional testimony of Dr. Carver, which specifies his proportionate time spent in actual clinical practice during the two years preceding March 11, 2000, Dr. Carver satisfies the requirements set forth in Kan. Stat. Ann. § 60-3412. Accordingly, defendant's motion to exclude the expert testimony of Dr. Carver is denied.

V. Plaintiff's Motion to Strike

Defendant has named Robert Shavelle, Ph.D., as an expert statistician. **Dr. Shavelle** is expected to testify that, due to the nature of plaintiff's injuries, plaintiff will likely die sooner than an individual who has not suffered a spinal cord injury. Plaintiff contends that the study upon which **Dr. Shavelle** relies is outdated and that **Dr. Shavelle** relies on this study because he derives a substantial income testifying on behalf of the insurance industry and defendants in personal injury cases.

To that end, plaintiff's counsel questioned **Dr. Shavelle** at his deposition regarding how much income **Dr. Shavelle** earns annually from litigation consulting and how many files **Dr. Shavelle** works on annually. **Dr. Shavelle** refused to answer plaintiff's counsel's questions. Rather, **Dr. Shavelle** testified that he derives 95% of his income from litigation consulting. Plaintiff therefore requests this court to strike **Dr. Shavelle** as an expert witness unless **Dr. Shavelle** provides this information before trial.

The court believes that the information sought by plaintiff regarding **Dr. Shavelle's** activities as an expert witness is relevant to **Dr. Shavelle's** bias and, therefore, within the scope of discovery permitted by Federal Rule of Civil Procedure 26(b)(1). Indeed, a finder of fact should be permitted to assess possible bias on the part of an expert witness by hearing evidence regarding the expert's gross income derived from similar litigation activities. Courts have held that the amount of income derived from services related to testifying as an expert witness is relevant to show bias or financial interest. *See, e.g., First State Bank of Junction City, Kan. v. Deere & Co.*, 1991 WL 46375, at *3-4 (explaining that witness's income was relevant to his bias and credibility as expert witness).

*12 The court therefore orders that **Dr. Shavelle** be produced for questioning at a deposition regarding the information sought by plaintiff. Specifically, **Dr. Shavelle** is ordered to provide information regarding how much income he earns annually from litigation consulting and how many files he works on annually. If possible, the deposition will be by telephone, and its scheduling will be expedited. The questioning by plaintiff at the deposition will not last more than two hours, provided **Dr. Shavelle** gives complete and unevasive answers to proper questions asked. If, after taking this deposition, plaintiff can demonstrate that additional information is required to enable him to undertake reasonable bias impeachment of **Dr. Shavelle**, he may seek leave from the court to conduct additional discovery. Further, should the court determine that **Dr. Shavelle** has not provided complete and unevasive answers to the discovery herein ordered, then additional discovery will be ordered, and appropriate sanctions, including not allowing **Dr. Shavelle** to testify at trial, may be imposed. Finally, to protect against possible abuse of the sensitive financial information for which discovery has been allowed, it will be subject to a protective order that prohibits dissemination of the information produced for any purpose not directly related to the prosecution of this case. This

EXHIBIT G
PAGE 9 of 10

protective order will remain in effect following the conclusion of the pending case. Plaintiff's requests for costs and fees associated with this discovery is denied.

IT IS THEREFORE ORDERED that defendant's Motion for Summary Judgment (Doc. 127) is denied; defendant's Motion to Disqualify Dr. Douglas Tucker and Dr. Larry Carver as Expert Witnesses Pursuant to K.S.A. § 60-3412 (Doc. 129) is denied; and plaintiff's Motion to Strike Robert Shavelle as an Expert Witness (Doc. 132) is granted to the extent set forth in this opinion.

D.Kan.,2003.
Spencer v. U.S.
Not Reported in F.Supp.2d, 2003 WL 23484640 (D.Kan.)

Motions, Pleadings and Filings (Back to top)

- 2003 WL 25332692 (Expert Report and Affidavit) Affidavit of Larry Carver, M.D. (Sep. 12, 2003)
- 2003 WL 25332693 (Expert Report and Affidavit) Affidavit of Thomas W. Graber, M.D. (Sep. 12, 2003)
- 2003 WL 25424450 (Expert Report and Affidavit) Affidavit of Douglas E. Tucker, M.D. (Sep. 11, 2003)
- 2003 WL 25424079 (Expert Deposition) Videotaped Deposition of Dennis Allin, MD (Aug. 25, 2003) Original Image of this Document (PDF)
- 2003 WL 25424080 (Expert Deposition) Videotaped Deposition of Alex John Spadoni, MD (Jun. 30, 2003) Original Image of this Document (PDF)
- 2003 WL 25729899 (Expert Deposition) (Deposition of John McGarry, MD) (Jun. 5, 2003) Original Image of this Document (PDF)
- 2003 WL 25424081 (Expert Deposition) Deposition of Thomas W. Graber, M.D. (May 22, 2003) Original Image of this Document (PDF)
- 2003 WL 25424083 (Expert Deposition) Deposition of Larry A. Carver, M.D. (May 15, 2003) Original Image of this Document (PDF)
- 2003 WL 25729898 (Expert Deposition) (Deposition of Queeny Poulose, MD) (May 7, 2003) Original Image of this Document (PDF)
- 2003 WL 25424082 (Expert Deposition) Deposition of Douglas E. Tucker, M.D. (Apr. 7, 2003) Original Image of this Document (PDF)
- 2003 WL 25708582 (Partial Expert Testimony) Deposition of Douglas E. Tucker, M.D. (Apr. 7, 2003) Original Image of this Document (PDF)
- 2003 WL 25729940 (Expert Report and Affidavit) (Report or Affidavit of Douglas E. Tucker, M.D.) (Feb. 28, 2003)
- 2:02cv02106 (Docket) (Mar. 8, 2002)
END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT G
PAGE 10 of 10