# DEPOSITION OF DAVID STRAUSS, PH.D.

## ROGER FREELAND V. THE UNITED STATES OF AMERICA

### December 4, 2000

## CONDENSED TRANSCRIPT AND KEYWORD INDEX

EXHIBIT H

PAGE 1 of 3





| Los Angeles | Irvine | San Jose | Woodland Hills | Riverside | San Diego | Palm Springs | San Francisco |
|---|---|---|---|---|---|---|---|
| (310) 207.8000 | (949) 955.0400 | (408) 885.0550 | (818) 702.0202 | (909) 686.0606 | (858) 455.5444 | (760) 322.2240 | (415) 615.0000 |

BSA                DEPOSITION OF DAVID STRAUSS, PH.D. - December 4, 2000                XMAX(12/12)

## Page 46

(1) the last three years, it's been -- the great bulk of
(2) the funding has come from expert witness fees.
(3)     Q    Do these fees go to your company on top
(4) of your salary as a professor here at the University
(5) of California-Riverside?
(6)     A    The company pays me in addition to my
(7) salary here, yes.
(8)     Q    And the research projects -- is it the
(9) Riverside Life Expectancy Project?
(10)     A    University of California Life
(11) Expectancy Project.
(12)     Q    Does the University of California not
(13) contribute any money to the project?
(14)     A    That's true.
(15)     Q    Why is it called the University of
(16) California Life Expectancy Project then?
(17)     A    Partly because it was originally funded
(18) by a grant from the National Institute of Health to
(19) the university. That's how it works. And partly
(20) because it is -- the research is part of the official
(21) work I do as a professor here at the University of
(22) California.
(23)     Q    So to that extent, you're doing the
(24) research, you're being paid by the University of
(25) California?

## Page 47

(1)     A    To some extent, yes.
(2)     Q    And the database comes from the State
(3) of California, does it not?
(4)     A    The raw data that we work with
(5) originally comes from the State, yes.
(6)     Q    And do you have any graduate students
(7) working on the project?
(8)     A    Yes.
(9)     Q    You don't pay them, do you?
(10)     A    I do.
(11)     Q    Does the University of California pay
(12) them as graduate students?
(13)     A    No.
(14)     Q    And you pay them or the company pays
(15) them?
(16)     A    The company pays them.
(17)     Q    Can you give me the names of any of
(18) those people who are currently working as graduate
(19) students on the UC-R Life Expectancy Project?
(20)     A    The main one is Steven Day.
(21)     Q    And he's a mathematician?
(22)     A    He's a Ph.D. student in our department.
(23)     Q    Does he receive any money from the
(24) University of California as a graduate student?
(25)     A    No.

## Page 48

(1)     Q    Does your company pay him to do work?
(2)     A    Yes.
(3)     Q    What other sources of income does your
(4) company have?
(5)     A    At the moment, well over 90 percent, I
(6) would say, comes from expert witness work.
(7)     Q    What's the relationship of -- your
(8) company is Shavelle & Strauss?
(9)     A    Strauss & Shavelle.
(10)     Q    What's the relationship of Strauss &
(11) Shavelle to the UC-R life Expectancy project?
(12)     A    I don't know about relationship. Could
(13) you ask me a specific question?
(14)     Q    Do you own the project?
(15)     A    I wouldn't use the word "own." Dr.
(16) Shavelle and I are the two core members at the
(17) University of California. We collaborate with
(18) doctors all over the world, really, but mostly in the
(19) United States, on research projects.
(20)     Q    Just physicians or are there a variety
(21) of people including physicians?
(22)     A    Mostly physicians.
(23)     Q    In other parts of the country and other
(24) parts of the world who contribute to the project?
(25)     A    Contribute in research, yes.

## Page 49

(1)     Q    In various ways?
(2)     A    Yes.
(3)     Q    But am I right that the data that you
(4) use primarily comes from the State of California?
(5)     A    Quite a lot of our published research
(6) comes from data which originally came from this
(7) state, but we've modified it in all kinds of ways. I
(8) would add we also publish a lot of research that
(9) doesn't use that database.
(10)     Q    I got off on a long detour there. I
(11) was looking at your article that said of 1,021
(12) people, 394 I think had died. I guess then I asked
(13) you how many patients injured at age 15 -- or 14 to
(14) 18 or 14 to 20 there were in the study, and you said
(15) you didn't know. That's how I got to asking if we
(16) could get that information, and you said you didn't
(17) know.
(18)     A    Can I just -- if you ask me a specific
(19) question like how many of them were in a given range,
(20) I'm sure we could provide that to you.
(21)     Q    I assume you can't tell me how many
(22) people who were injured at age 14 to 20 are still
(23) alive?
(24)     A    Well, you have to understand that those
(25) people could have been injured at any time in our

EXHIBIT  H
PAGE  2  of  3

## Page 102

(1) no, they've not said that.

(2) Q    According to this invoice that was

(3) provided to me. as of September 27th you had put in

(4) 8.6 hours, charged $250 per hour, for a total of

(5) $2,150; is that correct?

(6) A    Yes.

(7) Q    Between then and today, have you put in

(8) any more time?

(9) A    Yes.

(10) Q    How many hours?

(11) A    I'm guessing about four.

(12) Q    What were you doing for four hours?

(13) A    Preparing for the deposition, reading

(14) other materials that were sent to me, consulting with

(15) Ms. Dow.

(16) Q    You're charging me $400 an hour for

(17) your time today?

(18) A    Yes.

(19) Q    How much do you charge for trial

(20) testimony?

(21) A    I say somewhere that it's $400 an hour,

(22) although sometimes it's a flat rate for a trip to a

(23) place.

(24) Q    You charge $400 for -- would that

(25) include -- how do you charge for your travel time?

## Page 103

(1) A    I can give an example of the most

(2) recent trip I did to Cincinnati, which was two very

(3) long days, probably about 16 hours each, and charged

(4) a flat 10 hours for each, so it was 20 hours.

(5) Q    Times 400?

(6) A    Times 250.

(7) Q    Why are you charging me $400 an hour?

(8) A    That's deposition.

(9) Q    But you only charge 250 for the trial?

(10) A    Well, in the Cincinnati case, I was in

(11) some sense traveling and working about 30 hours of

(12) which only about one was actually in court.

(13) Q    How did you arrive at a charge of $400

(14) an hour for deposition testimony?

(15) A    It was based on my sense of what is

(16) usual and customary in this sort of work.

(17) Q    You think other statisticians charge

(18) $400 an hour for depositions?

(19) A    As I said. I don't regard myself as

(20) primarily as statistician, and I don't know what

(21) other people charge -- other statisticians would

(22) charge.

(23) Q    Well, who else charges $400 an hour

(24) that you consider to be in your field?

(25) A    I've read a number of depositions of

## Page 104

(1) doctors who are asked their rates for review and

(2) deposition and trial, and my sense is that what we're

(3) talking about is at highest average amongst them. I

(4) think I've seen more who charge more than less.

(5) Q    In the year 1999, how much income did

(6) you receive from consulting in medical/legal areas,

(7) depositions and trial testimony?

(8) A    Well, it all went through our company.

(9) Q    How much did you charge for that?

(10) A    How much did our company charge?

(11) Q    How much was paid for your services?

(12) A    I'm not sure. How much was paid for

(13) mine as opposed to Dr. Shavelle's?

(14) Q    Right.

(15) A    In which year? 1999?

(16) Q    Right.

(17) A    This is very rough, but I would say

(18) about 200,000.

(19) Q    And how much did you receive as a

(20) faculty member? That is, what does the university

(21) pay you?

(22) A    In 1999?

(23) Q    Yes.

(24) A    Something about 80,000.

(25) Q    Does your company have any source of

## Page 105

(1) income other than this legal stuff that you do?

(2) A    At the moment, virtually none.

(3) Q    How much did your company pay you in

(4) 1999?

(5) A    Less than 100,000, I think. I couldn't

(6) tell you exactly.

(7) Q    How much did your company pay Dr.

(8) Shavelle in 1999?

(9) A    Probably the same amount, roughly.

(10) Q    So even though you generated more

(11) income, you each received the same amount?

(12) A    I think we did because he's doing all

(13) kinds of other things.

(14) Q    But it just so happens that what he

(15) does doesn't generate income?

(16) A    Back then it didn't very much.

(17) Q    What was he doing then that he wasn't

(18) generating income for that he is generating income

(19) for now?

(20) A    Could you repeat that, please?

(21) Q    What did Dr. Shavelle do then in 1999

(22) that didn't generate income then that is generating

(23) income now?

(24) A    He wasn't doing anything then that he

(25) isn't doing now that I can think of, but he's now



EXHIBIT H
PAGE 3 of 3