Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT ANCHORAGE

GREGORY JOHNSON and KIMBERLY )
JOHNSON, individually and on )
behalf of their minor )
children, MADISON JOHNSON and )
ALEXANDER JOHNSON, )
)
        Plaintiffs, )
)
vs. )
)
UNITED STATES OF AMERICA, )
)
        Defendant. )
)

Case No. 3:06-CV-00120-RRB

VIDEOTAPED DEPOSITION OF DAVID DAVALOS, PA-C

Pages 1 - 183
Thursday, March 8, 2007
8:23 A.M.

Taken by Counsel for Plaintiffs
at
Norton Sound Regional Hospital
Nome, Alaska

1   at the medical problems that you've gotten into, and
2   they decide whether they want to be your collaborating
3   physician or not.
4         Based on that, the agreement is drawn up in a
5   State form that says what you can and can't do under
6   this physician's license, because you're essentially
7   working under their license.
8         And many times the physicians will call your
9   ex-supervisors or previous supervisors to really find
10  out, you know, what you're really like.  You say one
11  thing on paper, but this person, what is their real
12  true history.  And that's what most of them will do.
13        And so once they've established this
14  relationship, you essentially work in collaboration
15  with a physician.  Many times I'll call Dr. O'Neill up
16  on a patient, whether I'm having trouble with a
17  patient or the system is in the way or any of these
18  things, I'll call her up and I'll tell her what's
19  going on.  Or sometimes one can't know everything, so
20  you research out what you can and then you run it past
21  the collaborator just one last time on certain things.
22  So that you have -- a good collaborative is that you
23  communicate quite a bit.
24    Q   Do you know whether the collaborating M.D. is
25  obligated to review your records on any given

Page 118

1   reevaluate them over the three days.
2           His injury was serious enough that we were
3   worried about it on the first days, because we'd
4   normally say, well, in three days, let's recheck you.
5   But his showed some changes and he was in a lot of
6   pain, so we checked him more than we do a normal
7   person that, you know, flared up a back.
8           So there's even policies, recommendations for
9   disc injuries. A lot of physicians, back physicians,
10  that know that there's a disc injury, will have
11  people -- they don't rush in and do surgeries on an
12  extruded disc, they want it to calm down so they can
13  let the injury establish itself, then they decide what
14  they're going to do.
15          So when you first see an injury that you're
16  concerned, and you think it's enough that you need to
17  let their doc know, then you're concerned about it.
18      Q   You used the term "extruded" disc. Are there
19  other terms that mean the same thing that are used to
20  describe that?
21      A   Ruptured disc, some people will use a term
22  like bulging disc. It depends on who you're talking
23  to. You talk to a spine specialist, an extruded disc
24  means where the contents of the disc actually leave
25  the body itself and extrude out, outward or inward,

Page 119

1   but it leaves the capsule that it's in.
2       Q    And it was your assumption on 5/22 that
3   that's what you were dealing with; is that accurate?
4       A    Yes.
5            MS. LINDQUIST:  Can we go off record?
6            VIDEOGRAPHER:  Off record, 11:50.
7            (Proceedings recessed for lunch.)
8            VIDEOGRAPHER:  We're on record at 12:42.
9   BY MS. LONG:
10      Q    Mr. Davalos, I want to go back to the
11  physical evaluation that you described earlier.  And
12  you noted in your description of what you normally do
13  in a neurological evaluation in a situation with low
14  back pain such as Mr. Johnson's, that you do sensory
15  testing, including sharp -- and I forget the other
16  one.
17      A    Sharp and soft.
18      Q    Soft, okay.  Let me ask you if there's
19  anywhere in this record that identifies the results of
20  a sensory evaluation such as that on 5/22/04.
21      A    The results of it?
22      Q    Yes.
23      A    Well, your sensitivity to soft and sharp
24  touch, it's decreased.  The arrow down means decreased
25  sensitivity.  That's the result of that test.

Page 131

1           Do I have to go in today?
2           And I go, well -- and I gave him the options.
3   That they probably won't see you today. You can go in
4   through the ER, but he's going to see you tomorrow.
5   He asked that you come in through the ER tomorrow,
6   which will be day two.
7           And so essentially that's -- that was my
8   conversation. There probably was a lot more spoken,
9   but I don't remember.
10      Q   When you say day two, what are you referring
11  to?
12      A   Sunday.
13      Q   Day two of what? You used the term.
14      A   Day one is the 22nd, day two is the 23rd.
15      Q   And what do the day one and day two relate
16  to?
17      A   Day one is the first day I saw him.
18      Q   Not related to his injury, but just related
19  to the care that you provided; is that what I
20  understand?
21      A   Yes. It's only the days that I saw him.
22      Q   Now, do I also understand your testimony that
23  Ms. Katongan was with you at the 9:30 appointment?
24      A   Yes.
25      Q   I'm not sure it's an appointment when you go

Page 139

1   Q   Who did you speak with?
2   A   To the wife.
3   Q   And do you recall the substance of that
4   conversation?
5   A   I'm coming over to get him ready.
6   Q   Do you know what time that call was made?
7   A   No. I -- the exact time, I don't know.
8   Q   Did you take anyone with you to the Johnson's
9   house when you went over on the 23rd?
10  A   No, no. It was a preparatory. You go over
11  and see what they need, because you're going to have
12  to medicate them, and so you go by yourself.
13      And then later on, once they're feeling
14  better and you've assessed them and how they're going
15  to go, then you call in the people that you need.
16  They all are working all day, so they can't stand by
17  and wait. When you need them, then you call them and
18  they come over and do what you need, and then -- then,
19  you know, you can release them.
20  Q   Was it your medical opinion on 5/23/04, as a
21  result of your interactions on the 22nd and at that
22  visit on the 23rd, that Mr. Johnson needed care
23  outside of the village?
24  A   He needed care outside the village on the
25  22nd. And then on the 23rd it reinforced it. So yes.

```
                                                      Page 145
 1    more than a few.  But you have to explain to them why
 2    the back hurts and then the leg's burning.
 3        Q    And did you believe that Mr. and/or
 4    Mrs. Johnson was in that category of people who did
 5    not understand what was going on with the back?
 6        A    I don't remember.
 7        Q    Did you write all of this note at one time
 8    from 5/23?
 9        A    Yes.
10        Q    The examination that you did notes:  Deep
11    tendon reflections, 2 plus bilaterally at the knee?
12        A    Yes.
13        Q    And how did you do that evaluation?
14        A    You reach behind the leg, the popliteal
15    fascia, that's behind the kneecap on the back part of
16    your knee.  And you can use anything, like a
17    stethoscope to a reflex hammer, and you activate the
18    subpatellar tendon.  And you'll either get a response
19    in the upper leg, the quads, or you get the jerk of
20    the foot.
21        Q    And on that day what response did you get?
22        A    They were going down.  They were no longer 3
23    plus, they were 2 plus.  They were a measurable
24    decrease.
25        Q    And what did that mean to you?
```

Page 146

1    A    It was getting worse.
2    Q    And did you do DTRs of the ankle?
3    A    Yes, I did.  Whenever I do them, I usually do
4    them at the knees and behind the ankle.
5    Q    You didn't note any results from an ankle
6    DTR, correct?
7    A    No.  I put the pertinent positives in there.
8    Q    I need you to describe what you mean when you
9    say that you put the pertinent positives in there.
10   A    The item that you can measure is a pertinent
11   positive.  A pertinent negative is something you
12   expect but it's not there, so that's a pertinent
13   negative.
14   Q    So what does that mean the DTR was for the
15   ankle if you did it on 5/23?
16   A    It would have been normal.  I couldn't have
17   measured a change in it.
18   Q    Was a 3 plus of the ankle on 5/22 a normal
19   measurement?
20   A    The reference on 5/22 was primarily for the
21   knee.  And I didn't -- wouldn't have made reference to
22   the ankle.  Although I would have done the ankle, the
23   one that was pertinent was the one at the knee.
24   Q    And you indicate that it was decreasing or
25   diminishing between the 22nd and the 23rd?

Page 153

```
1      Q    Or occurred?
2      A    No.  No, in the sense that I don't remember,
3    you know.
4      Q    As a result of your interaction with
5    Mr. Johnson on the 23rd, did you take any action to
6    have him transferred to Anchorage?
7      A    To call in a medevac?
8      Q    Any action whatsoever.
9      A    No.
10     Q    Why not?
11     A    Because he said he wanted to wait another
12   day.  And despite what I told him, he wanted to wait
13   another day and see if he feels better.
14     Q    Well, what did you tell him?
15     A    I told him that he's not going to get any
16   better there, we can't do anything for him, he needs
17   to go.
18     Q    Did you tell him that he could get worse?
19     A    I don't recall if I told him he could get
20   worse.  I told him he's not going to get better and
21   he's going to -- it's not going to change, you know,
22   in the sense of getting better.
23     Q    Did you tell him that he could, if his
24   symptoms continued to progress, lose bowel and bladder
25   control?
```

Page 154

```
 1      A    No, I don't recall telling him that.  That's
 2   something we look for.
 3      Q    Do you recall telling him or did you tell him
 4   that he could lose his ability to walk forever if he
 5   waited?
 6      A    No, I did not.
 7      Q    Did you discuss medevac with Mr. Johnson or
 8   Mrs. Johnson on 5/23/04?
 9      A    No, I did not.
10      Q    After the appointment or visit that's marked
11   as 11 a.m., whether it happened shortly before or
12   shortly after that, did you see or talk to either of
13   the Johnsons on the 23rd?
14      A    After that?
15      Q    After that.
16      A    I don't recall, no.  Then the instructions
17   were that I'll come over and get you ready that day?
18   Well, when that ended, then:  I'll be back over
19   tomorrow and see how things are.
20           And essentially that was the agreement that I
21   remember.  And then when I came over the next day,
22   which was a Monday, he had significant neural
23   findings.
24      Q    Tell me what those significant neurological
25   findings were by your estimation?
```

Page 158

1   patient," and then they get on commercial and go in.
2   So I have that authority; I do not have the authority
3   to call in a medevac. And so then you have to be in
4   concert with someone else.
5       Q   And just so I'm clear: You didn't speak with
6   a physician on Sunday the 23rd about Mr. Johnson,
7   correct?
8       A   No, not that I recall.
9       Q   Where is Dr. Rabinowitz?
10      A   He's a locum tenen that comes in. And I
11  don't know if he's ever been back. He's here. He was
12  here in --
13      Q   In Nome?
14      A   -- in Nome covering. Dr. Scofield was his
15  backup. The doctor that I contacted in Anchorage
16  recommended that, you know, we send him in by medevac.
17  Well, that's -- you know, was it before I talked to
18  Dr. Rabinowitz, or was it after? I can't tell you. I
19  don't recall.
20      Q   Do you recall talking to Dr. Eule that day?
21      A   Yes.
22      Q   What do you recall of that conversation?
23      A   Just this. You know, you call up. A lot of
24  them, when you call them up, they say, Well, send them
25  in, they need to come in by medevac. And that's --