Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

---

GREGORY JOHNSON and KIMBERLY )
JOHNSON, individually and on )
behalf of their minor )
children, MADISON JOHNSON and )
ALEXANDER JOHNSON, )
)
       Plaintiffs, )
)
vs. )
)
UNITED STATES OF AMERICA, )
)
       Defendant. )
)

Case No. 3:06-CV-00120-RRB

---

VIDEOTAPED DEPOSITION OF DAVID POTASHNICK, PA

---

Pages 1 - 115
Monday, May 12, 2008
8:10 A.M.

Taken by Counsel for Plaintiffs
at
DILLON & FINDLEY, PC
Anchorage, Alaska

1    Q    In this particular case -- although it's
2    unclear a little bit from your report, and we'll talk
3    about it in a minute -- do you believe that as of
4    May 23rd that Mr. Davalos fell below the standard of
5    care as a physician assistant in his diagnosing or
6    treating of Mr. Johnson?
7    A    I'm sorry, May 23rd is?
8    Q    It's a Sunday.  The first day that he saw
9    Mr. Johnson was May 22nd, May 23rd is the second day.
10   Do you believe that he fell below the standard of care
11   of a physician [as spoken], trained and licensed and
12   certified as a physician's assistant in the state of
13   Alaska?
14   A    As of the second day, when he presented with
15   urinary signs and symptoms, I believe that he did fail
16   to act in the best interest of the patient.
17   Q    And do you believe that that's synonymous
18   with falling below the standard of care as well?
19   A    Yes, sir.
20   Q    Okay. Let me go -- and again, some of these
21   are a little repetitious, but I'm just trying to feel
22   in terms of, again, the community practitioner
23   manual -- and I'm looking at 3872, and this is for --
24   when it says Community Health Aide/Practitioner
25   Manual, I assume that that deals with CHAs and not

Page 49

1   specifically with PAs, or does the manual apply across
2   the board?
3       A   No, sir.
4       Q   So a PA has a different -- has different
5   requirements or different standards?
6       A   Well, again, the community health aide manual
7   basically is a cookbook, as I understand it, in the
8   state of Alaska to -- community health aides are
9   trained, and then this manual is supposed to sort of
10  guide their practice out in the villages.
11      Q   But in terms of the patient education format
12  that I just read, that would apply to physician
13  assistants as well, correct, in terms of what you
14  should tell a patient and the information that you
15  should provide to a patient; that applies to PAs as
16  well, correct?
17      A   I believe that all patients should be
18  apprised of what it is that you feel is wrong with
19  them, that you should apprise them of any treatment
20  you plan to -- for them, to give, and any possible --
21  if you believe that there may be other things that may
22  occur as a result of this, any possible things that
23  they need to watch out for, to either return or to
24  seek further attention.
25      Q   And on page 3872 -- it's actually page 282 of

Page 54

```
 1      Q   Well, or to -- if they couldn't make the
 2  diagnosis, to get consultation with an emergency room
 3  physician or an on-call physician at the health care
 4  facility that they work for or are responding to.
 5      A   Okay.  Was your question in the face of
 6  progressive symptoms?
 7      Q   Yes.
 8      A   In the face of progressive symptoms, yes,
 9  sir.
10      Q   All right.  I'm looking at the -- do you know
11  if there's any difference between the community health
12  aide low back exam and the low back exam that you
13  would administer as a trained physician's assistant?
14      A   I can't say specifically, because I don't
15  know what the health aide low back exam says.
16      Q   Okay.  Well, would you do -- when you were
17  doing lower extremity neurological exams, can you tell
18  me basically what you would do to conduct a lower
19  extremity neurological exam?
20      A   A strength exam, a sensory exam, and deep
21  tendon reflexes, generally.
22      Q   And do you do deep tendon reflexes at the
23  knee and the Achilles, or just at the knee or just at
24  the Achilles?
25      A   Typically both.
```

Page 63

1  A   I don't specifically recall.
2  Q   All right. Do you have any indication in
3  this case that Mr. Davalos performed a Babinski
4  examination on Mr. Johnson at any time?
5  A   I did not see an indication of that, sir.
6  Q   Were you trained at Hahnemann University to
7  document both positive and negative findings on your
8  chart?
9  A   Pertinent positive and pertinent negatives,
10 yes, sir.
11 Q   All right. And a Babinski, in the face of an
12 acute onset low back pain, conducting a lower
13 neurological exam, a Babinski exam would be a
14 pertinent positive or negative that you would respond,
15 correct? At least in my experience, I've seen,
16 always, positive for Babinski. Is that your
17 experience as well?
18 A   I'm not sure I understand. Are you saying
19 that if it was conducted, would it be a pertinent
20 positive or negative?
21 Q   Well, for most -- I'm trying to think if I've
22 ever seen a lower extremity neurological exam where a
23 Babinski was not performed. I mean, that's the
24 standard test that's performed, isn't it?
25 A   I've seen people with low back pain who did

Page 64

1  not have a Babinski performed.
2      Q    If a Babinski was performed, whether it was
3  positive or negative, it should be charted, though;
4  that is pertinent?
5      A    Yes, sir.
6      Q    All right. And the same thing for deep
7  tendon reflexes both knee and Achilles, those would be
8  pertinent negatives and positives, correct?
9      A    Yes, sir. Conducted, you would need to have
10 those, yes, sir.
11     Q    All right. So regardless if it's a positive
12 or negative, that's, in the face of a lower extremity
13 neurological exam, you would document -- you've been
14 trained to document that on a chart?
15     A    Yes, sir.
16     Q    And the same with sensory examinations, those
17 are -- positive and negatives, those are pertinent
18 findings that you've been trained to document on a
19 chart?
20     A    I would document the findings of the exam.
21 I'm not sure that it would be positive or negative,
22 but the findings of the exam.
23     Q    But you would document what those findings
24 were from a sensory exam?
25     A    Yes, sir.

1            VIDEOGRAPHER:  Off record, 9:26.
2            (Off the record.)
3            VIDEOGRAPHER:  We're on record, 9:35.
4    BY MR. BROWN:
5       Q    All right.  So the last question I asked, and
6    I think you agreed, that he did have bilateral lower
7    extremity motor weakness, correct?
8       A    Yes.  It indicates he had decreased strength
9    in dorsiflexion bilaterally.
10      Q    Is there -- was there any sensory exam
11   documented on the 22nd?
12      A    I do not see an indication of that.
13      Q    So if he had sensory deficits on the 22nd,
14   either -- well, again, that would be -- if you
15   performed a sensory exam, that would be a pertinent
16   finding that you would put, whether it was positive or
17   negative, correct?
18      A    Yes, sir.
19      Q    And in the face of these signs and symptoms,
20   a sensory exam would be within -- you should perform a
21   sensory exam, correct?
22      A    Yes, sir.
23      Q    He did subjectively complain, though, of
24   numbing in both legs.  Does that indicate a loss of or
25   a problem with sensation?

Page 74

1    A    Three-plus/four-plus?

2    Q    Uh-huh.

3    A    Again, I'm not quite sure how to interpret
4  it, because you either do or you do not have clonus,
5  and clonus being the differentiation between a
6  hyperreflexive and hyperreflexive with clonus. And I
7  see no indication anywhere, in the written or the
8  transcribed, of any clonus.

9    Q    Well, there's also no indication of any
10 sensory exam, correct?

11   A    That is correct.

12   Q    And do we know whether or not he did the deep
13 tendon reflexes, from his chart, at the knee or the
14 Achilles?

15   A    I don't believe that it's noted.

16   Q    And it's not noted and apparently he did not
17 perform a Babinski exam?

18   A    There's none noted.

19   Q    Would you agree that, based upon your
20 training, at least, at Hahnemann University as a
21 physician assistant, that this chart is deficient in
22 many ways, on the 22nd of May?

23   A    I would have to agree that there is
24 documentation lacking, yes, sir.

25   Q    But even with the documentation that's

Case 3:06-cv-00120-RRB   Document 60-8   Filed 07/01/2008   Page 9 of 12
JOHNSON, ET AL. v. USA                           DAVID POTASHNICK, PA
                                                         5/12/2008

Page 79

1  question.
2      A    Okay.  If you're asking me simply would the
3  fact that he was or was not out of bed have made a
4  difference in my original thoughts, I don't believe it
5  would have.
6      Q    All right.  So going to the chart on
7  May 22nd, as it exists, given his presenting signs and
8  symptoms and the unusual nature that you've testified
9  to, would this warrant advising the patient of red
10 flags or other progressive signs or symptoms that they
11 should be aware of and to -- let me stop there.
12     A    I would advise the patient of additional
13 things that I wanted them to watch for, in order to
14 have them contact me should any of those occur.
15     Q    And what would those things be?
16     A    If they suffered any bowel or bladder
17 dysfunction or any progression of their signs and
18 symptoms, if they were to get significantly worse.
19     Q    Do you have any indication from this chart
20 that Mr. Davalos provided that type of information to
21 the Johnsons?
22     A    I don't see any mention of that, no, sir.
23     Q    And were you trained at Hahnemann University
24 to document information provided to a patient, in
25 terms of reporting requirements or reporting

Page 87

1   again, because in the face of the three-plus DTRs,
2   that, in and of itself, would not.
3         You know, the decreased strength, again, you
4   know, if the patient were made more pain-free, I might
5   be more likely to believe the findings of that
6   examination also.
7         So I don't feel that it was unreasonable to
8   try and get Mr. Johnson pain-free on that first day,
9   with the plan of getting him out of there the
10  following morning, you know, based on the situation in
11  villages.
12    Q   But it was unreasonable not to tell him, in
13  the face of this unusual chart on May 22nd, what red
14  flags they should look for and whether they should
15  contact, make further contact, and what that meant in
16  the context of this presentation, correct?
17    A   I believe that if they were not apprised of
18  the potential things that could happen, that if things
19  to look for were not conveyed to them, that that would
20  be something that would not be what I would have done.
21    Q   That would be below the standard of care?
22    A   Yes, sir.
23    Q   And you're aware, from reading Mr. Davalos's
24  deposition, that not only is that not documented, he
25  acknowledged that he didn't warn the patient on May

Page 88

1    22nd of these red flag signs and symptoms?
2        A    I don't specifically recall that. Again I'm
3    sorry. I haven't memorized it, but I have no reason
4    to ...
5            MR. BROWN: Just a second. Do you have page
6    151 and 152 of his deposition? Do you have that,
7    Counsel?
8            MS. LINDQUIST: Yes.
9            THE WITNESS: Where are they numbered?
10   BY MR. BROWN:
11       Q    Do you have the deposition?
12       A    The Davalos deposition?
13       Q    Yeah. Do you have it paged, paginated?
14       A    No. I just have pages 1 through 183, and
15   it's not indicated what pages are which, unless this
16   number here --
17           MS. LINDQUIST: Yes, that's it.
18           THE WITNESS: -- 138, 139, interspersed with
19   the other numbers.
20           So it was 151? I'm sorry.
21   BY MR. BROWN:
22       Q    Yeah. At the bottom of page 151: "What did
23   you tell him?"
24           "I told him that he's not going to get any
25   better, we can't do anything for him, he needs to go."

Page 90

```
 1   that.
 2        Q    That's okay.  But again --
 3        A    It seems to bear out what you were saying,
 4   yes, sir.
 5        Q    And again, we know that on the evening of
 6   May 23rd that he did experience problems with stopping
 7   urination, correct?
 8        A    That was on?
 9        Q    May 23rd.  Excuse me, the evening of May
10   22nd.
11        A    Okay.  Yeah, my understanding is it happened
12   the evening or night, somewhere in that period of
13   time, late on the 22nd or early on the 23rd, that that
14   occurred.
15        Q    Let me just -- one final question.  Assuming
16   that his transcribed dictation -- and again, these
17   transcriptions that I showed you in Exhibit -- where
18   are those exhibits? -- Exhibit 1, these were
19   transcribed by Mr. Davalos after the fact.  But if it
20   was three-plus/four-plus bilateral, does that make
21   this even more of a problem for you, in terms of an
22   irregular examination?
23        A    And again, I'm not sure how one would be
24   three-plus/four-plus.  You either have clonus or you
25   do not have clonus, so it would either be three-plus
```